**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **CHERYL HALL FRAZIER,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **V.** | ) **CASE NO.:1:08-CV-221-MHT** |
| | ) |
| **ARGENT MORTGAGE** | ) |
| **COMPANY, LLC.,** | ) |
| | ) |
| **Defendant.** | ) |

**PLAINTIFF'S RESPONSE TO MOTION TO DISMISS**

**COMES NOW** Plaintiff and files the following response to the Defendant's motion to dismiss:

**INTRODUCTION AND SUMMARY**

This action arises from several violations of the federal Truth in Lending Act ("TILA") which occurred in connection with the Plaintiff's mortgage loan with Argent Mortgage Company, LLC (AMC). As a result of these failures, the cancellation periods never expired and plaintiff effectively cancelled her loan within the three year rescission period.

After rescission by the plaintiff, AMC failed to take the required action in recognition of the rescission. This is a new and further violation of TILA. A claim for this TILA violation is clearly stated in the Complaint. Furthermore, the claims

1

arising from these violations are not time-barred for at least three reasons. First, the statute of limitations for a TILA rescission claim is three years. Second, the claims herein have been tolled by several class actions making similar claims and in which Plaintiffs are putative class members. Finally, the claims are also the subject of an action by the attorneys general of 49 states and are therefore tolled by the provisions of 15 U.S.C. § 1635(f). The Motion to Dismiss is totally without merit and is due to be denied.

Finally, AMC states that the Plaintiff failed to rescind her loan prior to the foreclosing of the home on March 25, 2008. Plaintiff placed AMC on notice of her intention to rescind the loan by letter dated, March 17, 2008. This letter was mailed and faxed to the defendant and is attached to this response as **EXHIBIT "A"**. Plaintiff received a response to her rescission letter on March 25th 2008. See **EXHIBIT "B"**. Therefore, Defendant's argument that the Plaintiff failed to rescind the loan prior to the foreclosure is moot.

## **ARGUMENT**

### A.    **RESCISSION UNDER TILA**

#### 1.    **The Consumer's Right to Rescind**

TILA provides a consumer a three-day right to cancel certain types of real estate loan transactions. This right to cancel is set out in 15 U.S.C. §1635(a), which provides as follows:

Except as otherwise provided in this section, in the case of any consumer credit transaction (including opening or increasing the credit limit for an open end credit plan) in which a security interest, including any such interest arising by operation of law, is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, *the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission* forms required *under this section together with a statement containing the material disclosures required under this subchapter, whichever is later,* by notifying the creditor, in accordance with regulations of the Board, of his intention to do so. The creditor shall *clearly and conspicuously* disclose, in accordance with regulations of the Board, to any obligor in a transaction subject to this section the rights of the obligor under this section. *The creditor shall also provide, in accordance with regulations of the Board, appropriate forms for the obligor to exercise his right to rescind any transaction subject to this section.*

15 U.S.C. § 1635(a)(emphasis added).

As is plainly provided in this section, the three-day cancellation period begins upon the <u>later</u> of the following events: (1) the "consummation of the transaction;" (2) the "delivery of the information and rescission forms" required by that section; or (3) delivery of accurate "material disclosures" required by TILA. 15 U.S.C. § 1635(a). <u>Semar v. Platte Valley Fed. Sav. & Loan Ass'n.</u>, 791 F.2d 699, 702 (9th Cir. 1986); <u>Williamson v. Lafferty</u>, 698 F.2d 767, 769 (5th Cir. 1983); <u>Reynolds v. D & N Bank</u>, 792 F. Supp. 1035, 1038 (E.D. Mich. 1992).

**2.    The Required Notice of the Consumer's Right to Cancel and the Extended Right to Cancel.**

The Federal Reserve Board's regulations implementing TILA ("Reg. Z")

3

provide the rules governing the notice which must be given each borrower regarding the right to rescind. Those rules appear at 12 C.F.R. § 226.23(b) and state as follows:

(1) Notice of right to rescind. In a transaction subject to rescission, a creditor shall deliver ***two copies*** of the notice of the right to rescind to each consumer entitled to rescind (one copy to each if the notice is delivered by electronic communication as provided in § 226.36(b)). The notice shall be on a separate document that identifies the transaction and shall *clearly and conspicuously* disclose the following:

> (i)      The retention or acquisition of a security interest in the consumer's principal dwelling.

> (ii)      The consumer's right to rescind the transaction.

> (iii)      How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.

> (iv)      The effects of rescission, as described in paragraph (d) of this section.

> (v)      ***The date the rescission period expires.***

(2) Proper form of notice. To satisfy the disclosure requirements of paragraph (b)(1) of this section, the creditor shall provide the appropriate model form in Appendix H of this part or a substantially similar notice. 12 C.F.R. § 226.23(b)(emphasis added).

4

Failure to deliver the requisite form <u>or number of copies</u> of the notice of the right to cancel extends the period for rescission for up to *three years.* 15 U.S.C. § 1635(f); <u>Semar v. Platte Valley Fed. Sav. & Loan Ass'n.</u>, 791 F.2d 699, 702 (9th Cir. 1986); <u>Williamson v. Lafferty</u>, 698 F.2d 767, 769 (5th Cir. 1983); <u>Reynolds v. D & N Bank</u>, 792 F. Supp. 1035, 1038 (E.D. Mich. 1992)(emphasis added).

> Under the Truth in Lending Act, 82 Stat. 146, <u>15 U.S.C. § 1601</u> *et seq.,* when a loan made in a consumer credit transaction is secured by the borrower's principal dwelling, the borrower may rescind the loan agreement if the lender fails to deliver certain forms or to disclose important terms accurately. See <u>15 U.S.C. § 1635</u>. Under <u>§ 1635(f)</u> of the statute, this right of rescission "shall expire" in the usual case three years after the loan closes or upon the sale of the secured property, whichever date is earlier.

> <u>Beach v. Ocwen Federal Bank</u> 523 U.S. 410, 118 S.Ct. 1408

A consumer has up to three years to rescind her loan. See *Beach* supra. The Complaint alleges two separate sets of TILA violations: (1) violations arising from AMC's failure to take the actions required by Section 1635(b) after receipt of the notice of plaintiff's decision to cancel; and (2) violations arising from AMC's failure to give proper notice of plaintiffs' right to cancel and failure to properly disclose the finance charges imposed. The first set of violations occurred at the time of the closing of the plaintiff's loan and the second set occurred when AMC failed to rescind the plaintiff's loan.  A creditor's failure to comply with its obligations upon rescission is a separate violation of TILA, entitling the consumer

to damages provided under Section 1640(a). Williamson, 698 F.2d. at 768;
Egipciaco Ruiz v. R & G Financial Corporation, 313 F.Supp.2d at 50-51 (D.P.R.
2004); Mount v. LaSalle Bank Lake View, 886 F. Supp. at 651 (N.D. Ill. 1995).
These violations occurred after AMC responded to the notice of plaintiff's decision
to cancel the loans.  Plaintiff's notice was proper and the notice informed AMC of
the plaintiff's right to rescind her loan transaction. **(EXHIBIT "A")** AMC
responded to the plaintiff and rejected her right to rescind the loan. **(EXHIBIT
"B")** Therefore, the violation for failure to comply with Section 1635(b) occurred
after AMC's failure to comply with TILA. This Complaint was filed immediately
after AMC's denial to rescind the loans. The claim is not time barred. Id.

       The disclosure and notice violations occurred at the closing and prior to the
filing of this Complaint.  A claim for those violations is not time-barred for several
reasons.  First, as stated above the statute of limitations for rescission claims is
three years. Second, plaintiffs TILA claims are subject to equitable tolling. Ellis v.
General Motors Acceptance Corp., 160 F.3d 703 (11th Cir. 1998).[1] The second
reason claims, including those giving rise the right of rescission, are tolled is
because those claims are involved in at least one of several class action pending
against AMC. It is settled law that "commencement of a class action suspends the

---

[1] Plaintiffs acknowledge that under Beach the "right of rescission 'shall expire' in the usual case
three years after the loan closes or upon the sale of the secured property, whichever date is
earlier." (emphasis added)

applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." American Pipe & Construction Co. v. Utah, 414 U.S. 538, 554 (1974); Crown, Cork & Seal Co. v. Parker, 462 U.S. 345, 350 (1983). See also, Andrews v. Chevy Chase Bank, 243 F. R. D. 313 Ed. Wis., 2007. At least the following class actions[2] have been filed and are currently pending with class allegations of incomplete right-to-cancel notices:

> Knox et al., v Ameriquest et al., CV-05-240 U.S. District Court for the Northern District of California—San Francisco Division, filed on January 14th 2005[3];

> Williams et al., v. Ameriquest et al., CV-05-6189 U.S. District Court for the Southern District if New York, filed on July 1st 2005[4];

> In Re Ameriquest Mortgage Co., Mortgage Lending Practices Litigation MDL-1715, Lead Case 05-7090, U.S. District Court for the Northern District of Illinois, filed December 6th 2006[5].

---

[2] Both the Knox and Williams cases have been transferred to the MDL for coordinated proceedings.
[3] A copy of the original complaint in Knox is attached hereto as **EXHIBIT"C".**
[4] The original complaint in Williams is attached here to as **EXHIBIT "D".**
[5] This complaint is also attached hereto as **EXHIBIT "EG".**

Finally 15 U.S.C. 1635(f) states in pertinent part:

   (f) Time limit for exercise of right

   An obligor's right of rescission shall expire three years after the date
   of consummation of the transaction or upon the sale of the property,
   whichever occurs first, notwithstanding the fact that the information
   and forms required under this section or any other disclosures required
   under this part have not been delivered to the obligor, except that if
   (1) any agency empowered to enforce the provisions of this
   subchapter institutes a proceeding to enforce the provisions of this
   section within three years after the date of consummation of the
   transaction,
   (2) such agency finds a violation of this section, and
   (3) the obligor's right to rescind is based in whole or in part on any
   matter involved in such proceeding, then the obligor's right of
   rescission shall expire three years after the date of consummation of
   the transaction or upon the earlier sale of the property, or upon the
   expiration of one year following the conclusion of the proceeding, or
   any judicial review or period for judicial review thereof, whichever is
   later.

Filed herewith is the final order out of the Superior Court of California, Alameda
County. In this case 49 of the country's states and attorneys general, including
Alabama's, participated. (**EXHIBIT "F"**).   The order was entered in March 21st
2006      and      is      still      being      administered.      See
http://www.ameriquestmultistatesettlement.com.   By operation of § 1635(f)
AMC's customers would have "one year following the conclusion of the
proceeding, or any judicial review or period for judicial review thereof, whichever
is later." Therefore, the plaintiffs' claims are not time barred as AMC suggests.

Unfortunately, although AMC knows this, it has seen fit to file the instant motion to dismiss and brief anyway.

As stated above, an MDL is pending over these very issues in the United States District Court for the Northern District of Illinois, Eastern Division, In Re Ameriquest Mortgage Co. Mortgage Lending Practices Litigation, MDL No. 1715, Lead Case No. 05-CV-7097. In the MDL, the court recently entered an order granting injunctive relief, and described the litigation as follows:

> Plaintiffs allege that Ameriquest violated certain disclosure provisions of the Truth in Lending Act ("TILA") and its implementing regulations ("Regulation Z"). See 15 U.S.C. § 1635; 12 C.F.R. § 226.23. First, Ameriquest purportedly provided incomplete Notice of Right to Cancel forms ("NORTC") to borrowers. Specifically, Ameriquest delivered NORTCs that failed to identify the deadline upon which the borrower could rescind the transaction. Second, Plaintiffs claim that Ameriquest provided the wrong form to refinancing borrowers. Rather than using the H-9 form recommended in Regulation Z, Ameriquest gave borrowers an H-8 form, which allegedly is not approved for refinancing disclosures. Plaintiffs argue that these failures to comply with TILA constitute material violations entitling affected borrowers to cancel their mortgages for up to three years from the date of the transaction.1 See 15 U.S.C. § 1635(h); 12 C.F.R. § 226.23(a)(3). If a borrower rescinds a mortgage, he or she is no longer responsible for finance or other charges, and the lender loses its security interest. 15 U.S.C. § 1635(b). As such, proper and timely rescission of a mortgage derails a foreclosure action. Once a foreclosure sale is completed, however, a borrower can no longer cancel the mortgage. 15 U.S.C. § 1635(f). Thus, Plaintiffs contend, certain Ameriquest borrowers facing foreclosure may unknowingly be entitled to extended rescission rights but lose their defense if they fail to act prior to the impending property sale. Ameriquest apparently does not dispute Plaintiffs' description of TILA rights and remedies, or the fact that certain borrowers may lose their homes despite having

extended rescission rights. Nevertheless, it opposes the notice sought
by Plaintiffs on several other grounds, addressed in turn below.

(Memorandum Opinion and Order, Court Doc. 143)(emphasis added)

Doubtless, AMC would prefer to dispense with the strict procedural
formalities imposed by Congress in TILA as well as the applicable TILA
provisions of the Code of Federal Regulations.  However, the United States
Supreme Court noted, in Mourning v. Family Publ'ns Serv., 411 U.S. 356, 377
(U.S. 1973), that the Truth in Lending Act reflects a transition in congressional
policy from a philosophy of "Let the buyer beware" to one of "Let the seller
disclose."  By erecting a barrier between the seller and the prospective purchaser in
the form of hard facts, Congress expressly sought "to . . . avoid the uninformed use
of credit." 15 U. S. C. § 1601.  The Court cautioned that "[i]t is not a function of
the courts to speculate as to whether the statute is unwise or whether the evils
sought to be remedied could better have been regulated in some other manner."
Mourning v. Family Publ'ns Serv., 411 U.S. 356, 378 (U.S. 1973).  Similarly, the
Eleventh Circuit has noted, in Shroder v. Suburban Coastal Corp., 729 F.2d 1371,
1380 (11th Cir. 1984), the necessity of making TILA "disclosures in the proper
technical form and in the proper locations on the contract, as mandated by the
requirements of TILA and Regulation Z," and further noting that "[l]iability will
flow from even *minute* deviations from requirements of the statute and Regulation

10

Z.". (emphasis added)[6]

### 3. The Procedure for Rescission

A consumer may exercise her right to cancel a transaction by delivery of a written notification of the consumer's wish to cancel the transaction to the creditor's place of business. Notice is effective upon mailing. 12 C.F.R. § 226.23(a)(2). The lender's obligations upon rescission are set out in TILA Section 1635(b) which provides as follows:

> When an obligor exercises his right to rescind under subsection (a) of this section, he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void upon such a rescission. Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, down payment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction. If the creditor has delivered any property to the obligor, the obligor may retain possession of it. Upon the performance of the creditor's obligations under this section, the obligor shall tender the property to the creditor, except that if return of the property in kind would be impracticable or inequitable, the obligor shall tender its reasonable value. Tender shall be made at the location of the property or at the residence of the obligor, at the option of the obligor. If the creditor does not take possession of the property within 20 days after tender by the obligor, ownership of the property vests in the obligor

---

[6] In <u>Kitchen v. Ameriquest</u>, at 11-12, 2005 U.S. Dist. LEXIS 43937 (11th Cir. 2006), Ameriquest argued that the standard set in <u>Smith v. Chapman</u>, 614 F.2d 968 (5th Cir. 1980) is that strict compliance with TILA does not mean punctilious compliance if there is still a substantial, clear disclosure. Ameriquest stated this is the approach the court should take. However, the court in <u>Kitchen</u> disagreed and followed its reasoning under <u>Shroder</u> to find strict compliance with TILA.

> without obligation on his part to pay for it. The procedures prescribed
> by this subsection shall apply except when otherwise ordered by a
> court.

15 U.S.C. § 1635(b); see also 12 C.F.R. § 226.23(d).

As this statutory language makes clear, the creditor is obligated to take "necessary appropriate" actions to reflect the cancellation of the mortgage upon receipt of the notice of the election to cancel.  The creditor has 20 days in which to take those steps and it obligation to do so is not pre-conditioned on the borrower's duty to reasonably tender.  Ljepava v. M.L.S.C. Properties, Inc., 511 F.2d 935, 944 (9th Cir. 1975); Palmer v. Wilson, 502 F.2d 860, 861 (9th Cir. 1974); Gerasta v. Hibernia National Bank, 575 F.2d 580, 584 (5th Cir. 1978);  Fairbanks Capital Corp. v. Jenkins, 225 F.Supp.2d 910 (N.D.Ill. 2002); Brown v. National Permanent Federal Savings & Loan Ass'n, 683 F.2d 444, 447 (D.C.Cir.1982) (creditor must tender before the borrower's obligation arises);Mitchell v. Security Investment Corp. of Palm Beaches, 464 F.Supp. 650 (S.D.Fla.1979); Johnson v. Thomas, 342 Ill. App. 3d 382, 794 N.E.2d 919, 931, 276 Ill. Dec. 669 (Ill. App. Ct. 2003) (consumer not required to tender until after the creditor cancels the mortgage).

Section 1635(b) places upon the creditor requirements separate and distinct from those which arise upon the consummation of the loan.  The creditor's failure to comply with these requirements is a separate violation of TILA, entitling the consumer to damages provided under Section 1640(a). Williamson, 698 F.2d. at

768; <u>Mount</u>, 886 F. Supp. 650, 651.  The violation arising from a failure to properly respond to a notice of rescission takes place 20 days after the date of consumer's notice of the rescission.  <u>Ruiz</u>, 313 F.Supp.2d 48, 50-51.  For purposes of TILA's one-year statute of limitations, a claim for relief based on this violation is timely if filed within a year after the end of the 20-day period provided in Section 1635(b). <u>Id.</u>

In the present case, the plaintiff rescinded her loan within the allotted time under TILA prior to the foreclosure proceedings. Under 12 CFR 226.23(2), AMC has "20 calendar days" to "return any money" that "has been given to anyone" and to terminate the security interest.[7] The Seventh Circuit has summarized the borrower's remedies upon rescission as follows:

> Under TILA's civil liability provisions, a creditor that violates 15 U.S.C. § 1635 is liable for: "actual damage sustained" by the debtor, 15 U.S.C. § 1640(a)(1); "not less than $ 200 or greater than $ 2,000" in statutory damages, § 1640(a)(2)(A)(iii); and "the costs of the action, together with a reasonable attorney's fee," § 1640(a)(3). In addition, § 1635(b) itself provides that when a debtor rescinds she is "not liable for any finance or other charge"; "any security interest . . . becomes void"; and "[w]ithin 20 days after receipt of a notice of

---

[7] 12 CFR 226.23 provides:  "(d) Effects of rescission. (1) When a consumer rescinds a transaction, the security interest giving rise to the right of rescission becomes void and the consumer shall not be liable for any amount, including any finance charge.

(2) Within 20 calendar days after receipt of a notice of rescission, the creditor shall return any money or property that has been given to anyone in connection with the transaction and shall take any action necessary to reflect the termination of the security interest."

rescission," the creditor must "return to the [borrower] any money or property given as earnest money, down payment, or otherwise."

Handy v. Anchor Mortg. Corp., 464 F.3d 760, 765 (7th Cir. 2006).

In McIntosh v. Irwin Union Bank & Trust Co., 215 F.R.D. 26, 30 (D. Mass. 2003) the court held that when a consumer had an extended right to rescind because of a TILA violation, the statute of limitations for all the damages they seek, including statutory damages, extends to three years. Id. See, also, Mount v. LaSalle Bank Lake View, 886 F. Supp. 650, 651 (N.D. Ill. 1995); Elliott v. ITT Corp., 764 F. Supp. 102, 106 (N.D. Ill. 1991); Malfa v. Household Bank, F.S.B., 825 F. Supp. 1018, 1020 (S.D. Fla. 1993)); Washington v. Ameriquest Mortg. Co., 2006 U.S. Dist. LEXIS 50804, 26-27 (D. Ill. 2006).

Finally, AMC argues that because the security interest was already terminated on the plaintiffs' loan prior to rescission, this somehow voids their rescission rights. This is simply not supported by the majority of the courts. The main case AMC cites, King vs. California, 784, F.2d 910 (9th Cir. 1986) has been rejected by the DC and Sixth Circuits with it simplistic analysis that states there is nothing to rescind. In Duren v. First Gov't Mortgage and Investors Corp., 2000 U.S. App. LEXIS 15469 (D.C. Cir. June 7, 2000), the Court disagreed with the defendant's contention that the refinancing of the plaintiff's loan rendered TILA's statutory rescission remedy unavailable, "notwithstanding the Ninth Circuit's terse

suggestion to the contrary in King…"  Additionally, in <u>Barrett v. JP Morgan Chase Bank, 445 F.3d 874, 879</u> (6th Cir. 2006), the Court failed to follow the <u>King</u> decision in finding that mortgagors did not extinguish their right to rescind loan transactions when they refinanced them.[8]  The <u>King</u> court overlooked the fact that TIL rescission does not only cancel the security interest in the property, it also cancels *any* liability for the consumer to pay finance and other charges, including accrued interest, points, broker fees and closing costs.  This amounts to thousands of dollars in fees and costs that are due back to the plaintiff.  Therefore, AMC must return those charges to the consumer, or credit their account.  <u>Pulphus v. Sullivan,</u> 2003 WL 1964333 at 17 (N.D. Ill. Apr 28, 2003); <u>McIntosh v. Irwin Union Bank & Trust Co.,</u> 215 F.R.D. 26 (D. Mass. 2003); <u>Barrett,</u> 445 F.3d at 874.  Finally, a number of bankruptcy court decisions have permitted refinanced loans to be rescinded, as long as the loans fell within the three year statutory period, as does the plaintiffs.  <u>McKenna v. First Horizon Home Loan Corp.,</u> 429 F. Supp. 2d 291 (D. Mass. 2006); <u>Payton v. New Century Mortgage Corp.,</u> 2003 WL 22349118 (N.D. Ill. Oct 14, 2003); <u>Nichols v. Mid-Penn Consumer Discount,</u> 1989 WL 46682 (E.D. Pa. Apr. 28 1989), *aff'd without opinion,* 893 F.2d 1331 (3rd Cir. 1989); <u>Mayfield v. Vanguard Savings & Loan Ass'n,</u> 710 F. Supp. 143 (E.D. Pa.

---

[8] The Court in its discussion cites numerous court opinions that specifically failed to follow <u>King</u> simply because the analysis was virtually nonexistent.

1989); <u>Abele v. Mid-Penn Consumer Discount</u>, 77 B.R. 460, 467 (E.D. Pa. 1987), *aff'd mem*., 845 F.2d 1009 (3rd Cir. 1988); <u>In re Steinbrecher</u>, 110 B.R. 155 (Bankr. E.D. Pa. 1990); <u>In re Milbourne</u>, 108 B.R. 522 (Bankr. E.D. Pa. 1989); <u>Wiggins v. Avco Fin. Servs.</u>, 62 F. Supp. 2d 90 (D.D.C. 1999); <u>In re Tucker</u>, 74 B.R. 923 (Bankr. E.D. Pa. 1987); <u>Pac. Shore Funding v. Lozo</u>, 42 Cal. Rptr. 3d 283, 291 (Cal. Ct. App. 2006).

## **CONCLUSION**

The Complaint clearly defines the legal requirements that plaintiffs claims apply to their loans and the acts and omissions made by AMC which plaintiffs allege violates those requirements.    Plaintiff's allegations easily meet the notice pleading requirements applicable to these claims and AMC has been provided more than "fair notice" of the nature of the claims and the supporting facts.  See <u>Lombard's, Inc. v. Prince Mfg., Inc.</u>, 753 F.2d 974, 975 (11th Cir. 1985)(Under notice pleading, plaintiff need only give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests).[9]

The foregoing demonstrates that AMC's motion to dismiss and/or motion for summary judgment is due to be denied based on both statutory law and case

---

[9]The tone and substance of Defendant's brief seem to presume that some heightened standard of pleading applies to Plaintiff's claims.  However, no citation or argument is given to support such a position.  Certainly, these claims do not fall within the category of claims subject to the heightened standard set out in Rule 9(b) of the Federal Civil Rules of Procedure.  That said, plaintiff stands ready to supply any further detailed pleading which this Court deems necessary.

law.

      Respectfully submitted May 16th 2008.

<div align="right">

s/ James D. Patterson
James D. Patterson (PATTJ6485)
Earl P. Underwood, Jr. (UNDEE6591)
Law Offices of Earl P. Underwood, Jr.
Post Office Box 969
Fairhope, AL 36533-0969
251-990-5558 (voice)
251-990-0626 (fax)
jpatterson@alalaw.com
epunderwood@alalaw.com

</div>

## **CERTIFICATE OF SERVICE**

      I hereby certify that on May 16th 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:


Stephen J. Bumgarner
Burr & Forman LLP
3400 Wachovia Tower
420 North 20th St.
Birmingham AL 35203

<div align="center">

/s/ James D. Patterson
James D. Patterson

</div>

The Law Offices of

# Earl P. Underwood, Jr.

21 South Section Street
Post Office Box 969
Fairhope, Alabama 36533-0969
(251) 990-5558

Earl P. Underwood, Jr.
James D. Patterson

March 17, 2008

VIA Priority Mail

Argent Mortgage Company, LLC
ATTN: Post Close Dept.
3 Park Place, 19th FL
Irvine, CA 92614

Argent Mortgage Company, LLC
44 S Broadway 16th FL
White Plains, NY 92868

AMC Mortgage Services, Inc.
505 City Parkway W Ste 100
Orange, CA 92868

Citi Residential Lending, Inc.
Customer Care
P.O. Box 11000
Santa Ana, CA 92711-1000

> RE:   **Notice of Cancellation**
> **Loan Number: 0086107315**
> **Closing Date: September 13, 2005**
> **Borrower Name: Cheryl Hall**
> **Property Address: 105 TV Road, Dothan, AL 36301**

Dear Sirs:

Cheryl Hall has authorized and instructed me to provide notice that she is hereby exercising her extended right to rescind the above referenced mortgage loan transaction pursuant to the Federal Truth in Lending Act, 15 U.S.C. §§ 1635 and 1640 (TILA), Regulation Z § 226.23.

Ms. Hall's rescission voids the security interest held by Argent Mortgage Company, LLC., and is effective immediately regardless of your response to this notice. In addition, the promissory note is also voided since it is part of the transaction and Ms. Hall has no obligation to pay any finance or other charge in connection with this transaction as these charges are cancelled by operation of law.

Pursuant to the Regulation, you have twenty days after receipt of this notice of rescission to return to Ms. Hall all monies paid. Should Argent Mortgage Company, LLC. ignore this rescission notice, it will become liable to Ms. Hall for actual and statutory damages pursuant to 15 U.S. C. § 1640(a).

Ms. Hall retained me to audit the loan and to advise her as to whether there were any breaches to contract or violations of state and federal laws. My audit reveled that Ms.

Post Office Box 969
21 South Section Street
Fairhope, Alabama 36533-0969
Voice: (251) 990-5558
Fax: (251) 990-0626

World Wide Web Address:
http://www.alalaw.com
E-mail address:
epunderwood@alalaw.com

Hall Notice of Cancellation
March 17, 2008
Page 2 of 2

Hall has an extended right to rescind this transaction due to the fact that her finance charge was understated.

      Before any good faith negotiations can begin you must fulfill your statutory obligations by canceling the security interest and retuning all consideration paid by Ms. Hall within 20 days of receipt of this letter. Failing that, you will be responsible for actual and statutory damages pursuant to 15 U.S.C. § 1640(a).

Sincerely,

Earl P. Underwood, Jr.

EPUjr/dcl

Cc: Colleen McCullough

Post Office Box 969
21 South Section Street
Fairhope, Alabama 36533-0969
Voice: (251) 990-5558
Fax: (251) 990-0626

World Wide Web Address:
http://www.alalaw.com
E-mail address:
epunderwood@alalaw.com

The Law Offices of

# Earl P. Underwood, Jr.

21 South Section Street
Post Office Box 969
Fairhope, Alabama 36533-0969
(251) 990-5558

Earl P. Underwood, Jr.
James D. Patterson

### DATE:03/17/08

### VIA FACSIMILE TO 205-930-5101

## TO:      Colleen McCullough

## COMPANY:   Sirote & Permutt

## Fax Number:    205-930-5101

## FROM: Earl P. Underwood, Jr.

RE:   Cheryl Hall Foreclosure

TOTAL PAGES INCLUDING COVER PAGE :❸ 3

NOTICE:  UNLESS OTHERWISE INDICATED OR OBVIOUS FROM THE NATURE OF THE TRANSMITTAL, THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE IS ATTORNEY PRIVILEGED AND CONFIDENTIAL INFORMATION INTENDED FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED, IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR OR ARE NOT SURE WHETHER IT IS PRIVILEGED, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE, AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA U.S. POSTAL SERVICE AT OUR EXPENSE.

21 South Section Street
Post Office Box 969
Fairhope Alabama 36533-0969
Voice: (251) 990-5558
Fax: (251) 990-0626

World Wide Web Address:
http://www.alalaw.com
E-mail address:
epunderwood@alalaw.com
jpatterson@alalaw.com

## TRANSACTION REPORT
MAR/18/2008/TUE 01:47 AM

FAX(TX)

| # | DATE | START T. | RECEIVER | COM.TIME | PAGE | TYPE/NOTE | | FILE |
|---|------|----------|----------|----------|------|-----------|---|------|
| 001 | MAR/18 | 01:46AM | 12059305101 | 0:01:21 | 3 | OK | ECM | 1575 |

The Law Offices of
# Earl P. Underwood, Jr.

21 South Section Street
Post Office Box 969
Fairhope, Alabama 36533-0969
(251) 990-5558

Earl P. Underwood, Jr.
James D. Patterson

### DATE:03/17/08

### VIA FACSIMILE TO 205-930-5101

**TO:**    **Colleen McCullough**

**COMPANY:**   **Sirote & Permutt**

**Fax Number:**   **205-930-5101**

**FROM: Earl P. Underwood, Jr.**

**RE:**   **Cheryl Hall Foreclosure**

**TOTAL PAGES INCLUDING COVER PAGE :❶ 3**

NOTICE: UNLESS OTHERWISE INDICATED OR OBVIOUS FROM THE NATURE OF
THE TRANSMITTAL, THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE
IS ATTORNEY PRIVILEGED AND CONFIDENTIAL INFORMATION INTENDED FOR
THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS
MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT
ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS
STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN
ERROR OR ARE NOT SURE WHETHER IT IS PRIVILEGED, PLEASE IMMEDIATELY
NOTIFY US BY TELEPHONE, AND RETURN THE ORIGINAL MESSAGE TO US AT THE
ABOVE ADDRESS VIA U.S. POSTAL SERVICE AT OUR EXPENSE.

**P**

$4.60
US POSTAGE  PRIORITY MAIL

062S0005136598
FROM 36532



stamps.com
03/17/2008

## USPS PRIORITY MAIL®

Law Offices of Earl P. Underwood, Jr.
Post Office Box 969
Fairhope, AL 36533-0969

**SHIP TO:**  Argent Mortgage Company, LLC
3 Park Plz
Irvine CA 92614-8562

**ZIP - e/ USPS DELIVERY CONFIRM**



**420 92614 9101 0105 2129 7829 8818 68**

Electronic Rate Approved #010521297

 **$4.60**
US POSTAGE   PRIORITY MAIL

062S0005136598
FROM 36532



 stamps.com
03/17/2008

## USPS PRIORITY MAIL®

Law Offices of Earl P. Underwood, Jr.
Post Office Box 969
Fairhope, AL 36533-0969

**SHIP TO:** AMC Mortgage Services, Inc.
505 City Pkwy W Ste 100
Orange CA 92868-2927

**ZIP - e/ USPS DELIVERY CONFIRM**



**420 92868 9101 0105 2129 7829 3144 89**

Electronic Rate Approved #010521297



**$4.60**
US POSTAGE  PRIORITY MAIL

062S0005136598
FROM 36532

stamps.com
03/17/2008

# USPS PRIORITY MAIL®

EARL UNDERWOOD
PO BOX 969
FAIRHOPE, AL 36533

SHIP
TO:    Citi Residential Lending, Inc.
       Customer Care
       PO Box 11000
       Santa Ana CA 92711-1000

ZIP - e/ USPS DELIVERY CONFIRM



**420 92711 9101 0105 2129 7829 3170 84**

Electronic Rate Approved #010521297



**P** $4.60
US POSTAGE  PRIORITY MAIL

062S0005136598
FROM 36532



stamps.com
03/17/2008

# USPS PRIORITY MAIL®

Law Offices of Earl P. Underwood, Jr.
Post Office Box 969
Fairhope, AL 36533-0969

SHIP TO: Argent Mortgage Company, LLC
44 S Broadway FL 16
White Plains NY 10601-4411

**ZIP - e/ USPS DELIVERY CONFIRM**



**420 10601 9101 0105 2129 7829 3437 48**

Electronic Rate Approved #010521297

1100 Town & Country Road     Tel 1 714 347 4700
Orange, CA 92868             Toll Free 1 888 350 3555

Citi Residential Lending

# citi

March 25, 2008

*Via Federal Express*

The Law Offices of Earl P. Underwood Jr.
Earl P. Underwood Jr.
21 South Section Street
Fairhope, AL 36533

| Re: | Borrowers: | Cheryl Hall |
| --- | --- | --- |
| | Loan Number: | 0086107315 |
| | Property Address: | 105 TV Road |
| | | Dothan, AL 36301 |

Dear Mr. Robertson:

This letter is in response to your correspondence dated March 17, 2008 which purports to rescind the loan referenced above.

Please note that the loan file was acquired by Citi Residential Lending (CRL) through a servicing transfer on October 1, 2007 from the prior servicer. Our understanding of the practice of the originator is that at closing, the borrower was provided a full copy set of unsigned documents in addition to an executed set of the required documents to consummate a loan closing.

Our review of our copy of the file indicates that all material disclosures were provided to your client and that she executed the Lender's copy of the Notice of Right to Cancel to acknowledge their receipt of two (2) complete copies of the document. Accordingly, we respectfully deny your client's rescission request.

We trust that this responds to your concerns.

Sincerely,

Cheryl Stackhouse
Legal Analyst

cc:     Donna Plett (i/o)

1  EMMETT C. STANTON (CSB No. 83930)
   AARON MYERS (CSB No. 200145)
2  FENWICK & WEST LLP
   801 California Street
3  Mountain View, CA 94041
   Telephone: (650) 988-8500
4  Facsimile: (650) 938-5200
   estanton@fenwick.com
5  amyers@fenwick.com

6  BRYAN A. KOHM (CSB No. 233276)
   FENWICK & WEST LLP
7  275 Battery Street, 16th Floor
   San Francisco, CA 94111
8  Telephone: (415) 875-2300
   Facsimile: (415) 281-1350
9  bkohm@fenwick.com

10 SHIRLEY HOCHHAUSEN (CSB No. 145619)
   COMMUNITY LEGAL SERVICES IN EAST PALO ALTO
11 2117-B University Avenue
   East Palo Alto, CA 94303
12 Telephone: (650) 326-6440
   Facsimile: (650) 326-9722
13 s_hochhausen@hotmail.com

14 Attorneys for Plaintiffs NONA KNOX, ALBERT KNOX, MARIA
   TORRES, HELADIO ARELLANES AND MARIA ARELLANES

15

16            UNITED STATES DISTRICT COURT

17    NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

18 NONA KNOX, ALBERT KNOX, MARIA        | Case No.
   TORRES, HELADIO ARELLANES AND        |
19 MARIA ARELLANES on behalf of         | **CLASS ACTION**
   themselves and those similarly situated, |
20                                       | **COMPLAINT FOR VIOLATIONS OF THE
                                         | TRUTH IN LENDING ACT (15 U.S.C. § 1601
21         Plaintiffs,                    | *ET SEQ.*); THE REAL ESTATE
                                         | SETTLEMENT AND PROCEDURES ACT
22     v.                                | (12 U.S.C. § 2601 *ET SEQ.*); THE FAIR
                                         | HOUSING ACT (42 U.S.C. § 3601 *ET SEQ.*);
23 AMERIQUEST MORTGAGE                   | THE EQUAL CREDIT OPPORTUNITY ACT
   COMPANY, a Delaware corporation,      | (15 U.S.C. § 1691 *ET SEQ.*); THE UNRUH
24 ARGENT MORTGAGE COMPANY,             | ACT (Cal. Civ. Code § 51); CALIFORNIA
   LLC, a Delaware Limited Liability     | BUSINESS & PROFESSIONS CODE § 17200
25 Company, AND DOES 1-100, inclusive,  | *ET SEQ.*; CALIFORNIA BUSINESS AND
                                         | PROFESSIONS CODE § 17500 *ET SEQ.*;
26         Defendants.                    | THE CONSUMERS LEGAL REMEDIES
                                         | ACT (Cal. Civ. Code § 1750 *ET SEQ.*);
27                                       | UNJUST ENRICHMENT; DECLATORY
                                         | RELIEF; AND INJUNCTIVE RELIEF**
28                                       |
                                         | **DEMAND FOR JURY TRIAL**

COMPLAINT

FILED
JAN 14 2005
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

C 05 00240

EDL

1    Plaintiffs Nona Knox, Albert Knox, Maria Torres, Heladio Arellanes and Maria Arellanes

2    (collectively "Plaintiffs") hereby allege for their Complaint against Ameriquest Mortgage

3    Company ("Ameriquest"), Argent Mortgage Company ("Argent") and Does 1 through 100,

4    inclusive (collectively "Defendants"), as follows:

5                              **INTRODUCTION**

6        1.    Defendants were and are engaged in unfair, unlawful and deceptive business

7    practices in soliciting, inducing and closing residential loan transactions in the State of California

8    and nationwide.

9        2.    During loan transactions, Defendants fail to provide required disclosures,

10   including the statutorily mandated Notice of Right to Cancel, and, without the applicants'

11   knowledge or consent, falsify income stated on loan applications so that borrowers qualify for

12   larger loans than they can afford.

13       3.    Through predatory lending practices, Defendants wrongfully induce borrowers to

14   take residential mortgages that saddle borrowers with principal amounts Defendants know or

15   should know the borrowers' income cannot support, and then charge the borrowers expensive

16   origination fees and expenses.

17       4.    Defendants engage in a pattern of discriminatory conduct—targeting borrowers on

18   the basis of race, national origin, age and gender—and provide those borrowers less favorable

19   terms and conditions in loan contracts than would be provided but for the borrowers' race,

20   national origin, age and/or gender.

21       5.    Defendants engage in a "bait and switch" scheme:  Defendants represent to

22   borrowers that their loans will have certain terms and conditions, then induce borrowers to sign

23   mortgage contracts consisting of significantly less favorable terms and conditions, while at the

24   same time misleading the borrowers about those terms and conditions.

25                              **PARTIES**

26       6.    Plaintiffs Nona and Albert Knox ("Mr. and Mrs. Knox") were at all relevant times

27   residents of East Palo Alto, California.  Mrs. Knox is a resident of East Palo Alto, California,

28   African-American and a senior citizen.  Mr. Knox was a resident of East Palo Alto, California,

COMPLAINT

1

1   African-American and a senior citizen. Mr. Knox is deceased. His widow, Mrs. Knox, maintains

2   this action on behalf of his estate.

3       7.      Plaintiff Maria Torres ("Mrs. Torres") is and at all relevant times was a resident of

4   East Palo Alto, California. Mrs. Torres is Hispanic and her native language is Spanish. Mrs.

5   Torres speaks very little English and is illiterate in English.

6       8.      Plaintiffs Heladio Arellanes and Maria Arellanes ("Mr. and Mrs. Arellanes") are

7   and at all relevant times were residents of Richmond, California. Mr. and Mrs. Arellanes are

8   Hispanic and their native language is Spanish. Mr. and Mrs. Arellanes speak very little English

9   and are illiterate in English.

10      9.      On behalf of themselves and all persons similarly situated, Plaintiffs bring this

11  class action against Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure.

12      10.     Defendant Ameriquest is a corporation organized under the laws of the State of

13  Delaware with its principal place of business in Orange, California. Ameriquest is a wholly

14  owned subsidiary of Ameriquest Capital Corporation.

15      11.     Defendant Argent is a Limited Liability Company organized under the laws of the

16  State of Delaware with its principal place of business in Orange, California. Argent is a wholly

17  owned subsidiary of Ameriquest Capital Corporation.

18      12.     Defendants Does 1 through 100, inclusive, are sued under fictitious names because

19  their true names and capacities are unknown to Plaintiffs, who will further amend this Complaint

20  when their true names and capacities are learned. Plaintiffs are informed and believe, and on that

21  basis allege, that each of the fictitiously-named Defendants is responsible in some manner for the

22  occurrences alleged herein, and that Plaintiffs' damages were caused by those Defendants.

23                              **JURISDICTION AND VENUE**

24      13.     This Court has personal jurisdiction over the Defendants named herein because a

25  substantial portion of the wrongdoing alleged in this Complaint took place in the Northern

26  District of California, Defendants' principal place of business is in California, and Defendants are

27  authorized to and regularly do business in the Northern District of California, including San

28  Mateo County.

COMPLAINT

2

14.     This is an action for violations of 15 U.S.C. § 1601 *et seq.* (Truth in Lending Act, hereinafter "TILA"), 12 U.S.C. § 2601 *et seq.* (Real Estate Settlement Procedures Act, hereinafter "RESPA"), 42 U.S.C. § 3601 *et seq.* (Fair Housing Act), 15 U.S.C. § 1691 *et seq.* (Equal Credit Opportunity Act), and related state laws. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1367 (supplemental jurisdiction).

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the events and omissions giving rise to this Complaint occurred within the Northern District of California. The loan contracts between Plaintiffs and Defendants were made and to be performed, and the obligations arose, in the Northern District of California.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

16.     This lawsuit is brought on behalf of a class consisting of all persons, wherever located, who entered into loan or line of credit transactions with any named Defendant or their predecessors, directly or indirectly, where such transaction involved any of the wrongful conduct described herein ("Class" or "Class Members"). Excluded from the Class are Defendants, their parents, subsidiaries and affiliates, officers and directors, or any entity in which Defendants have a controlling interest, and the legal representatives, successors, or assigns of any such excluded persons.

17.     Class Members are so numerous that joinder of all Class Members is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, such information can be ascertained through appropriate discovery from records maintained by Defendants and their agents. Plaintiffs are informed and believe that the number of potential Class Members is in the hundreds or thousands.

18.     Plaintiffs' claims are typical of the claims of Class Members, as Plaintiffs and all other Class Members suffered harm arising out of Defendants' wrongful conduct as alleged herein.

19.     Defendants Ameriquest and Argent, though separate entities, are both wholly owned subsidiaries of Ameriquest Capital Corporation and are engaging in nearly identical wrongful conduct.

COMPLAINT

1    20.    Plaintiffs will fairly and adequately represent and protect the interests of the Class,

2    and have retained counsel competent and experienced in class action and complex civil litigation.

3    21.    Common questions of law and fact exist as to all Class Members and predominate

4    over any questions solely affecting individual Class Members.  Among the questions of law and

5    fact common to the Class are:

6            a.    Whether Defendants or their agents engaged in a pattern of failing to

7    provide required TILA disclosures clearly and conspicuously, in writing and in a form that the

8    plaintiffs could keep;

9            b.    Whether Defendants or their agents engaged in a pattern of falsifying

10    income without applicants' knowledge or consent;

11           c.    Whether Defendants or their agents have and are engaged in a "bait and

12    switch" scheme whereby borrowers are promised a set of loan terms only to learn after entering

13    the transaction that they have received a different and far less beneficial set of loan terms;

14           d.    Whether Defendants' documents, statements, contracts, advertisements and

15    practices relating to the transactions between Class Members and Defendants were unfair,

16    deceptive, untrue, misleading or omitted material facts and disclosures;

17           e.    Whether Defendants discriminated against Class Members on the basis of

18    race, national origin, age and/or gender;

19           f.    Whether Defendants engaged in unfair and unlawful business practices;

20           g.    Whether the acts of Defendants alleged herein violated other applicable

21    laws;

22           h.    Whether injunctive relief prohibiting Defendants' unfair and unlawful

23    business practices should be issued;

24           i.    Whether declaratory relief giving Class Members the right to rescind their

25    mortgage loans should be issued; and

26           j.    Whether Plaintiffs and the Class have sustained damages and, if so, the

27    proper measure of damages.

28

COMPLAINT

4

 

22.     A class action is the appropriate form of action for the following reasons:

        a.      It is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class Members is impracticable;

        b.      Common questions of law and fact of the Class predominate over any questions that apply only to individual Class Members;

        c.      Relief is sought to enjoin Defendants from engaging in the wrongful conduct, as alleged herein, and for declaratory relief providing all Class Members the right to rescind any loan contract with any Defendant; and

        d.      Prosecution of individual actions may result in inconsistent judgments.

## THE NATURE OF SUBPRIME LENDING

23.     Subprime lending is the business of making loans to persons with low income or credit deficiencies. Subprime lending generally involves residential loans or equity lines of credit based upon equity in a residential property.

24.     Subprime borrowers generally are charged up-front fees of 3% to 4% and interest rates of 10% to 12%. By contrast, conventional borrowers with strong credit generally pay 1% or less in fees and obtain interest rates of approximately 7%.

25.     Borrowers with good credit usually earn an "A" credit rating, which qualifies them for the best loans on the most favorable terms. However, as competition for "A" rated borrowers has increased, profit margins for "A" lending has diminished. As a consequence, more "A" lenders began pursuing the subprime market to compensate for these lower profits. Subprime borrowers are often referred to as "B" or "C" or "non-conforming" borrowers.

26.     The greatest factor in the growth of the subprime market is the ever-increasing prevalence of debt. To the extent that lenders pursue subprime loans and put borrowers into high-cost loans they cannot afford, subprime lending may be riskier for the lender than most conventional lending. However, the potential payoffs to the lender more than make up for the risk, as the lender can profit handsomely from large up-front loan origination fees and hefty interest rates.

COMPLAINT

5

## PREDATORY LENDING PRACTICES DECEITFULLY AND
## UNFAIRLY TAKE ADVANTAGE OF CONSUMERS

27.    Predatory subprime lenders "flip" loans in order to artificially generate closing fees. By this practice, lenders encourage unnecessary and financially detrimental refinancing, as each time a loan is refinanced the borrower is again charged closing costs, which typically are rolled into the loan balance to be financed.

28.    Predatory subprime lenders knowingly make loans with high loan-to-value ratios. This skims the equity from the property, places the borrower in jeopardy of default, and puts the borrower in the position of spending years paying off additional loan balances without developing any equity.

29.    While some borrowers in the subprime market are genuine credit risks, many low-income, elderly and minority borrowers have been steered into subprime loans by lenders who are reluctant or refuse to offer them prime loans. Predatory lenders target such consumers for subprime loans. In this fashion, predatory lenders obtain more money by charging higher rates and fees than necessary or appropriate simply by inducing the borrowers to enter into a subprime rather than prime loan transaction. Studies by Freddie Mac and Standard & Poor's have found that 20% to 30% of borrowers who receive subprime mortgages could have qualified for traditional mortgages at the lower rates offered by banks to prime borrowers. Thus, subprime lenders make loans and offer equity lines on residences to borrowers with "A" credit ratings, but charge the borrowers interest rates of "B" credit consumers. The practice of targeting communities with a primarily low-income, elderly, or racial/ethnic minority population for imposition of unjustifiably expensive loan terms is known as "reverse redlining."

30.    Subprime lending has grown rapidly in recent years. According to HUD, subprime loans for home purchases increased by 56.3% from 1993 to 1998, in a period of economic growth and extremely low unemployment, compared to an increase of only 16.4% for conventional products. Annual growth since 1993 has exceeded 40% in total subprime loan originations.

31.    Predatory subprime lenders often charge interest rates unrelated to credit risk and

COMPLAINT

6

1    charge or impose large, up-front loan fees and costs.

2                   **DEFENDANTS' ROLE AS PREDATORY LENDERS**

3         32.    Defendants have engaged in a scheme of targeting elderly, female, minority and/or

4    low-income individuals to deceitfully and wrongfully induce them to enter into loan contracts

5    with Defendants.  Furthermore, Defendants have ignored and/or circumvented statutory and

6    industry safeguards intended to protect the financially unsophisticated borrowers that Defendants

7    target.

8         33.    Ameriquest is the nation's largest retail lender to borrowers with poor credit

9    histories or low incomes.  Ameriquest targets persons in low-income neighborhoods for soliciting

10   high-priced mortgages.

11        34.    In 1996, Ameriquest, then known as Long Beach Mortgage Company ("LBMC"),

12   entered into a $4 million settlement with the U.S. Department of Justice ("DOJ") arising from

13   charges that it engaged in discriminatory pricing practices.  A true and correct copy of the

14   complaint and settlement agreement are attached as **Exhibits A and B**, respectively.  The DOJ's

15   charges included allegations that LBMC charged fees and interest rates on loans to older African-

16   American female borrowers that were four times higher than the fees and interest rates charged to

17   younger male borrowers of other races.

18        35.    In April 1997, less than one year after entering into the settlement agreement with

19   the DOJ, LBMC changed its name to Ameriquest Mortgage Company.  A true and correct copy

20   of LBMC's amended articles of incorporation is attached as **Exhibit C**.  Around the same time,

21   Long Beach Financial Services ("LBFS"), LBMC's parent company, changed its name to

22   Ameriquest Capital Corporation.  A true and correct copy of LBFS's amended articles of

23   incorporation is attached as **Exhibit D**.

24        36.    Defendants aggressively solicit low-income borrowers to enter into refinancing

25   and other residential real estate transactions involving principal amounts that exceed the

26   borrowers' ability to repay.  Thus, at the outset of these transactions, Defendants anticipate that

27   the transactions may well lead to default and foreclosure.  Defendants remain unconcerned,

28   however, because they obtain exorbitant fees up-front and unconscionable interest rates in the

COMPLAINT

7



1   interim, making the transactions much more profitable than conventional mortgages.

2       37.   Defendants unfairly and unlawfully obtain origination fees, excessive interest

3   payments, and prepayment penalties by extending loans to consumers, including Plaintiffs and

4   Class Members, for which they do not qualify and cannot afford. Defendants achieve this

5   unlawful result by falsifying the income of Plaintiffs and Class Members stated on mortgage

6   applications, without the applicants' knowledge or consent.

7       38.   In addition, Defendants offer consumers who are female, elderly and/or of

8   minority race or national origin loans with substantially less favorable terms than those offered by

9   Defendants to males, non-seniors and persons of other races.

10      39.   Defendants deceive and otherwise harm unsuspecting consumers by inducing them

11  to enter into inappropriate loans and line of credit transactions that saddle them with principal

12  obligations that are unlikely to be able to be repaid when compared to the consumers' monthly

13  income and ability to pay.

14      40.   At the heart of this scheme are Defendants' persistent "bait and switch" tactics.

15  Defendants induce customers to agree to enter into loan transactions by promises of "no costs" up

16  front, fixed interest rates, all-inclusive low monthly payments and/or particular fees and interest

17  rates. When the paperwork is presented to the customers for signature, however, the terms are

18  different from those promised, with huge up-front costs, variable interest rates instead of fixed

19  rates, monthly payments that do not include taxes and insurance, and/or higher fees or interest

20  rates than previously represented. By these and other unlawful tactics, including falsifying

21  borrowers' income without their knowledge or consent, Defendants qualify the borrowers for

22  loans that they would not otherwise be able to obtain and induce the borrowers to go forward with

23  the transactions. At the time of the transactions, however, the borrowers frequently are unaware

24  that the terms of the mortgage contract do not match Defendants' prior representations.

25  Furthermore, Defendants or their agents mislead the borrowers by misrepresenting the contents of

26  documents and telling the borrowers there is no need or time to read them—just "sign here."

27      41.   In furtherance of the "bait and switch" scheme, Defendants failed to provide

28  required disclosures to Plaintiffs and Class Members and misled them as to the true terms and

COMPLAINT

8

1    costs of their loan transactions.  Defendants instructed Plaintiffs and Class Members to sign as

2    indicated on the mortgage applications and contracts, without providing them an opportunity to

3    review the papers, and while misrepresenting their contents as alleged above.  Additionally, in the

4    case of Plaintiffs and Class Members that are illiterate in English, Defendants failed to inform or

5    provide translations of the contents of the mortgage applications and contracts.

6         42.    Defendants' marketing and sales schemes have been implemented through, among

7    other means, standardized training, conditioning and oral scripts, uniform written materials

8    disseminated to targeted homeowners, and uniform business contracts and forms.  Defendants

9    have developed and implemented a misleading sales approach or "sales pitch" used by

10   Defendants' agents and employees when soliciting potential or existing borrowers.

11        43.    These oral misrepresentations were in conformity with standardized letters,

12   brochures, and other advertisements developed and were used by Defendants to induce consumers

13   to enter subprime loan transactions.

14        44.    As part and parcel of their common course of conduct, Defendants' business

15   practices include oppressive and harassing marketing techniques.  Defendants use these high-

16   pressure tactics to induce consumers to enter into residential loan transactions.  Defendants

17   especially target past customers to enter into new loans and existing customers to increase their

18   loans by "rolling in" other debts.  With respect to existing customers, Defendants "flip" the

19   existing loans into new loans, adding to the principal amounts due, and tacking on additional high

20   loan generation fees (for instant profit to Defendants).

21        45.    As part of their corporate marketing plan and wrongful scheme, Defendants

22   intentionally and particularly targeted homeowners who are senior citizens, racial minorities,

23   widows, persons with low income, and/or residents of geographic areas known to be underserved

24   by conventional lenders, including without limitation the City of East Palo Alto in San Mateo

25   County, California.  These consumers are bombarded by mailers, telephone calls and personal

26   visits by Defendants' sales personnel inviting them to "consolidate their debts" or obtain money

27   for remodeling through residential equity loans and refinancing transactions, all under the

28   misleading pretext that such loans are at truly "no cost" and will enable consumers to reduce their

COMPLAINT

9

1  monthly payments. The true purpose of these transactions is for Defendants to obtain huge up-

2  front fees and impose high interest rates. Borrowers' rarely derive any benefit from the refinance

3  and monthly payments are often increased, rather than reduced, as a result of transacting with

4  Defendants.

5     46.     In connection with their "bait and switch" scheme, Defendants also have engaged

6  in false and misleading advertising and other marketing to induce consumers to enter into

7  residential real estate loan transactions that were financially detrimental to those consumers and

8  known by Defendants to be unconscionable, especially when compared to the risks involved and

9  the income of the borrowers.

10    47.     These marketing and advertising materials falsely emphasize that the loans will be

11  tailored to meet the needs of the borrower at reasonable rates and without obligation.

12  Defendants' marketing and advertising materials specifically target low-income and financially

13  troubled individuals. For example, one of Defendants' brochures published and disseminated in

14  California provides in pertinent part:

15

16                    YOU DESERVE RESPECT

17         It's a whole new approach to lending. We realize that, as a homeowner,
    you have proven yourself to be a responsible, hard-working individual. And that
18  is a significant factor in our loan approval process. In fact, we don't require the
    strict lending guidelines of most banks. And we don't charge the high rates that
19  many finance companies charge. We look beyond the numbers and credit
    reports. We look at you - the person who worked hard enough to buy a home.
20  Our flexible lending guidelines let us work with most credit situations. We can
    help even if you've experienced bankruptcy, credit problems, high debt ratios,
21  mortgage rates, defaults and liens, or if you're self-employed with a hard-to-
    prove income.
22

23                    YOU DESERVE THE PERFECT LOAN

24         With the equity you built up, you've already passed the first step in our
    easy loan approval process. Whether you're buying a new home or refinancing
25  your current one, we can customize a loan to fit whatever your needs or special
    situation may be. With our competitive rates and flexible payments, you can
26  maximize your budget. You can even pull out extra cash to consolidate your
    high-interest credit cards and debt, and ultimately, lower your monthly payments.
27  Or you can use that extra money to make home improvements, pay school tuition,
    buy a new car or take that well-deserved vacation. Whatever you want....
28

COMPLAINT

1    48.    As herein alleged, the representations contained in this advertisement and other

2  similar advertisements disseminated by Defendants were and are materially false and misleading.

3    49.    Further, Plaintiffs are informed and believe, and on that basis allege, that

4  Defendants' conduct, as herein alleged, is part of a pattern and practice of predatory lending that

5  discriminates against low-income borrowers on the basis of race, national origin, age and/or

6  gender.

<div align="center">

**DEFENDANTS' CONDUCT TOWARD THE NAMED PLAINTIFFS**

**TYPIFIES DEFENDANTS' WRONGFUL CONDUCT**

</div>

9  I.    **Plaintiff Nona Knox**

10    50.    Plaintiff Nona Knox ("Mrs. Knox") is an elderly woman who owns and resides in

11  a house in East Palo Alto.  At the time of the events described herein, she was caring for her

12  elderly husband, Albert Knox ("Mr. Knox"), who was suffering from cancer.  Mr. Knox passed

13  away in September 2004.  Mrs. Knox maintains this action on her own behalf and on the behalf of

14  her husband's estate.

15    51.    In early 2002, Mrs. Knox responded by telephone to an unsolicited advertisement

16  mailed to her by Ameriquest.  While the mailing was in fact a simple solicitation, it was designed

17  by Ameriquest to appear to be a ready-to-execute contract.  Ameriquest made an appointment

18  with Mrs. Knox and sent two men, Richard Valle ("Valle") and another Ameriquest agent, to the

19  Knox home.  Mrs. Knox informed Valle that she and her husband wanted to refinance their home

20  to pay off credit cards and a car loan and to obtain money to remodel their bathroom.

21    52.    Mrs. Knox showed Valle their then current mortgage terms and said that she

22  wanted to refinance at a fixed rate.  To the best recollection of Mrs. Knox, Valle responded, "We

23  can do better," and asked Mrs. Knox and her husband their ages.  Mrs. Knox was 66 at the time;

24  Mr. Knox was 79.

25    53.    Valle filled out the entire loan application for Mrs. Knox.  He did not have Mr. or

26  Mrs. Knox write down any information.  Rather, in response to Valle's questions about the

27  Knoxes' income and assets, Mrs. Knox provided Valle with bank statements, social security

28  check stubs, and pension information, which together documented a monthly income of

COMPLAINT

1    approximately $4,000. The loan application, however, lists the Knoxes' monthly income as

2    $6,800. This false amount was inserted into the mortgage application without the knowledge or

3    consent of Mr. or Mrs. Knox.

4         54.    Valle also told Mrs. Knox that the loan would be at "no cost" to them, and he

5    promised that they would receive $20,000 cash back for the bathroom remodel.

6         55.    Mrs. Knox asked Valle whether he was offering the best rate. To Mrs. Knox's

7    best recollection, Valle responded, "I'm giving you the lowest possible rate for a person your

8    age."

9         56.    Valle and the other Ameriquest agent returned to the Knox home on May 13,

10   2002, to complete the signing of the mortgage contract. The contract was dated May 10, 2002.

11   The loan signing took only about one hour, during which Valle did most of the talking. Valle did

12   not give Mrs. Knox an opportunity to read even a single page of the loan contract; instead, he

13   flipped through the contract page by page while substantially stating, "this is for [purported

14   purpose of the page], sign here." When Mrs. Knox inquired why she and her husband needed to

15   sign blank pages, Valle responded, to the best of Mrs. Knox's recollection, "You just need to sign

16   these to get things done."

17        57.    At the May 13 signing, the loan contract presented to Mr. And Mrs. Knox by Valle

18   and the other Ameriquest agent included a Notice of Right to Cancel dated May 10, 2002. This

19   notice was ineffective, however, since Defendants failed to fill in both the "signing date" and the

20   "final date to cancel." Furthermore, even had this information been included, the notice still

21   would have been ineffective since Valle did not leave any copies of the notice with the Knoxes.

22        58.    A notary brought to the Knox home by Valle and the other Ameriquest agent took

23   Mr. and Mrs. Knox's fingerprints, checked their identification, and signed and stamped the notary

24   book. A notary stamp does not appear, however, anywhere on the purported copy of the loan

25   contract later provided to the Knoxes.

26        59.    Valle did not leave a copy of the loan contract or any other papers with Mrs. Knox,

27   nor did he say anything to her about points, fees, or the insufficiency of income.

28        60.    Valle did not tell Mr. or Mrs. Knox that the loan contract—which was based on the

COMPLAINT

1  loan application filled out by Valle—falsely stated that the Knoxes' monthly income was $6,800

2  and that Mr. Knox was self-employed by the "Knox Music Academy," a fictitious entity

3  purportedly operating at the Knox home address. Mr. and Mrs. Knox did not know that this

4  fictitious income from a fictitious business was included in the loan contract and did not suggest

5  or consent to it. Mr. Knox was not a music teacher of any kind. Indeed, at the time of the loan

6  application and contract signing, Mr. Knox was suffering from terminal cancer and related

7  medical conditions, and was unable to tend to rudimentary daily activities without the assistance

8  of Mrs. Knox.

9      61.    Ameriquest did not provide Mr. or Mrs. Knox with possession of the loan

10  documents until after the loan had been approved, at which time Valle returned to the Knox home

11  with a disbursement check. The check was for only approximately $8,000, even though Valle

12  had promised the Knoxes that they would receive approximately $20,000 in cash. According to

13  Valle, the discrepancy was due to Mr. and Mrs. Knox needing to pay off more bills.

14      62.    Unbeknownst to Mr. and Mrs. Knox, the loan was "bought down" from 12.5% to

15  8.252% fixed APR at a cost of $14,875, which was added to the loan principal without the

16  knowledge or consent of Mr. or Mrs. Knox. The Knoxes also paid $2,726 in closing costs and

17  $1,114.80 for the first month's interest. The Knoxes' total settlement charges were $18,715.80,

18  despite having been told that the loan would be at "no cost" to them.

19  **II.    Plaintiff Maria Torres**

20      63.    Plaintiff Maria Torres ("Mrs. Torres") received an unsolicited phone call from an

21  Ameriquest agent, Jesùs Elizalde ("Elizalde"), urging her to refinance her then current mortgage.

22  Mrs. Torres was not prepared to commit, and while she remained undecided Elizalde repeatedly

23  called her to urge her to refinance.

24      64.    After Elizalde convinced her to refinance, Mrs. Torres traveled to his office to

25  provide information. During this meeting all discussions regarding the loan took place in

26  Spanish, as Mrs. Torres speaks no English.

27      65.    During the first meeting, Elizalde had Mrs. Torres sign various papers. He did not

28  inform Mrs. Torres about the contents of the papers or their purpose. Mrs. Torres did not read or

COMPLAINT

1   fill out any paperwork, nor could she, as she is illiterate in English. Mrs. Torres informed

2   Elizalde that her monthly income was approximately $1,700 and that she occasionally received

3   approximately $500 in gifts from her children. Mrs. Torres provided pay stubs from her janitorial

4   job and other basic information to Elizalde. The loan application, however, lists Mrs. Torres'

5   monthly income as $4,500—an amount inserted into the mortgage application without Mrs.

6   Torres' knowledge or consent. No information was provided regarding Mrs. Torres' husband or

7   his income.

8          66.     Approximately one month later, Elizalde told Mrs. Torres to come back to his

9   office to complete the transaction. Mrs. Torres returned to Elizalde's office. Elizalde requested

10  that Mrs. Torres sign various documents; she signed where Elizalde indicated, but could not read

11  the documents to confirm their contents because all were in English. Elizalde did not inform Mrs.

12  Torres of the contents of the documents. Elizalde never told Mrs. Torres whether the interest rate

13  was fixed or variable, that there were prepayment penalties and broker fees, or that her income

14  had been falsified.

15         67.     The loan contract presented to Mrs. Torres for signature included a Notice of Right

16  to Cancel. This notice was ineffective, however, since Defendants failed to fill in both the

17  "signing date" and the "final date to cancel." Furthermore, even had this information been

18  included, the notice still would have been ineffective since the document was in English. Finally,

19  even had Defendants presented a Spanish-translation copy to Mrs. Torres at the signing, the

20  notice still would have been ineffective because Defendants did not leave such a copy with Mrs.

21  Torres.

22  **III.    Plaintiffs Heladio Arellanes and Maria Arellanes**

23         68.     Plaintiffs Heladio Arellanes and Maria Arellanes ("Mr. and Mrs. Arellanes") were

24  referred to Argent's agent, Rogelio Mota ("Mota"), by a neighbor. All meetings and

25  conversations took place in Spanish, as Mr. and Mrs. Arellanes do not speak English.

26         69.     Mr. and Mrs. Arellanes went to Mota's office and informed him that they were

27  interested in refinancing their then current mortgage because they had a high interest rate. Mr.

28  and Mrs. Arellanes specifically requested a loan with a lower interest rate, and one that included

COMPLAINT

1    taxes and insurance. This first meeting lasted only fifteen minutes. Mr. and Mrs. Arellanes gave

2    Mota copies of their then current mortgage papers, pay stubs and bank statements. Mr. and Mrs.

3    Arellanes did not fill out or sign any paperwork.

4         70.    Mota contacted Mr. and Mrs. Arellanes approximately thirty days later and

5    informed them that the loan had been approved. He asked them to come by his office to sign the

6    forms. The loan application falsely lists Mr. and Mrs. Arellanes' monthly income as $4,761.49.

7    Neither Mr. nor Mrs. Arellanes had knowledge of this misstatement of income nor suggested or

8    consented to it.

9         71.    During the second meeting at Mota's office, Mota told Mr. and Mrs. Arellanes

10   where to sign the documents, without providing any translation or information regarding their

11   contents. The documents were entirely in English. Mr. and Mrs. Arellanes did not read the

12   documents, as they are illiterate in English. Mota's only explanation regarding the documents

13   was to promise Mr. and Mrs. Arellanes that their monthly payments would be lower.

14        72.    Specifically, Mota never informed Mr. and Mrs. Arellanes, *inter alia*, that the

15   interest rate on the new loan was variable as opposed to fixed; that there was a prepayment

16   penalty; that their income had been falsified; or that they had a right to rescind or cancel the

17   contract before a certain date. Mota gave Mr. and Mrs. Arellanes an unsigned copy of the

18   documents, but only in English.

19        73.    The loan contract presented to Mr. and Mrs. Arellanes for signature included a

20   Notice of Right to Cancel. This notice was ineffective, however, since Defendants failed to fill in

21   both the "signing date" and the "final date to cancel." Furthermore, even had this information

22   been included, the notice still would have been ineffective since the document was in English.

23   Finally, even had Defendants presented a Spanish-translation copy to Mr. and Mrs. Arellanes at

24   the signing, the notice still would have been ineffective because Defendants did not leave such a

25   copy with them.

26   //

27   //

28   //

COMPLAINT

15

# CAUSES OF ACTION

## FIRST CAUSE OF ACTION
### Violation of the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* and Federal Reserve Regulation Z, 12 C.F.R. § 226.1 *et seq.*
### (Against All Defendants)

74.    Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through 73, inclusive, as if fully set forth herein.

75.    Defendants Ameriquest and Argent are creditors within the meaning of the Truth in Lending Act as implemented by Regulation Z.

76.    Ameriquest violated TILA and Regulation Z by:

a.    Failing to provide Plaintiffs and Class Members with material disclosures in a form they could keep prior to consummation, in violation of 12 C.F.R. § 226.17;

b.    Failing to provide Plaintiffs and Class Members with notices of right to cancel that were clear, conspicuous, and reflective of the parties' legal obligations, in violation of 12 C.F.R. § 226.23;

c.    Failing to take into account the ability of Plaintiffs and Class Members to repay their loans, in violation of 15 U.S.C. § 1639(h); and

d.    Subjecting the loans to a prepayment penalty, in violation of 15 U.S.C. § 1639(c).

77.    Plaintiffs and Class Members were and continue to be, as a direct and proximate result of these violations, damaged in a sum according to proof, not yet ascertained, including, but not limited to, statutory damages and all amounts paid or to be paid to Defendants, excluding principal payments.

WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

//

//

//

//

//

COMPLAINT

16

**SECOND CAUSE OF ACTION**
**Violation of the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 *et seq.***
**and Regulation X, 24 C.F.R. § 3500.1 *et seq.***
**(Against All Defendants)**

78.    Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through 77, inclusive, as if fully set forth herein.

79.    The loan agreements between Plaintiffs and Class Members, on the one hand, and Defendants, on the other hand, are federally related mortgage loans as defined by the Real Estate Settlement Procedures Act, 12 U.S.C. § 2602.

80.    Defendants violated RESPA by failing to provide the disclosures required by RESPA in an accurate and timely fashion.

81.    Plaintiffs and Class Members were and continue to be, as a direct and proximate result of these violations, damaged in a sum according to proof, not yet ascertained, including, but not limited to, all amounts paid or to be paid to Defendants, excluding principal payments.

WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

**THIRD CAUSE OF ACTION**
**Violation of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.***
**(Against All Defendants)**

82.    Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through 81, inclusive, as if fully set forth herein.

83.    Defendants Ameriquest and Argent are entities that engage in transactions related to residential real estate, and the loans made by Defendants to Plaintiffs and Class Members, as alleged herein, were such transactions.

84.    Plaintiffs and Class Members are minorities.

85.    Plaintiffs are informed and believe, and on that basis allege, that Defendants discriminated against them and Class Members, on the basis of their race and/or gender, in the terms and conditions of the loan contracts entered into between Plaintiffs and Class Members, on the one hand, and Defendants, on the other.

86.    Plaintiffs and Class Members have been damaged as a result of Defendants'

COMPLAINT

17

1  discriminatory conduct.

2      WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

3

4  **FOURTH CAUSE OF ACTION**
**Violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.***
**(Against All Defendants)**

5

6      87.    Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through

7  86, inclusive, as if fully set forth herein.

8      88.    Defendants Ameriquest and Argent are creditors within the meaning of 15 U.S.C.

9  § 1691(e).

10     89.    The loan contracts that Plaintiffs and Class Members entered into with Defendants

11 were credit transactions.

12     90.    Plaintiffs are informed and believe, and on that basis allege, that Defendants

13 discriminated against them and Class Members, on the basis of race, national origin and/or

14 gender, in the terms and conditions of the loan contracts entered into between Plaintiffs and Class

15 Members, on the one hand, and Defendants, on the other.

16     91.    Plaintiffs and Class Members have been damaged as a result of Defendants'

17 discriminatory conduct.

18     WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

19

20 **FIFTH CAUSE OF ACTION**
**Violation of the Unruh Act, California Civil Code § 51**
**(Against All Defendants)**

21

22     92.    Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through

23 91, inclusive, as if fully set forth herein.

24     93.    Plaintiffs are informed and believe, and on that basis allege, that Defendants

25 discriminated against them and Class Members, on the basis of race, national origin, and/or

26 gender, in the terms and conditions of the loan contracts entered into between Plaintiffs and Class

27 Members, on the one hand, and Defendants, on the other.  Specifically, the terms and conditions

28 offered to Plaintiffs and Class Members were less favorable than those offered by Defendants to

COMPLAINT

18

 

1    borrowers not better qualified than Plaintiffs and Class Members but of different race, national

2    origin and/or gender.

3         94.    Plaintiffs and Class Members have been damaged as a result of Defendants'

4    discriminatory conduct.

5         WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

6

7                                    **SIXTH CAUSE OF ACTION**
                  **Violation of California Business and Professions Code § 17200 *et seq.***
8                              **(Against All Defendants)**

9         95.    Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through

10   94, inclusive, as if fully set forth herein.

11        96.    Plaintiffs and Class Members are informed and believe, and on that basis allege,

12   that Defendants, and each of them, engaged in numerous acts and/or practices of unfair

13   competition within the state of California in violation of Business and Professions Code section

14   17200 *et seq.* and similar sister-state statutes proscribing deceptive business practices.  These acts

15   or practices include without limitation the following:

16        a.    Offering and making Plaintiffs and Class Members loans, while failing to

17   take into account their ability to repay such loans;

18        b.    Misrepresenting to Plaintiffs and Class Members the terms on which

19   Defendants were willing to enter into refinancing or other loan transactions with them;

20        c.    Failing to provide required notices and copies of loan documents;

21        d.    Falsifying information in loan applications of Plaintiffs and Class

22   Members, without their knowledge or consent;

23        e    Discriminating on the basis of race, national origin, gender and/or age; and

24        f.    Violating the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*; the Real

25   Estate Settlement Procedures Act, 12 U.S.C. § 2601 *et seq.*; the Fair Housing Act, 42 U.S.C.

26   § 3601 *et seq.*; the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*; California Business

27   and Professions Code section 17500 *et seq.*; the Consumers Legal Remedies Act, California Civil

28   Code section 1750 *et seq.*; or any other applicable statute.

COMPLAINT

1    97.    The above-described unlawful, unfair and fraudulent business practices present an

2  ongoing threat of injury to Plaintiffs, Class Members and the general public. Plaintiffs, Class

3  Members and the general public continue to be financially harmed by such conduct and, unless it

4  is restrained, Defendants, and each of them, will continue to engage in such conduct.

5    98.    Pursuant to California Business and Professions Code section 17203 and similar

6  state statutes, Plaintiffs and Class Members are entitled to an order of this Court enjoining

7  Defendants, and each of them, from continuing to engage in unfair competition as defined in

8  Business and Professions Code section 17200 in the State of California and similar statutes of

9  sister-states. Plaintiffs, Class Members, and the general public will be irreparably harmed if such

10  an order is not granted.

11    99.    Plaintiffs and Class Members have been injured by Defendants' conduct and are

12  entitled to restitution and disgorgement of profits realized by Defendants, and each of them, as a

13  result of their unfair competition as defined in Business and Professions Code section 17200 *et*

14  *seq.* and similar sister-state statutes.

15    WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

16

17  **SEVENTH CAUSE OF ACTION**
   **Violation of California Business and Professions Code § 17500 *et seq.***
   **(Against All Defendants)**

18

19    100.    Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through

20  99, inclusive, as if fully set forth herein.

21    101.    The advertising, promotional materials and other written and oral promotional

22  efforts undertaken by Defendants to induce consumers to enter into loan transactions with

23  Defendants contained statements that were deceptive, untrue and/or misleading, or omitted

24  material information, and which were known, or by the exercise of reasonable care should have

25  been known, by Defendants, and each of them, to be deceptive, untrue and/or misleading, in

26  violation of California Business and Professions Code section 17500 *et seq.* and similar sister-

27  state statutes proscribing false advertising.

28    102.    Defendants' use of various forms of advertising media to advertise, call attention

COMPLAINT



1  to or give publicity to the sale of their goods and services, and other practices, as set forth above,

2  which were not as advertised or as otherwise represented, constituted unfair competition;

3  deceptive, untrue and/or misleading advertising; and unlawful business practice within the

4  meaning of California Business and Professions Code sections 17200 *et seq.* and 17500 *et seq.*

5  These advertisements and practices have deceived and are likely to deceive the consuming public

6  in violation of those sections.

7        103.    Pursuant to California Business and Professions Code sections 17203 and 17535,

8  Plaintiffs and Class Members, individually and on behalf of the public, seek an order of this Court

9  enjoining Defendants, and each of them, from continuing to engage in their false advertising

10  practices. The public, Plaintiffs and Class Members will be irreparably harmed if such an order is

11  not granted.

12        104.    Plaintiffs and Class Members have been injured by Defendants' conduct and are

13  entitled to restitution and disgorgement, individually and on behalf of the public, of profits

14  realized by Defendants, and each of them, as a result of their unfair, unlawful, deceptive, untrue

15  and/or misleading advertising practices.

16       WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

17

18                        **EIGTH CAUSE OF ACTION**
           **Violation of California Civil Code § 1750 *et seq.***
                    **(Against All Defendants)**

19

20        105.    Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through

21  104, inclusive, as if fully set forth herein.

22        106.    By their wrongful conduct as alleged herein, Defendants created, engaged in

23  and/or participated in unfair acts or practices in violation of the Consumers Legal Remedies Act,

24  California Civil Code section 1750 *et seq.*, and similar sister-state statutes.

25        107.    By their conduct, Defendants engaged in unfair or deceptive acts or practices in

26  transactions intended to result in the sale of goods or services in violation of California Civil

27  Code section 1770, including but not limited to:

28

COMPLAINT

21



1              a.      Representing that their goods or services have characteristics, uses, or

2  benefits which they do not have, in violation of section 1770(a)(5);

3              b.      Advertising goods or services with intent not to sell them as advertised, in

4  violation of section 1770(a)(9); and/or

5              c.      Representing that the subject of a transaction has been supplied in

6  accordance with a previous representation when it has not, in violation of section 1770(a)(16).

7       108.    Plaintiffs and Class Members have as a direct and proximate result of Defendants'

8  unfair or deceptive acts or practices suffered and continue to suffer damages in a sum according

9  to proof, not yet ascertained, including, but not limited to, all amounts paid or to be paid to

10  Defendants by Plaintiffs and Class Members, excluding principal payments.

11       109.    Pursuant to section 1780, Plaintiffs and Class Members seek to enjoin Defendants,

12  and each of them, from engaging in their unfair methods of competition or unfair or deceptive

13  acts or practices, as alleged herein.

14      WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

15

16                         **NINTH CAUSE OF ACTION**
                                **Unjust Enrichment**

17                        **(Against All Defendants)**

18       110.    Plaintiffs hereby incorporate by reference the allegations of paragraphs 1 through

19  109, inclusive, as if fully set forth herein.

20       111.    By their wrongful acts and omissions, Defendants were unjustly enriched at the

21  expense of Plaintiffs and Class Members.

22       112.    Plaintiffs and Class Members are entitled to restitution from Defendants and

23  disgorgement of all profits, benefits and other compensation obtained by Defendants through their

24  wrongful conduct.

25      WHEREFORE, Plaintiffs and the Class pray for relief as set forth below.

26  / /

27  / /

28  / /

COMPLAINT

**PRAYER FOR RELIEF**

1.    Certification of a plaintiff class;

2.    Compensatory and general damages according to proof;

3.    Special damages according to proof;

4.    Restitution and disgorgement according to proof;

5.    Declaratory relief;

6.    Injunctive relief;

7.    Prejudgment interest at the maximum legal rate;

8.    Punitive and exemplary damages according to proof;

9.    Costs of the proceedings herein;

10.    Reasonable attorneys' fees; and

11.    All such other and further relief as the Court deems proper.


Dated: January 13, 2005                    FENWICK & WEST LLP


                                           By: _____
                                                Aaron Myers

                                           Attorneys for Plaintiffs
                                           NONA KNOX, ALBERT KNOX, MARIA
                                           TORRES, HELADIO ARELLANES AND
                                           MARIA ARELLANES

COMPLAINT

1

## **DEMAND FOR JURY TRIAL**

2          Pursuant to Federal Rule of Civil Procedure 38(b) and Local Rule 30-6, Plaintiffs hereby

3    demand a trial by jury.

4

5    Dated: January 13, 2005                    FENWICK & WEST LLP

6

7                                               By: _____

8                                                        Aaron Myers

9                                               Attorneys for Plaintiffs
                                                NONA KNOX, ALBERT KNOX, MARIA
                                                TORRES, HELADIO ARELLANES AND
10                                              MARIA ARELLANES

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                                             B9042/00448/LIT/1219198

28

COMPLAINT
                                        24

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,
    Plaintiff,

v.

                                         Case No. CV-96-6159

LONG BEACH MORTGAGE COMPANY,
    Defendant.

---

### COMPLAINT FOR COMPENSATORY AND PUNITIVE DAMAGES,
### CIVIL MONEY PENALTIES AND INJUNCTIVE RELIEF

The United States alleges that Defendant Long Beach Mortgage Company has engaged in a pattern or practice of illegal discrimination by basing the price of loans, at least in part, on an applicant's race, national origin, sex and/or age.

Specifically, the United States alleges:

### I. JURISDICTION AND VENUE

1. This action is brought by the United States to enforce the provisions of Title VIII of the Civil Rights Act of 1968 ("Fair Housing Act"), as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. §§ 3601-3619, and of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691-1691f.

2. This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1345, 42 U.S.C. § 3614, and 15 U.S.C. § 1691(h) and venue is appropriate pursuant to 28 U.S.C. §§ 1391(c), 1392(a) and 1395. For purposes of venue, Defendant Long Beach Mortgage company resides in Los Angeles County within the meaning of 28 U.S.C. 1391(c), Local Rule 4.1 and General Order 349-A (January 30, 1995), because it operates eleven retail offices in Los Angeles County. Moreover, a majority of the aggrieved persons in this case reside in Los Angeles County.

### II. THE DEFENDANT

3. Defendant Long Beach Mortgage Company is incorporated under the laws of the State of Delaware. In subsequent paragraphs of this complaint, Long Beach Mortgage Company will be referred to as "Long Beach," "the lender" or "the defendant."

4. Between December 1990 and October 1994, Long Beach Mortgage Company operated under the name of Long Beach Bank, as a federally chartered thrift institution, and was subject to the regulatory authority of the Office of Thrift Supervision ("0TS"). Prior to December 1990, Long Beach Bank was a savings and loan association, chartered by the State of California. With respect to the allegations of this Complaint, the lender's operations were essentially the same before and after its status changes.



5. Long Beach's business includes engaging in residential real estate-related transactions and regularly extending credit to persons. Long Beach, as an entity whose business includes engaging in residential real estate transactions -- including home equity lending as well as home purchase and refinancing lending -- is subject to the requirements of the Fair Housing Act, as amended, 42 U.S.C. §§ 3601-3619. Long Beach is also a creditor as that term is defined by section 702(e) of the ECOA, 15 U.S.C. § 1692a(e), and is, therefore, subject to the requirements of the ECOA and its implementing Regulation B, as amended, 12 C.F.R. Part 202, in effect on or after March 23, 1977.

6. According to data Long Beach has reported under the Home Mortgage Disclosure Act, for the years 1990 through 1993, almost all of its residential mortgages were made in California. In 1994, about 82% were made in California, reflecting the lender's recent expansion into other states.

7. In the spring of 1993 the OTS conducted an examination of the lending practices of Long Beach to evaluate its compliance with, among other laws, the Fair Housing Act and the Equal Credit Opportunity Act. Based on information gathered in its examination, OTS determined that there was reason to believe that Long Beach may have engaged in a pattern or practice of discrimination on the basis of race and national origin in the loan prices charged to borrowers for residential mortgage loans. On January 5, 1994, OTS referred this matter to the United States Department of Justice pursuant to the referral provisions of the ECOA, 15 U.S.C. § 169le(g).

8. The United States' allegations of discrimination are based on its investigation of Long Beach Bank's practices from January 1991 through June 1994 ("the period in question").

### III.  BACKGROUND

#### A.  The "B/C" Mortgage Market

9. Long Beach has targeted its mortgage lending activities toward a segment of the residential lending market known as the "B/C" or subprime market. This market is comprised of depository institutions, mortgage companies and finance companies that serve borrowers who, because of their higher credit risk or perceived higher credit risk, do not secure home mortgage loans from what is known as the "A" or prime market. Long Beach, like other "B/C" lenders, prices its loans according to the level of risk suggested by the qualifications of the borrowers so that the price of the loan increases as the qualifications of the borrowers weaken.

10. As a condition of its willingness to approve home mortgage loan applications of borrowers who may not meet the "A" mortgage market underwriting guidelines, Long Beach charges its borrowers prices that are substantially higher than those that are prevalent in the "A" market. The higher prices take the form of higher interest rates, higher fees and/or a greater number of discount "points" (each point being one percent of the loan amount, paid at the time of loan closing).

11. Loans made in the "B/C" market rarely last for the duration of the amortization period set forth in the loan contract. Between 1991 and 1994, loans in the "B/C" market in general, and loans funded by Long Beach in California in particular, were re-financed, or otherwise turned over, on an average of less than four years despite contractual amortization periods of fifteen or thirty years. Long Beach was aware of and predicted this relatively quick turnover of its loan portfolio, and relied upon its estimates of the turnover rate to package and market its loans to secondary market purchasers.



## B. **Mortgage Lending operations**

12. Long Beach develops and implements its home lending business through employees and through mortgage brokers. The business developed by employees is known as "retail" lending and the business developed by brokers is known as "wholesale" lending. In all of its lending activities, including wholesale and retail, Long Beach reserves the right to determine whether applicants are qualified for financing and to set the terms and conditions of any financing to be granted. All loans are funded by, and in the name of, Long Beach.

13. In addition to allowing employees and brokers to propose a risk level for each applicant, Long Beach has permitted employees and brokers to propose a loan price that exceeds the lender's base price for the stated risk level. The portion of the proposed price above the base price for the risk level is unrelated to the qualifications of the borrowers or the risk to the lender. Rather, this portion of the proposed price determines, or assists in determining, the compensation to be paid to the employee or broker.

14. The fees and points paid to Long Beach and to the brokers were financed in most instances from the proceeds of the loan funded by Long Beach.

15. During the period in question, Long Beach placed ceilings on the amount by which the price proposed by employees or brokers could exceed the lender's base price, but these caps allowed for great variation in the pricing of loans. For example, brokers were permitted to charge as many as 12 points above the lender's base price. Thus, for a loan in the amount of $100,000, the lender permitted an additional charge of up to $12,000 to consumers. Long Beach generally attempts to underwrite applications to the level proposed by the submitting broker or loan officer.

16. Long Beach has not properly instructed its employees or brokers regarding their obligation to treat prospective customers without regard to race, national origin, gender or age; and the lender has failed to supervise or monitor the performance of employees and brokers to ensure that loan proposals would lead to compliance with fair lending laws.

17. In addition to a borrower's risk level, Long Beach's loan pricing system has been based on the race, national origin, gender or age of the applicant. Information as to each applicant's race, national origin, gender and age has been available and known to employees and brokers, as well as to officials of Long Beach who have made the decisions to grant or deny loans and to set or confirm the terms and conditions of any loan granted. The totality of loan originations by Long Beach reveals that African Americans, Latinos, women, and persons over the age of 55 were charged higher prices for their loans than the terms and conditions granted to persons without those characteristics who presented similar levels of risk to the lender.

18. Long Beach has used a number of devices to obtain higher prices from African Americans, Latinos, women and persons over the age of 55. Long Beach has directed its marketing efforts toward persons and neighborhoods, particularly minority neighborhoods, that Long Beach officials believed might be susceptible to the higher prices that would be demanded by the lender without stating the cost of its loans or that the cost of its loans was substantially higher than "A" mortgage lenders. In dealing with consumers, loan officers and brokers have emphasized low monthly payment amounts when discussing the price of the loan, rather than interest rate, points, or Annual Percentage Rate. These methods have allowed Long Beach to present terms and conditions that appeared to be favorable to the consumer, but in fact would cost the consumer considerably more money than was necessary to obtain the loan, given the turnover rate of the

loans at issue (described in paragraph 11 above).

19. Loan originations also reveal that the combination of factors of race, national origin, gender, and age contributed to an increase in the price of the loans extended by Long Beach. For example, for loans brought in by Long Beach's loan officers, African American females over the age of 55 were 2.6 times more likely than white males under age 56 to be charged fees and points that amounted to 6% or more of the loan amount. For loans brought in by the lender's wholesale brokers, older African American females were almost four times as likely as younger white males to be charged fees in this range.

20. After being made aware of possible unlawful pricing discrimination in its mortgage lending operations following the OTS examination in 1993, Long Beach officials imposed lower ceilings on the costs that could be charged to consumers. However, in 1994, after relinquishing its charter as a regulated thrift institution, Long Beach abandoned the limitations that had been adopted to address possible fair lending violations.

## IV. CLAIMS OF DISCRIMINATION

21. The disparities between the terms and conditions of financing extended to African Americans, Latinos, women and persons over the age of 55 and the terms and conditions extended to persons without such characteristics could not have occurred by chance and cannot be explained by factors unrelated to race, national origin, gender or age.

22. The defendant's policies and practices, as described herein, constitute:

   a. A pattern or practice of resistance to the full enjoyment of rights secured by the Fair Housing Act, as amended, 42 U.S.C. §§ 3601-3619, and the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691-1691f; and

   2. A denial of rights granted by the Fair Housing Act, as amended, to a group of persons that raises an issue of general public importance.

23. Specifically, the pattern or practice, as alleged herein, constitutes:

   a. Discrimination on the basis of race, national origin, or sex in making available residential real estate-related transactions in violation of Section 805 of the Fair Housing Act, 42 U.S.C. § 3605(a); and

   2. Discrimination against applicants with respect to credit transactions, on the basis of race, national origin, age, or sex in violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691(a)(1).

24. Persons who have been victims of Long Beach's discriminatory policies and practices are aggrieved persons as defined in 42 U.S.C. § 3602(i) and the ECOA, and have suffered damages as a result of Long Beach's conduct as described herein.

25. The discriminatory policies and practices of the defendant were intentional and willful, and were implemented with deliberate disregard for the rights of African Americans, Latinos, women, and persons over the age of 55.



## V. **REQUEST FOR RELIEF**

WHEREFORE, the United States prays that the Court enter an ORDER that:

1. Declares that the policies and practices of the defendant constitute a violation of Title VIII of the Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. SS 3601-3619, and the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691-1691f;

2. Enjoins the defendant, its agents, employees, successors, and all other persons in active concert or participation with it, from discriminating on account of race, national origin, sex, or age in any aspect of its home equity or mortgage lending activities;

3. Requires the defendant to develop and submit to the Court for its approval a detailed plan that: (a) remedies the vestiges of defendant's discriminatory policies and practices; and (b) recognizes appropriate business justification for pricing loans on the basis of the risk posed to the lender and also recognizes appropriate pricing differences between retail and wholesale loan originations, but ensures that the pricing of loans extended by the lender is not based, in any way, on the race, national origin, gender or age of the applicant;

4. Awards such damages as would fully compensate the victims of the defendant's discriminatory policies and practices for the injuries caused by the defendant;

5. Awards punitive damages to the victims of the defendant's discriminatory policies and practices; and

6. Assesses a civil penalty against the defendant in order to vindicate the public interest.

7. The United States further prays for such additional relief as the interests of justice may require.

Respectfully submitted,

JANET RENO
ATTORNEY GENERAL

DEVAL L. PATRICK
ASSISTANT ATTORNEY GENERAL

PAUL F. HANCOCK
Chief, Housing and Civil Enforcement Section

ALEXANDER C. ROSS
JENNIFER C. CASS
GAVIN C. DOWELL
Attorneys, Housing and Civil Enforcement Section
Civil Rights Division
U.S. Department of Justice
P.O. Box 65998
Washington, D.C. 20035-5998
(202) 307-2896

NORA MANELLA
UNITED STATES ATTORNEY
FOR THE CENTRAL DISTRICT OF CALIFORNIA

LEON W. WEIDMAN
Civil Chief
Assistant United States Attorney

PAMELA L. JOHNSTON
Assistant United States Attorney
United States Attorney's Office
7516 Federal Building
300 N. Los Angeles Street
Los Angeles, CA 90012
(213) 894-0444

ATTORNEYS FOR PLAINTIFF

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,
    Plaintiff,

v.

                                         96-6159

LONG BEACH MORTGAGE COMPANY,
    Defendant.

---

### SETTLEMENT AGREEMENT AND ORDER THEREON

The United States of America and Long Beach Mortgage Company have agreed to enter into this Stipulated Order and Settlement Agreement ("Agreement") simultaneously with the filing by the United States of its Complaint alleging violations of the Fair Housing Act (42 U.S.C. §§ 3601-3619) and the Equal Credit Opportunity Act (15 U.S.C. § 1691-1691f) by Long Beach Bank FSB (the "Bank"), the predecessor in interest to Long Beach Mortgage Company ("LBMC") , to resolve fully and finally all claims asserted, or that could have been asserted, arising out of or relating to the matters referred to in the Complaint.

### I. **INTRODUCTION**

The Bank operated in what the lending industry calls the "B/C" credit market (in which market LBMC currently operates), where borrowers, usually because of their impaired credit, paid prices higher than for "A" residential mortgage loans to compensate for increased risk to the lender ("B/C" residential mortgage loans are hereafter referred to as "mortgage loans"). The Complaint alleges that during the period January 1991 through June 1994, the Bank engaged in lending practices that constituted unlawful discrimination on the basis of race, national origin, gender and age. The United States maintains that evidence, including a statistical analysis, shows (1) that the Bank treated African American, Hispanic, female or older borrowers differently from younger, white male borrowers by charging them higher prices for mortgage loans and (2) that there is no non-discriminatory explanation for this difference in treatment. The United States does not claim that the Bank discriminated in charging borrowers a risk-related premium, but rather in the additional discretionary amounts that were charged by its loan officer employees and its wholesale brokers.

The Complaint alleges that a lender is responsible for discriminatory loan prices in the entirety of its lending operations. The Complaint further alleges that while "retail" loans were generated through employees of the Bank and "wholesale" loans were generated through independent third-party mortgage brokers, the Bank retained the right to determine whether to grant the loan and to set the terms and conditions of financing, and any resulting credit was extended by and in the name of the Bank.

LBMC denies all allegations in the Complaint and all claims made by the United States of discrimination by the Bank. LBMC disputes the validity of the statistical analysis relied upon by the United States as the principal basis for its claims and further maintains that the United States' theories of liability regarding wholesale lending are legally unsupportable.

LBMC acknowledges that some borrowers may pay higher prices for mortgage loans because of limited credit availability or lack of borrower sophistication and knowledge of alternative credit sources. LBMC asserts that these problems could be better addressed by intensive national efforts in consumer education and industry-wide initiatives directed at employee and broker education and training. Nevertheless, LBMC states that, whatever its differences with the United States as to the characterization of past events, it shares the goal of the United States of assuring that considerations such as race, national origin, gender or age play no role whatsoever in the price of credit, and LBMC is entering into this Agreement in order to further that goal.

The United States acknowledges that LBMC cooperated fully during the United States' investigation of this matter. Moreover, LBMC is willing to further the spirit of the fair lending laws by adopting creative remedies such as taking a leadership role in the consumer education initiatives described in this Agreement.

The United States recognizes the important role that consumer education initiatives can have in complementing the remedial aspects of this Agreement that directly address the violations alleged in the Complaint and the invaluable service LBMC can provide by taking a leadership role in these endeavors. It also commends LBMC for its willingness to commit substantial funds to an ambitious project that is designed to accomplish the objectives of the fair lending laws.

## II.  **RESOLUTION OF THE DISPUTE**

The parties have agreed that to avoid costly litigation this controversy should be resolved voluntarily. The parties have also agreed that there should be no evidentiary hearing, trial or other adjudication on the merits, and that entry of this Agreement is not to be construed as an admission by LBMC of the validity of the claims asserted against it as successor in interest to the Bank.

Now, therefore, on the basis of the foregoing, the United States and LBMC agree, and the Court orders as follows:

## III.  **GENERAL UNDERTAKING**

1.  LBMC, its officials, employees, and agents, as well as successors, will not engage in any act or practice that discriminates on the basis of age, sex, race or national origin in the pricing of mortgage loans as prohibited by the Fair Housing Act (42 U.S.C. §§ 3601-3619) and the Equal Credit Opportunity Act (15 U.S.C. § 1691-1691f). The parties agree that this undertaking, and every other undertaking contained in this Agreement, shall be enforceable by order of this Court upon application therefor by the United States or LBMC, as the case may be. The party making such application shall have the burden of proving its entitlement to the order sought.

## IV.  **SPECIFIC UNDERTAKINGS**

2.  LBMC has formulated and agreed to implement the following measures with respect to its retail mortgage lending operations to address the concerns raised by the United States:

### A.  **Training for LBMC Retail Personnel**

3.  Within ninety (90) days after the date of this Agreement, officers, directors, and LBMC employees involved in retail mortgage loan pricing shall complete a training course appropriate for the duties and responsibilities of each such individual. The training courses shall include the

following elements:

    a. a detailed discussion of LBMC's responsibilities under this Agreement;

    2. a detailed discussion of the purpose of, and prohibitions contained in, the Fair Housing Act and the Equal Credit Opportunity Act;

    3. a detailed discussion of individual and principal liability for violations of the Fair Housing Act and the Equal Credit Opportunity Act;

    4. a detailed discussion of LBMC's policies regarding discrimination, including the policy that it is unlawful for LBMC personnel to make differing initial price quotations on the basis of a loan applicant's race, national origin, sex or age;

    5. a detailed discussion regarding LBMC's disciplinary policy regarding violations of the Fair Housing Act and the Equal Credit Opportunity Act by employees; and

    6. a detailed discussion of the applicability of fair lending laws to mortgage loan pricing.

4. Commencing ninety (90) days after the date of this Agreement and thereafter for the duration of this Agreement, new LBMC employees involved in retail mortgage loan pricing shall complete the training course described in Paragraph 3 of this section within thirty (30) days of employment with LBMC.

5. Each person required to complete a training course under Paragraphs 3 or 4 of this Agreement shall execute a form, which shall be maintained by LBMC, acknowledging:

    a. completion of the training course;

    2. that they have received, read and understand LBMC's policies regarding discrimination, including LBMC's disciplinary policy regarding violations of the Fair Housing Act and the Equal Credit Opportunity Act;

    3. that they understand that violations of the Fair Housing Act and the Equal Credit Opportunity Act may subject them to individual liability, judicial sanctions, and/or administrative sanctions; and

    4. that they understand that violations of the Fair Housing Act and the Equal Credit Opportunity Act may subject LBMC to liability, judicial sanctions, and/or administrative sanctions.

## B. **Accurate Risk Classifications**

6. LBMC relies in part upon risk-based pricing in the pricing of its mortgage loans. Insofar as LBMC desires to continue to utilize risk-based pricing, LBMC shall use its best efforts to place mortgage loan applicants in appropriate risk classifications based on objective credit and risk-related criteria.

## C. **Retail Mortgage Loan Monitoring system**

7. Within one hundred eighty (180) days of the date of this Agreement, LBMC shall develop and implement a system by which it shall use a statistical model to monitor retail mortgage loan prices on an ongoing basis and shall submit a written description of the statistical model to the United States in accordance with the terms and conditions of Appendix A, which is attached hereto and incorporated herein by reference.

8. The parties understand and agree that, from time to time, circumstances may require modification of the monitoring system consistent with the requirements of Paragraph 7 of this Agreement. Any material modification of the monitoring system shall be documented, and such documentation shall be provided to the United States prior to implementation of any such changes.

9. LBMC's compliance personnel shall review the results of the monitoring system on at least a quarterly basis. This quarterly review shall include both a review of the prior quarter's loan activity and the cumulative loan activity of LBMC from the date of implementation of the monitoring system. The compliance personnel shall produce a written report no less often than quarterly summarizing its findings related to its review of the monitoring system. A special fair lending compliance committee ("Compliance Committee"), consisting of senior management, shall review the quarterly findings of LBMC's compliance personnel. The Compliance Committee shall also issue a quarterly written report summarizing its review of the monitoring system. This report shall consist of:

   a. a general report of LBMC's performance in the pricing of funded retail mortgage loans to members of protected classes;

   2. descriptive statistics of funded retail mortgage loan prices broken down by age, sex, race and national origin. LBMC shall prepare reasonable additional statistical analyses of the performance of LBMC at the request of the United States if the United States deems them necessary measure compliance with the terms of this Agreement. If the parties are unable to reach agreement on the nature of any follow-up analyses to be conducted, the matter may be submitted to the Court for resolution; and

   3. the written reports of the compliance personnel as described in this Paragraph.

10. If the retail monitoring system reveals material, unexplained pricing disparities, the responsible person(s) will be appropriately counseled and advised that if a material variance is found among loans in the calendar quarter following such counseling, LBMC will take one or more of the following steps, as appropriate:

   a. deduct from future commission payments price-related commissions contributing to the material variance during this period;

   2. suspend or limit pricing flexibility by the responsible person(s);

   3. institute closer monitoring; and/or

   4. suspend or discharge the employee(s) responsible for the discriminatory conduct.

11. Nothing in this Agreement shall be interpreted to require LBMC, in analyzing the results from its retail monitoring system, to compare retail mortgage loans to wholesale mortgage loans or otherwise to compare prices paid by borrowers who are not similarly situated.


## V. **CONSUMER EDUCATION PROGRAM**

12. LBMC will contribute a total of one million dollars ($1,000,000) to consumer education programs in conjunction with civil right groups. This amount will be paid in three equal annual installments commencing ninety (90) days after the date of this Agreement. A committee made up of representatives from LBMC and from leading, national civil rights groups chosen by LBMC will determine the recipients and specific allocation of the foregoing amount. The consumer education campaign will include the distribution of informative pamphlets or other forms of literature and sponsorship of educational workshops or forums focusing on:

    a. the fact that different residential mortgage loan products carry different prices, and that different sources may charge different prices for essentially the same product, and that the same source may charge different prices for the same product;

    2. the importance of shopping among different providers of credit, and questions to ask while shopping;

    3. how to evaluate and compare the ultimate price of competing loan products; and

    4. options available for borrowers with impaired credit.

## VI. **POLICIES AND PRACTICES RELATED TO WHOLESALE MORTGAGE LOANS**

### A. **Education of Mortgage Brokers**

13. To promote the objectives of the fair lending laws, in connection with its wholesale mortgage loan operations, LBMC shall inform all brokers with which it has an existing contractual arrangement and all brokers with whom it creates a contractual relationship for the duration of this Agreement:

    a. that LBMC will adhere to the Fair Housing Act and the Equal Credit Opportunity Act in all aspects of the credit process including the pricing of mortgage loans;

    2. that LBMC maintains loan underwriting standards designed to ensure that loan applicants will be placed at the correct credit risk level on a non-discriminatory basis;

    3. that LBMC's wholesale price sheets reflect the price it seeks to obtain for mortgage loans at each credit risk level and that the wholesale broker may charge borrowers such additional amounts as may be permitted by applicable law;

    4. that LBMC reserves the right to reject the broker's proposal or make a counteroffer when it believes the broker's proposed compensation and costs are not permitted under the fair lending laws; and

    5. that each wholesale broker must provide the proposed borrower with such disclosures concerning broker compensation as may be required under applicable law.

14. LBMC shall offer all wholesale brokers with whom it does mortgage loan business the opportunity to undergo fair lending training similar to the training described in Paragraphs 3b, 3c and 3d of this Agreement.

 

## B. **Expanded Documentation for Wholesale Loans**

15. In the event that LBMC agrees to a mortgage broker's request for an exception to the prices on wholesale mortgage loans set forth on LBMC's rate sheet, LBMC will ensure that the non-discriminatory reasons for any such price exception is documented in the loan file.

16. LBMC agrees that it will periodically review the results of its wholesale lending operations for its compliance with fair lending laws. To the extent LBMC prepares any statistical analyses or other reports constituting or relating to such review, such analyses or reports shall be confidential information and LBMC shall not be obligated to disclose such documents or information, if any, to the United States or third parties. Furthermore, nothing in this Agreement shall be interpreted to require LBMC to disclose the identities of the wholesale brokers with whom it does business.

## VII. **MONETARY COMPENSATION**

17. Within ninety (90) days of the date of this Agreement, LBMC shall place three million dollars ($3,000,000) into a Long Beach Mortgage Company Settlement Agreement Compensation Fund ("the Fund"). The Fund shall be maintained in an interest-bearing account. The purpose of the Fund is to compensate all those whom the United States alleges were injured by the Bank's lending practices.

18. It is agreed and understood between the parties that the United States shall have sole discretion to determine who is entitled to receive compensation from the Fund. The United States has determined:

    a. two million dollars ($2,000,000) of the Fund shall be used to reimburse retail borrowers, and one million dollars ($1,000,000) of the Fund shall be used to reimburse wholesale borrowers;

    2. there is a total of no more than twelve hundred (1,200) borrowers entitled to reimbursement;

    3. the payments provided under the terms of this Agreement shall be full and adequate compensation to all retail and wholesale borrowers identified by the United States as having been discriminated against.

19. Within thirty (30) days of the date of this Agreement, the United States shall provide LBMC with a list of loan numbers for borrowers it believes should receive compensation. The list shall designate the amount of compensation payable in connection with each loan.

20. Using a notice in the form set forth in Attachment I ("Notice"), LBMC shall notify by registered mail, return receipt requested to the last known address as reflected in LBMC's records, all persons identified by the United States pursuant to Paragraph 19 of the nature of the settlement and of their right to receive compensation. The Notice will include a requirement that the borrower respond within forty-five (45) days of the date of the Notice and execute a general release, as set forth in Attachment II, of any claims related to the mortgage loan at issue. LBMC will notify the United States of the names and addresses of all persons from whom no return receipt has been received within thirty (30) days of the mailing of the Notice, and the United States shall have an additional sixty (60) days to locate such borrowers and provide them with a copy of the Notice.



21. If a timely response pursuant to Paragraph 20 is received, LBMC will issue a check to the borrower, in the amount designated by the United States pursuant to Paragraph 19, within is ten (10) business days of the establishment of the Fund or receipt of the executed release, whichever is later.

22. The cost of the mailings provided for in Paragraphs 20 and 21 of this Agreement shall be paid by LBMC. All interest that accrues on the Fund shall be paid to LBMC to help defray the costs of administering the Fund.

23. Any money left in the Fund after all disbursements to borrowers shall be used to supplement the second installment of LBMC's contribution to the consumer education program described in Paragraph 12.

## VIII.  **RECORDKEEPING AND REPORTING REQUIREMENTS**

24. For a period of three (3) years from the date of this Agreement, LBMC agrees to retain all loan application files submitted for mortgage loans and all loan-related documents and notices relevant to any pricing decisions. During this period, upon reasonable notice from the United States, LBMC shall make individual mortgage loan application files and related records available for inspection and copying by the United States.

25. For a period of three (3) years from the date of this Agreement, LBMC shall report its compliance with this Agreement to the Civil Rights Division of the United States Department of Justice semi-annually.[1] The reports shall be submitted to the United States within ninety (90) days after the last business day of LBMC's second and fourth fiscal quarters. This reporting shall consist of the written reports of the compliance personnel and the Compliance Committee as described in Paragraph 9.

## IX.  **RETENTION OF JURISDICTION; MISCELLANEOUS**

26. The Court shall retain jurisdiction over the parties and of this matter for a period of three (3) years from the date this Agreement is entered by the Court solely for the purpose of enforcing the terms of this Agreement (as may be hereafter modified by the parties in writing). Except as otherwise expressly set forth above, either party may object to any aspect of the interpretation of, implementation of or compliance with this Agreement within forty-five (45) days of learning of the objectionable aspect. Either party may bring a matter to the Court for resolution only after the parties have endeavored in good faith to resolve informally any difference relating to the interpretation, implementation or compliance with this Agreement. The sole remedy available to the United States with respect to any breach by LBMC of any provision of this Agreement, and any modification(s) thereto, shall be an application to this Court to enforce this Agreement in accordance with its terms, and in no event may the United States seek to pursue any claim against LBMC that was or could have been asserted, or that arises out of or relates to any of the matters referred to, in the Complaint. The United States hereby agrees that at any time on or after the expiration of 180 days from the entry of this Agreement by the Court, either party may seek, and shall be entitled to obtain, an order from the Court dismissing the Complaint with prejudice. This Agreement shall remain in effect for a period of three (3) years from the date it is entered by the Court.

27. The terms of this Agreement shall be binding upon LBMC and its successors.



28. This Agreement may be modified at any time by written agreement of the parties, and without the need for any Court approval of any such modification. Any and all such written modifications shall be considered to be part of this Stipulated Order and Settlement Agreement.

29. For purposes of measuring time periods, the "date of" this Agreement shall be deemed to be the date of its entry by the Court.

30. Each party to this litigation shall bear its own costs and attorneys' fees.

It is so agreed by the parties and approved and ordered by the

Court as evidenced by their respective signatures on the attached page.

SO ORDERED:

DICKRAN TEVRIZIAN
UNITED STATES DISTRICT COURT JUDGE

DATE: SEPTEMBER 5, 1996

Stipulated and agreed to this 3rd day of September, 1996.

FOR PLAINTIFF UNITED STATES OF AMERICA:

DEVAL L. PATRICK
Assistant Attorney General

PAUL F. HANCOCK
Chief, Housing and Civil Enforcement Section

ALEXANDER C. ROSS
Special Litigation Counsel

JENNIFER C. CASS
GAVIN C. DOWELL
Trial Attorneys
U.S. Department of Justice
Civil Rights Division
P.O. Box 65998
Washington, DC 20035-5998
(202) 514-4713

FOR DEFENDANT LONG BEACH MORTGAGE COMPANY:

RICHARD L. THORNBURGH
RONALD W. STEVENS
LAURENCE E. PLATT
THOMAS J. NOTO
Kirkpatrick & Lockhart LLP
Suite 200

1800 Massachusetts Ave., N.W.
Washington, DC 20036-1800
(202) 778-9000

---

**APPENDIX A**

Pursuant to paragraph 7 of the Stipulated Order and Settlement Agreement, LBMC will provide the United States with a written description of the statistical model that it intends to use to monitor its retail mortgage loan prices. LBMC will identify for the United States the variables that LBMC intends to incorporate in this statistical model. The United States shall notify LBMC in writing as soon as practicable of any objections it may have to any of the variables identified by LBMC and the reasons for such objection. It is understood and agreed that LBMC shall have no liability whatsoever to any person or entity for any price disparities that are attributable to the good faith use of any particular variable(s) prior to the date on which LBMC receives written notification from the United States of its objection to the use of such variable(s) and its reason(s) for such objection(s).

If the parties are unable to resolve the matter informally within the thirty (30) day period following the date of LBMC's receipt of the United States' written objection(s), the United States may petition the Court within fifteen (15) days of the end of the aforesaid thirty (30)-day period for a declaration that statistically significant price differences attributable solely to any variable(s) to which it has objected in writing would violate the Equal Credit Opportunity Act or the Fair Housing Act. Any findings of fact and law necessary for such a declaration shall be made by the Court.

In connection with any proceeding initiated by the United, States to obtain such a declaration, nothing contained in this Agreement shall be deemed to constitute a waiver by either the United States or LBMC with respect to, or otherwise estop either of them from presenting to the Court, any argument either party may otherwise have regarding the validity of any variable or of any other argument raised by the United States in support of any assertion that LBMC's conduct with respect to the pricing of mortgage loans has resulted in a purported violation of the Equal Credit Opportunity Act or the Fair Housing Act.

If and only if the United States both serves a written notice of objection(s) to the use of any particular variable(s) upon LBMC and subsequently petitions the Court for a declaration as aforesaid, then, in the event that the Court rules in favor of the United States, LBMC shall be liable to any borrower whose actual mortgage loan price materially exceeds the mortgage loan price predicted for such borrower by a statistical model that does not include the variable(s) found by the Court to be invalid and to have resulted in a violation of the Equal Credit Opportunity Act or the Fair Housing Act ("out-of-pocket expenses"). LBMC's liability to any such borrower shall be determined as of the date that LBMC received written notice from the United States of its objection(s) to the variable(s) at issue, and shall be limited to reimbursement to the borrower(s) of his/her/their out-of-pocket expenses.

In the event that LBMC's use of a model that has been accepted by the United States reveals that any borrower was discriminated against based on a prohibited factor, LBMC shall provide compensation to such borrower equal to his/her/their actual out-of-pocket expenses. The intent of the parties is to limit compensation in any and all cases to actual out-of-pocket amounts paid by any borrower and the United States agrees not to seek additional damages or penalties in connection with any such material price differences; provided, however, that the United States may seek additional damages or penalties if it can demonstrate that LBMC's continued use of any variable to which the United States objected in writing and which is subsequently found by the Court to be invalid and to have resulted in a violation of the Equal Credit Opportunity Act or the Fair Housing Act, was done in bad faith and without any reasonable

basis for believing that such variable could validly be used in the statistical model. In this respect, the fact that LBMC continued to use any such variable(s) after receipt of written notice from the United States of its objection(s) thereto shall not, of itself, be sufficient to establish that LBMC's continued use of such variable was in bad faith and/or unreasonable.

## ATTACHMENT I

## FORM OF NOTICE

Dear _____:

Long Beach Mortgage Company ("LBMC") is the successor in interest to Long Beach Bank ("the Bank"). Our records indicate that during the period January 1991 through June 1994, you obtained a mortgage loan from the Bank (the "Loan"). LBMC and the United States Department of Justice ("United States") recently settled a lawsuit in which the United States alleged that from January 1991 through June 1994, the policies and practices of the Bank resulted in certain African American, Hispanic, female and older (persons over the age of 55) customers paying a higher price on their mortgage loans than similarly situated younger white male customers of the Bank.

We have denied those allegations and continue to assert that the Bank never discriminated in its mortgage loan business. Nevertheless, we have agreed with the government to voluntarily resolve this controversy, in part, through the payment of money to those persons identified by the United States as allegedly injured by these practices.

The terms of the settlement between the United States and LBMC are incorporated in a Stipulated Order and Settlement Agreement ("Agreement") signed by the parties and signed and approved by the United States District Court for the Central District of California ("Court"), and which is available upon written request from the Clerk of the Court at the following address:

[Address]

In addition to the establishment of a $3 million settlement fund ("Fund") to be used to compensate 1,200 retail and wholesale borrowers, the Agreement provides that, for a period of three years, LBMC will (1) not engage in any act or practice that violates any federal fair lending law; (2) conduct training courses for LBMC's existing and future employees involved in retail mortgage loan pricing regarding LBMC's obligations under the Agreement, the purpose and content of federal fair lending laws and LBMC's own policies prohibiting violations of such laws; (3) use its best efforts to place mortgage loan applicants in appropriate risk classifications based on objective credit and risk-related criteria; (4) develop and implement a statistical model to monitor retail mortgage loan prides on an ongoing basis, which model is subject to review by the United States; (5) conduct a quarterly review of, and prepare written reports regarding, the results of the retail monitoring system, and if such system reveals material, unexplained pricing disparities, provide appropriate counselling to the responsible persons and determine whether to take one or more additional steps (reduction of commissions, suspension or limitation of pricing flexibility by the responsible person, closer monitoring and/or suspension or discharge of the responsible persons) ; (6) inform all wholesale brokers with whom it has a contractual relationship that LBMC adheres to the fair lending laws, will offer to provide training in such laws to brokers, seeks to ensure that loan applicants are placed in the appropriate credit risk level on a non-discriminatory basis, uses wholesale price sheets that reflect the price LBMC seeks to obtain at each credit risk level and that wholesale brokers may charge such additional amounts as may be permitted by applicable law, LBMC



reserves the right to reject a broker's proposal or make a counteroffer when it believes the broker's proposed compensation and costs are not permitted under the fair lending laws and that each broker must provide the proposed borrower with all disclosures required by law; and (7) periodically review the results of its wholesale lending operations for its compliance with fair lending laws.

Pursuant to the Court-approved Agreement, the government has determined that you should receive a payment of $_____ in connection with your Loan. The United States believes the money you are entitled to receive is full and adequate compensation for your potential claim. If you desire to receive this money, you must sign the General Release enclosed with this letter in which you agree to accept this money in exchange for your full release of LBMC in connection with the Loan. The release waives your right to sue for any claim you might have arising out of or relating to the Loan. You must sign this release in the presence of a notary public, and return the signed release to:

> Long Beach Mortgage Company
> 1100 Town & Country Road
> Suite 1100
> Orange, California 92668
> Attn: Consumer Relations Department

The signed and notarized release must be returned to the above address no later than _____, 1996 [forty-five (45) days after the date of this letter]. If LBMC receives the executed release by such date, LBMC will mail a check to you, in the amount specified above, within ten (10) business days after the Fund is established and receipt by LBMC of your fully executed release. The method of delivery of the release is at your option but registered mail, return receipt requested, is recommended. If you do not want to participate in this settlement, you may decline to do so and thereby give up your right to receive money under the Agreement while retaining the right to hire your own attorney and proceed on your own.

Sincerely,

---

## ATTACHMENT II

## FORM OF

## GENERAL RELEASE

STATE OF CALIFORNIA

COUNTY OF _____

WHEREAS I/we, _____ and _____, understand that the United States Department of Justice ("the United States") has conducted an investigation of Long Beach Bank, FSB ("the Bank"), and has alleged that with respect to certain mortgage loans originated during the period January 1, 1991, through June 30, 1994, the Bank violated provisions of the Fair Housing Act and the Equal Credit Opportunity Act;

WHEREAS, I/we understand that the Bank and its successor in interest Long Beach Mortgage Company ("LBMC") categorically deny that the Bank violated any provisions of the Fair Housing Act or the Equal

Long Beach Settlement Agreement  Page 12 of 13

Credit Opportunity Act;

WHEREAS, I/we obtained a mortgage loan with the Bank between January 1, 1991 and June 30, 1994 (the "Loan");

WHEREAS, I/we understand that in order to avoid costly litigation, LBMC and the United States have resolved the matter by entering into a Stipulated Order and Settlement Agreement ("Agreement") that has been approved by the United States District Court for the Central District of California ("Court"), and that I/we will be entitled to a payment from a Settlement Fund ("Fund") established pursuant to the Agreement provided that we execute the General Release described below;

THEREFORE, I/we agree to the following:

In consideration of _____ to be paid to me/us out of the Fund, I/we hereby agree, effective upon receipt of payment, to release and forever discharge LBMC and its current, former, and future officers, directors, employees, agents, parent companies, affiliates, predecessors, and successors from any and all legal and equitable claims or causes of action, whether or not known or suspected to exist as of the date of execution of this General Release, that have been or might have been asserted by me/us or the United States, as of the date of execution of this General Release, that arise out of or relate to the Loan.

I/we understand that the payment to be made to me/us does not constitute an admission by the Bank or LBMC of the validity of any claims made by me/us or by the United States on our behalf.

I/we understand that there will be only one compensation payment even though there may have been two or more co-applicants and that the above-designated payment will be the sole and total compensation paid to us arising out of the Loans.

I/we acknowledge that I/we understand and are waiving my/our right to pursue my/our own legal action instead of accepting payment from the Fund.

With respect to any and all claims released hereby, the undersigned stipulate and agree to expressly waive and relinquish, to the fullest extent permitted by law, the provisions, rights, and benefits of § 1542 of the California Civil Code, which provides:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected the settlement with the debtor.

This General Release constitutes the entire agreement between LBMC and me/us, without exception or exclusion.

I/we have read this General Release and understand the contents hereof, and I/we execute this General Release of my/our own free act(s) and deed(s).

Signed this _____ day of _____, 1996.

Borrower _____

Borrower _____

On _____, 1996, before me personally appeared _____ and _____, proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same.

WITNESS my hand and official seal.

Notary Public

(SEAL)

---

1. All notices, correspondence, reports, or documents required to be provided to the United States shall be mailed to the following address:

    Chief, Housing and Civil Enforcement Section
    Civil Rights Division
    U.S. Department of Justice
    P.O. Box 65998
    Washington, D.C. 20035



STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 10/06/1994
944189547 - 2409839

## AMENDED AND RESTATED CERTIFICATE OF INCORPORATION
## OF
## LONG BEACH MORTGAGE COMPANY

The undersigned Corporation does hereby certify as follows:

  1. The name of the Corporation is Long Beach Mortgage Company, the name under which it was originally incorporated.

  2. The original Certificate of Incorporation of the Corporation was filed in the Office of the Secretary of State of the State of Delaware on June 17, 1994.

  3. This Amended and Restated Certificate of Incorporation has been duly adopted in accordance with Sections 242 and 245 of the General Corporation Law of the State of Delaware.

  4. The text of the Certificate of Incorporation of the Corporation is hereby amended and restated to read in its entirety as follows:

### ARTICLE I

### NAME OF CORPORATION

The name of the Corporation is Long Beach Mortgage Company.

### ARTICLE II

### REGISTERED OFFICE

  The address of the registered office of the Corporation in the State of Delaware is 1209 Orange Street, Wilmington, County of New Castle.  The name of the registered agent of the Corporation at such address is The Corporation Trust Company.

### ARTICLE III

### PURPOSE

  The purpose of this Corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of the State of Delaware ("GCL").

### ARTICLE IV

### AUTHORIZED CAPITAL STOCK

  4.01 Number, Classes and Par Value of Shares. The Corporation is authorized to issue two classes of stock designated "Common Stock" and "Preferred Stock," respectively.  The total number of shares of stock that the Corporation is authorized to issue is 5,100,000.  The number of shares of Common Stock that the Corporation is authorized to issue is 5,000,000, and the number of shares of Preferred Stock that the Corporation is

authorized to issue is 100,000. All shares of Common Stock and Preferred Stock shall have a par value of $.01 per share.

4.02   Designation of Series of Preferred Stock By Board of Directors. The shares of Preferred Stock may be issued from time to time in one or more series. The Board of Directors is hereby granted the express authority to fix by resolution or resolutions the designations and number of shares constituting any such series and the powers, preferences and relative, participating, optional or other special rights, and qualifications, limitations or restrictions thereof, including without limitation the voting powers, dividend rights, conversion rights, redemption rights and liquidation preferences, of any series of shares of Preferred Stock, and to increase or decrease the number of authorized shares of any series subsequent to the issue of that series, but not below the number of shares of such series then outstanding. In case the authorized number of shares of any series shall be so decreased, the shares constituting such decrease shall resume the status which they had prior to the adoption of the resolution originally fixing the number of shares of such series. Shares of Preferred Stock that are redeemed, purchased, or otherwise acquired by the Corporation may be reissued except as otherwise provided by applicable law or the applicable certificate of designation.

## ARTICLE V

### LIMITATION OF DIRECTOR LIABILITY

To the fullest extent permitted by the GCL as the same exists or may hereafter be amended, a director of the Corporation shall not be liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director. The liability of a director of the Corporation to the Corporation or its stockholders for monetary damages shall be eliminated to the fullest extent permissible under applicable law in the event it is determined that Delaware law does not apply.   The Corporation is authorized to provide by bylaw, agreement or otherwise for indemnification of directors, officers, employees and agents for breach of duty to the Corporation and its stockholders to the fullest extent permitted by applicable law. Any repeal or modification of this Article V shall not result in any liability for a director with respect to any action or omission occurring prior to such repeal or modification.

## ARTICLE VI

### BOARD POWER REGARDING BYLAWS

In furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized to make, repeal, alter, amend and rescind the Bylaws of the Corporation.

## ARTICLE VII

### ELECTION OF DIRECTORS

7.01   No Written Ballot. Elections of directors need not be by written ballot unless the Bylaws of the Corporation shall so provide.

7.02   Cumulative Voting. In the event the Corporation should be subject to the provisions of Section 708 (a), (b) and (c) of the California Corporations Code ("Code") by reason of the applicability of Section 2115 of the Code, then so long as the Corporation is subject to the provisions of said Section 2115, in any election of directors of the Corporation, a holder of any class or series of stock then entitled to vote in such election shall be entitled to

PH/DOVER                          5126749085              OCT              10:51  NO.013 P.04



as many votes as shall equal (i) the number of votes which (except for this Section 7.02 as to cumulative voting) such stockholder would be entitled to cast for the election of directors with respect to such stockholder's shares of stock, multiplied by (ii) the number of directors to be elected in the election in which such stockholder's class or series of shares is entitled to vote, and each shareholder may cast all of such votes for a single director or for any two or more of them as such stockholder may see fit.  Except as set forth above in this Section 7.02, the stockholders of this Corporation shall not be entitled to cumulate votes in the election of directors.

## ARTICLE VIII

## CORPORATE POWER

The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Amended and Restated Certificate of Incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred on stockholders herein are granted subject to this reservation.

IN WITNESS WHEREOF, the undersigned Corporation has executed this Amended and Restated Certificate of Incorporation effective as of September 1‌‌, 1994.

LONG BEACH MORTGAGE COMPANY

By: _____
       M. Jack Mayesh, President

ATTEST:

_____
Jon R. Daurio, Secretary

CA942550.134/2+

3



TE OF DELAWARE
RETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 08/09/1996
960233234 - 2409839

### CERTIFICATE OF CHANGE OF LOCATION OF REGISTERED OFFICE AND OF REGISTERED AGENT

It is hereby certified that:

     1. The name of the corporation (hereinafter called the "Corporation") is LONG BEACH MORTGAGE COMPANY.

     2. The registered office of the corporation within the State of Delaware is hereby changed to 9 East Loockerman Street, City of Dover 19901, County of Kent.

     3. The registered agent of the corporation within the State of Delaware is hereby changed to National Registered Agents, Inc., the business office of which is identical with the registered office of the corporation as hereby changed.

     4. The corporation has authorized the changes hereinbefore set forth by resolution of its Board of Directors.

Signed on August 7, 1996.


Norman R. Gritsch, Vice President

# CERTIFICATE OF AMENDMENT
## OF
## CERTIFICATE OF INCORPORATION
### OF
### LONG BEACH MORTGAGE COMPANY

Long Beach Mortgage Company, a corporation organized under the General Corporation Law of the State of Delaware (the "Corporation"), hereby certifies as follows:

1.      Article I of the Certificate of Incorporation of the Corporation is hereby amended to read in its entirety as follows:

"ARTICLE I

NAME OF CORPORATION

The name of this corporation is Ameriquest Mortgage Company"

2.      The amendment set forth has been duly approved by the Directors of the Corporation and by the Stockholders of the Corporation.

3.      The amendment set forth was duly adopted in accordance with the provisions of Section 242 of the General Corporation Law of the State of Delaware.

4.      The foregoing amendment of Certificate of Incorporation has been duly approved by the stockholders of the Corporation in accordance with Section 242 of the Delaware General Corporation Law.

IN WITNESS WHEREOF, I, the undersigned, being the Secretary of the Corporation, for the purpose of amending the Certificate of Incorporation of the Corporation pursuant to Section 242 of the General Corporation Law of the State of Delaware, do make and file this Certificate, hereby declaring and certifying that the facts stated are true, and accordingly have hereunto set my hand, this 29th day of April, 1997.

_Norman R. Gritsch, Secretary_

s:\exec\docs\011003.20

_STATE OF DELAWARE_
_SECRETARY OF STATE_
_DIVISION OF CORPORATIONS_
_FILED 09:00 AM 04/29/1997_
_971137786 – 2409839_





OF DELAWARE
ARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 08/26/1994
944161474 - 2410743

## AMENDED AND RESTATED CERTIFICATE OF INCORPORATION
### OF
## LONG BEACH FINANCIAL SERVICES COMPANY

The undersigned Corporation does hereby certify as follows:

1.    The name of the Corporation is Long Beach Financial Services Company, the name under which it was originally incorporated.

2.    The original Certificate of Incorporation of the Corporation was filed in the Office of the Secretary of State of the State of Delaware on June 17, 1994.

3.    This Amended and Restated Certificate of Incorporation has been duly adopted in accordance with Sections 242 and 245 of the General Corporation Law of the State of Delaware.

4.    The text of the Certificate of Incorporation of the Corporation is hereby amended and restated to read in its entirety as follows:

### ARTICLE I

### NAME OF CORPORATION

The name of the Corporation is Long Beach Financial Services Company.

### ARTICLE II

### REGISTERED OFFICE

The address of the registered office of the Corporation in the State of Delaware is 1209 Orange Street, Wilmington, County of New Castle. The name of the registered agent of the Corporation at such address is The Corporation Trust Company.

### ARTICLE III

### PURPOSE

The purpose of this Corporation is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of the State of Delaware ("GCL").

### ARTICLE IV

### AUTHORIZED CAPITAL STOCK

4.01    Number, Classes and Par Value of Shares.    The Corporation is authorized to issue two classes of stock designated "Common Stock" and "Preferred Stock," respectively. The total number of shares of stock that the Corporation is authorized to issue is 20,000,000. The number of shares of Common Stock that the Corporation is authorized to issue is 15,000,000, and the number of shares of Preferred Stock that the Corporation is




authorized to issue is 5,000,000. All shares of Common Stock and Preferred Stock shall have a par value of $.01 per share.

4.02   Designation of Series of Preferred Stock By Board of Directors.   The shares of Preferred Stock may be issued from time to time in one or more series. The Board of Directors is hereby granted the express authority to fix by resolution or resolutions the designations and number of shares constituting any such series and the powers, preferences and relative, participating, optional or other special rights, and qualifications, limitations or restrictions thereof, including without limitation the voting powers, dividend rights, conversion rights, redemption rights and liquidation preferences, of any series of shares of Preferred Stock, and to increase or decrease the number of authorized shares of any series subsequent to the issue of that series, but not below the number of shares of such series then outstanding. In case the authorized number of shares of any series shall be so decreased, the shares constituting such decrease shall resume the status which they had prior to the adoption of the resolution originally fixing the number of shares of such series. Shares of Preferred Stock that are redeemed, purchased, or otherwise acquired by the Corporation may be reissued except as otherwise provided by applicable law or the applicable certificate of designation.

## ARTICLE V

## LIMITATION OF DIRECTOR LIABILITY

To the fullest extent permitted by the GCL as the same exists or may hereafter be amended, a director of the Corporation shall not be liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director. The liability of a director of the Corporation to the Corporation or its stockholders for monetary damages shall be eliminated to the fullest extent permissible under applicable law in the event it is determined that Delaware law does not apply. The Corporation is authorized to provide by bylaw, agreement or otherwise for indemnification of directors, officers, employees and agents for breach of duty to the Corporation and its stockholders to the fullest extent permitted by applicable law. Any repeal or modification of this Article V shall not result in any liability for a director with respect to any action or omission occurring prior to such repeal or modification.

## ARTICLE VI

## BOARD POWER REGARDING BYLAWS

In furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized to make, repeal, alter, amend and rescind the Bylaws of the Corporation.

## ARTICLE VII

## ELECTION OF DIRECTORS

7.01   No Written Ballot.   Elections of directors need not be by written ballot unless the Bylaws of the Corporation shall so provide.

7.02   Cumulative Voting.   In the event the Corporation should be subject to the provisions of Section 708 (a), (b) and (c) of the California Corporations Code ("Code") by reason of the applicability of Section 2115 of the Code, then so long as the Corporation is subject to the provisions of said Section 2115, in any election of directors of the Corporation, a holder of any class or series of stock then entitled to vote in such election shall be entitled to

2

MAR-13-97 THU 11:53 AM   NC    734-1450          FAX NO. 30273 4148   STATE OF DELAWARE
                                                                              SECRETARY OF STATE
                                                                              DIVISION OF CORPORATIONS
                                                                              FILED 09:00 AM 03/13/1997
                                                                              971082123 - 2410743

## CERTIFICATE OF CHANGE OF LOCATION OF REGISTERED OFFICE
## AND OF REGISTERED AGENT

It is hereby certified that:

      1.  The name of the corporation (hereinafter called the "Corporation") is Long Beach Financial Services Company.

      2.  The registered office of the Corporation within the State of Delaware is hereby changed to 9 East Loockerman Street, City of Dover  19901, County of Kent.

      3.  The registered agent of the Corporation within the State of Delaware is hereby changed to National Registered Agents, Inc., the business office of which is identical with the registered office of the Corporation as hereby changed.

      4.  The Corporation has authorized the changes hereinbefore set forth by resolution of its Board of Directors.

Signed on March 12, 1997.


                                _____
                        Jon Daurio, Vice President




authorized to issue is 5,000,000. All shares of Common Stock and Preferred Stock shall have a par value of $.01 per share.

4.02    Designation of Series of Preferred Stock By Board of Directors.    The shares of Preferred Stock may be issued from time to time in one or more series. The Board of Directors is hereby granted the express authority to fix by resolution or resolutions the designations and number of shares constituting any such series and the powers, preferences and relative, participating, optional or other special rights, and qualifications, limitations or restrictions thereof, including without limitation the voting powers, dividend rights, conversion rights, redemption rights and liquidation preferences, of any series of shares of Preferred Stock, and to increase or decrease the number of authorized shares of any series subsequent to the issue of that series, but not below the number of shares of such series then outstanding. In case the authorized number of shares of any series shall be so decreased, the shares constituting such decrease shall resume the status which they had prior to the adoption of the resolution originally fixing the number of shares of such series. Shares of Preferred Stock that are redeemed, purchased, or otherwise acquired by the Corporation may be reissued except as otherwise provided by applicable law or the applicable certificate of designation.

## ARTICLE V

### LIMITATION OF DIRECTOR LIABILITY

To the fullest extent permitted by the GCL as the same exists or may hereafter be amended, a director of the Corporation shall not be liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director. The liability of a director of the Corporation to the Corporation or its stockholders for monetary damages shall be eliminated to the fullest extent permissible under applicable law in the event it is determined that Delaware law does not apply. The Corporation is authorized to provide by bylaw, agreement or otherwise for indemnification of directors, officers, employees and agents for breach of duty to the Corporation and its stockholders to the fullest extent permitted by applicable law. Any repeal or modification of this Article V shall not result in any liability for a director with respect to any action or omission occurring prior to such repeal or modification.

## ARTICLE VI

### BOARD POWER REGARDING BYLAWS

In furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized to make, repeal, alter, amend and rescind the Bylaws of the Corporation.

## ARTICLE VII

### ELECTION OF DIRECTORS

7.01    No Written Ballot.    Elections of directors need not be by written ballot unless the Bylaws of the Corporation shall so provide.

7.02    Cumulative Voting.    In the event the Corporation should be subject to the provisions of Section 708 (a), (b) and (c) of the California Corporations Code ("Code") by reason of the applicability of Section 2115 of the Code, then so long as the Corporation is subject to the provisions of said Section 2115, in any election of directors of the Corporation, a holder of any class or series of stock then entitled to vote in such election shall be entitled to



as many votes as shall equal (i) the number of votes which (except for this Section 7.02 as to cumulative voting) such stockholder would be entitled to cast for the election of directors with respect to such stockholder's shares of stock, multiplied by (ii) the number of directors to be elected in the election in which such stockholder's class or series of shares is entitled to vote, and each shareholder may cast all of such votes for a single director or for any two or more of them as such stockholder may see fit.  Except as set forth above in this Section 7.02, the stockholders of this Corporation shall not be entitled to cumulate votes in the election of directors.

## ARTICLE VIII

## CORPORATE POWER

The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Amended and Restated Certificate of Incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred on stockholders herein are granted subject to this reservation.

IN WITNESS WHEREOF, the undersigned Corporation has executed this Amended and Restated Certificate of Incorporation effective as of August 25, 1994.

LONG BEACH BANK FINANCIAL SERVICES
COMPANY

By: _____
Roland E. Arnall, Chairman of the Board
of Directors

ATTEST:

_____
Alan T. Leupp, Secretary

OA942210.1B5/20+

3

MAR-13-97 THU 11:53 AM    NC# 734-1450          FAX NO. 30273    6

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 03/13/1997
971082123 - 2410743

## CERTIFICATE OF CHANGE OF LOCATION OF REGISTERED OFFICE
### AND OF REGISTERED AGENT

It is hereby certified that:

      1. The name of the corporation (hereinafter called the "Corporation") is Long Beach Financial Services Company.

      2. The registered office of the Corporation within the State of Delaware is hereby changed to 9 East Loockerman Street, City of Dover 19901, County of Kent.

      3. The registered agent of the Corporation within the State of Delaware is hereby changed to National Registered Agents, Inc., the business office of which is identical with the registered office of the Corporation as hereby changed.

      4. The Corporation has authorized the changes hereinbefore set forth by resolution of its Board of Directors.

Signed on March 12, 1997.

Jon Daurio, Vice President


### CERTIFICATE OF AMENDMENT
### OF
### CERTIFICATE OF INCORPORATION
### OF
### LONG BEACH FINANCIAL SERVICES COMPANY

Long Beach Financial Services Company, a corporation organized under the General Corporation Law of the State of Delaware (the "Corporation"), hereby certifies as follows:

    1.    Article I of the Certificate of Incorporation of the Corporation is hereby amended to read in its entirety as follows:

#### 'ARTICLE I

#### NAME OF CORPORATION

The name of this corporation is Ameriquest Capital Corporation"

    2.    The amendment set forth has been duly approved by the Directors of the Corporation and by the Stockholders of the Corporation.

    3.    The amendment set forth was duly adopted in accordance with the provisions of Section 242 of the General Corporation Law of the State of Delaware.

    4.    The foregoing amendment of Certificate of Incorporation has been duly approved by the stockholders of the Corporation in accordance with Section 242 of the Delaware General Corporation Law.

IN WITNESS WHEREOF, I, the undersigned, being the Secretary of the Corporation, for the purpose of amending the Certificate of Incorporation of the Corporation pursuant to Section 242 of the General Corporation Law of the State of Delaware, do make and file this Certificate, hereby declaring and certifying that the facts stated are true, and accordingly have hereunto set my hand, this 8th day of April, 1997.

Norman R. Gritsch, Secretary

OA970920.109/2+

STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 04:00 PM 04/08/1997
971113793 - 2410743

05 CV 7102

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

JUDGE SWAIN

05 CV 6189

CHERYL WILLIAMS and DUVAL
NAUGHTON, on behalf of themselves and all
others similarly situated,

                    Plaintiffs,                    **CLASS ACTION COMPLAINT**

            v.                                     **DEMAND FOR JURY TRIAL**

AMERIQUEST MORTGAGE COMPANY,

                    Defendant.

RECEIVED
JUL 0 1 2005
U.S.D.C. S.D. N.Y.
CASHIERS

         Plaintiffs Cheryl Williams and Duval Naughton, on behalf of themselves and all

others similarly situated (hereinafter "Plaintiffs"), allege the following upon information and

belief, formed after a reasonable inquiry under the circumstances:

I.    **NATURE OF THE CASE**

         1.       Ameriquest Mortgage Company (hereinafter "Ameriquest" or

"Defendant"), has engaged and is engaged in uniform unfair, unconscionable, deceptive and

unlawful commercial practices in soliciting and closing residential mortgage transactions in the

State of New York and nationwide.

         2.       According to the 2003 and 2004 Mortgage Market Statistical Annuals,

Ameriquest was the third largest subprime lender by volume during the period October 1999

through December 2003, with $61.8 billion in total originations during the period.  Based on

estimates from Ameriquest's securitization-filing, Ameriquest has risen to be the top "direct to

consumer" subprime mortgage originator in the United States and originated an estimated $16.84

- 1 -

452833.3

billion in loans for the first 6 months of 2004, representing a 76% rise over the same period in 2003. This growth has occurred as a result of Ameriquest's unfair and predatory practices, alleged herein.

       3.      While Ameriquest claims that its philosophy is "Do the Right Thing," Ameriquest's conduct begs the question – the right thing for whom? Ameriquest's policies and common conduct are designed exclusively to unfairly and unlawfully increase its own profits at the expense of the homeowners Ameriquest purports to assist.

       4.      Defendant targets consumers for predatory, "subprime" equity loans and induces borrowers to enter into unfair and deceptive residential mortgages without regard for the homeowners' interests or ability to pay. By its predatory loan practices, Ameriquest engages in a persistent "bait and switch" scheme through which it lures borrowers with promises of favorable interest rates, monthly payments and/or loan terms, and then switches the terms at closing to less favorable ones.

       5.      Plaintiffs and the Class members each received a loan which, to their surprise, contained one or more of the following unfavorable terms which were not disclosed:

       a.      A confusing and unfair variable interest rate structure which provides only for an increase and not decrease in the borrower's interest rate;

       b.      A misleading charge for "discount points" or a "discount fee" often totaling thousands of dollars added to the principal of the loan, although Ameriquest provided no "discount" to the interest rate;

       c.      A prepayment penalty that hinders borrowers from refinancing on better terms with other lenders; and

        d.     duplicative and excessive costs and closing fees in amounts designed to strip home equity and prevent borrowers from refinancing without incurring high costs.

      6.     Ameriquest also routinely fails to provide required disclosures, including the statutorily mandated Notice of Right to Cancel, and circumvents statutory protections by failing to leave a true copy of completed loan documents in borrowers' possession so that borrowers cannot review the loan terms.

      7.     When borrowers inquire at closing about why they are not receiving their loans on the promised terms, they are typically – and falsely – promised early refinancing on more favorable terms.

      8.     Ameriquest's unfair practices allow Ameriquest to profit by leaving borrowers with a three-way Hobson's choice. Either the borrower can 1) choose to remain in a loan with unacceptable terms; 2) find another lender offering better terms and pay Ameriquest a substantial and unjustified prepayment penalty while losing equity on additional closing costs; or 3) refinance with Ameriquest and thereby provide Ameriquest with an opportunity to capitalize the points and closing costs from the first loan while charging another set of points and/or closing costs in an equal or larger amount.

      9.     By failing to disclose to the Plaintiffs prior to the loan closing that they would not receive loans on the terms originally promised, Ameriquest violated the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681m(a) and the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691(d).

-3-

10.     By failing to give people complete and accurate information about their right to cancel the loan, Ameriquest violated the Truth in Lending Act ("TILA"), 15 U.S.C. § 1635.

11.     By virtue of this conduct, Plaintiffs and the Class have been harmed and continue to incur damages and suffer harm. Through this action, Plaintiffs seek, on behalf of themselves and all others similarly situated, damages, restitution, a declaration of the right to rescind, attorneys fees, costs, and any other relief the Court deems proper.

## II.     JURISDICTION AND VENUE

12.     This Court has personal jurisdiction over Defendant named herein because a substantial portion of the wrongdoing alleged in this Complaint took place in the Southern District of New York, and Defendants are authorized to and regularly do business in the Southern District of New York.

13.     This is an action for violations of 15 U.S.C. § 1601 *et seq.* (Truth in Lending Act), 15 U.S.C. § 1691 *et seq.* (Equal Credit Opportunity Act), 15 U.S.C. § 1681m(a) (Fair Credit Reporting Act), and related state laws. This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise from federal law. Additionally, there is federal jurisdiction over the federal statutory claims pursuant to 15 U.S.C. §§ 1640, 1681p, and 1691e. This Court also has jurisdiction of this action under 28 U.S.C. § 1332, in that the matter in controversy exceeds $5,000,000, and there are members of the class who are citizens of different states than Defendants. The Court has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

14.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial portion of the events and omissions giving rise to this Complaint occurred within the Southern District of New York. Plaintiff Williams and numerous other members of

-4-

the Class reside in the Southern District of New York, and their mortgage loans that are the subject of this Complaint, were solicited and closed in this judicial district.

## III.    THE PARTIES

### A.    Plaintiffs

15.    Plaintiff Cheryl Williams is a resident of New York, New York, and has been a victim of Ameriquest's practices, as alleged herein.

16.    Plaintiff Duval Naughton is a resident of Brooklyn, New York, and has been a victim of Ameriquest's practices, as alleged herein.

### B.    Defendants

17.    Defendant Ameriquest Mortgage Company is a privately-held Delaware corporation that has its principal place of business in Orange, California. Ameriquest Mortgage Company is a wholly-owned subsidiary of Ameriquest Capital Corporation.

18.    Ameriquest is the nation's largest privately-held subprime lender. Ameriquest Mortgage Company has more than 270 offices nationwide. Ameriquest Mortgage Company conducts business in New York and has more than 15 offices throughout New York State, including offices at 15 Metro Tech Center, Brooklyn, New York 11201 and at 245 Park Avenue, 24th Floor, New York, New York 10167.

## IV.    AMERIQUEST'S PATTERN AND PRACTICE OF UNFAIR, UNCONSCIONABLE, UNLAWFUL, AND DECEPTIVE PRACTICES

19.    Ameriquest has engaged in and continues to engage in a uniform common plan and scheme to prey upon unsuspecting consumers by routinely causing borrowers to enter into inappropriate residential loans with unfavorable terms, misleading and inappropriate "discount" fees, high and adjustable interest rates, and excessive loan principal compared to equity and ability to pay.

452833.3

A.    **Bait And Switch Practices of Ameriquest**

20.    Ameriquest engages in "bait and switch" tactics in regard to its residential loan transactions. Ameriquest systematically baits customers into residential mortgage loan transactions with promises of fixed interest rates, low interest rates, low or no fees, lower monthly payments compared to then current payments, no prepayment penalties, and/or the existence or absence of particular terms. When the paperwork is presented to customers for signature at closing, the terms are contrary to the terms promised. Frequently, borrowers are unaware that the terms of the mortgage documents do not match Ameriquest's prior representations.

21.    This practice goes hand in hand with Ameriquest's uniform practice of failing to make statutory disclosures and misrepresenting or concealing loan terms, as well as its aggressive and unfair sales tactics. While each practice is separately unlawful and unfair, in tandem these practices allow Ameriquest to systematically close loans that benefit Ameriquest to the detriment and misfortune of Plaintiffs and the Class.

22.    After presenting new or different loan terms, if the borrower becomes aware of the changes, Ameriquest engages in scare and pressure tactics to cause customers to proceed with the transaction anyway. Ameriquest further uses their borrowers' concern about loan terms in the initial transaction as an opportunity to bait the hook for a second loan, by promising an early refinancing on better terms. The refinance loans then capitalize finance charges, provide an excuse for new and additional points and other closing costs and provide an opportunity for Ameriquest to reap other additional hidden profits at their borrowers' expense.

23.    Ameriquest misleads the borrowers into signing loan documents without reading them by misrepresenting their contents and telling borrowers there is no need or time to read them and pressuring them to "just sign the papers."

-6-

452833.3

24.    While Ameriquest purports to provide a three-day right of rescission, they fail to provide notice of this right in the legally mandated form with full information about the legal deadline for cancellation. In many cases, Ameriquest fails to timely provide the legally required copies of the appropriate cancellation forms.

25.    Ameriquest also fails to timely deliver copies of various loan papers, including required disclosures under the Truth in Lending Act, until after the loan is consummated. This prevents consumers from understanding the loan terms, including most importantly, the true cost of the loan.

26.    Ameriquest also has a uniform practice of removing certain documents, such as those relating to the prepayment penalty, before presenting the documents to the customer for signing. For this reason and others, customers are systematically denied any meaningful opportunity to discover that the terms on the final documents do not match the prior representations.

**B.    Ameriquest's Sales and Marketing Scheme**

27.    Ameriquest has a business practice of using oppressive and unfair marketing techniques to prey upon low income homeowners in New York and nationwide.

28.    Ameriquest trains and encourages its Account Executives to engage in any conduct necessary to close the greatest number of loans as quickly as possible and to maximize the total loan principal. Ameriquest loan officers, called account executives ("AEs"), across the country, including those in New York, receive daily leads on new customers that are generated by software at Ameriquest's Orange, California, headquarters. These leads target homeowners who are carrying both a mortgage and significant credit card and/or other consumer debt; persons who have mobile home mortgages; persons with less than perfect credit; and other financially-vulnerable persons. These homeowners are solicited through repeated mailers, telephone calls,

-7-

and/or personal visits by Ameriquest sales personnel, all inviting them to consolidate their debts or to obtain money for expenses, with false and misleading promises of more favorable loan terms and/or reduced monthly payments. Ameriquest profits by obtaining high fees upfront and high interest rates in the interim, and often by selling its loan portfolios to other companies.

29.    Ameriquest systematically trains its sales personnel through standardized sales presentations (videos) developed under the control of Defendant's corporate headquarters in Orange, California as well as by use of the movie "Boiler Room" which depicts unethical and illegal high-pressure sales practices by a securities brokerage firm. These videos demonstrate high-pressure mortgage sales, while failing to train employees on the legal requirements and regulations for mortgage lending.

30.    Ameriquest also trains its sales personnel to routinely rush borrowers through the lengthy, complex documentation of the regulated closing process so as to divert the borrowers' attention from the documented terms of the loans. Moreover, Ameriquest trains its Account Executives to overcome objections raised by borrowers at closing by such tactics as threatening delay or cancellation of the closing, by offering immediate cash pending the closing of the loan, and by assuring borrowers that they can refinance with better terms after improving their credit score, without disclosing that they could be subject to the prepayment penalty, higher interest rates and other fees if they did so.

31.    At all times relevant to this action, Ameriquest's uniform and fundamental business strategy with respect to the sale of home-secured loans has been to:

a.    uniformly hold out to all prospective customers, through the use of misleading promotions and material omissions regarding loan terms, that refinancing and/or

-8-

consolidating their debts with Ameriquest will be beneficial and will save them money when in fact it will not;

        b.      employ aggressive, misleading, and unfair high-pressure sales tactics to obfuscate loan terms both prior to closing and at closing, if and when customers question loan terms, in order to force the customers to close the loan;

        c.      force borrowers into mortgage loan that include one or more of the following terms:  (1) a high and/or non-disclosed adjustable interest rate; (2) a "discount" fee that does not lower the interest rate; (3) excessive closing fees; and/or (4) a prepayment penalty provision;

        d.      sell loans to these homeowners in amounts so high in relation to the value of their homes that the resulting debt-to-value ratio (coupled with prepayment penalties and other restrictions) effectively strips their homes of equity and prevents the borrowers from refinancing their loans with Ameriquest's competitors, often by inflating appraisal values or the borrowers' income or asset statements; and

        e.      engage in "flipping," or aggressive solicitation of targeted borrowers, including existing Ameriquest customers, to refinance existing loans without significant benefit to the homeowner, thus generating additional debt, capitalizing previously charged points and fees, incorporating new and excessive costs and fees into the principal of the loan, and often increasing the borrower's interest rate.

        32.      Because Ameriquest profits from the origination and "flipping" of loans, and the subsequent sale of those loans to investment bankers and others as assets for mortgage-based securities, Ameriquest has little concern for the actual risk that the loans might default or

with the continued profitability of the loans after origination, except to the extent that Ameriquest can induce existing borrowers to borrow more.

33.    Ameriquest unfairly and deceptively holds out its mortgage loans as sound financial transactions that will save borrowers money. Ameriquest fails to disclose prior to closing and/or intentionally obfuscates and/or conceals before and at closing the following:

a.    required TILA disclosures clearly and conspicuously, in a form that borrowers can understand, in order to mislead consumers as to the true terms and costs of their loan transactions;

b.    the high and/or adjustable interest rates charged on its loans, as well as the risks associated with adjustable rate mortgage ("ARM") loans;

c.    the high and deceptive "discount" fees and closing fees routinely added to the loan principal;

d.    the fact that, under 15 U.S.C. § 1635(a), 12 C.F.R. § 226.23(b)(1), borrowers have the right to rescind certain transactions up to three days following the consummation of the transaction or the delivery of the information and disclosures required by statute;

e.    the existence of a prepayment penalty, and that such prepayment penalty would make refinancing impossible and/or highly unfavorable for the borrower;

f.    the fact that the borrowers would have to pay, out of pocket, the cost of homeowners' insurance and property taxes that legitimate lenders include in monthly escrow payments, and instead implies or allows borrowers to believe that the monthly payment includes these costs; and

-10-

        g.     the fact that far from saving borrowers money (as Ameriquest systematically claims), the Ameriquest loans, increase the total amount of debt outstanding, exacerbate overall interest obligations, and place vulnerable borrowers at high risk of foreclosure.

        34.     In addition, Ameriquest routinely fails to provide required disclosures to borrowers prior to closing — including, but not limited to, the HUD-1 statement, Notice of Right to Cancel, a "good faith" Good Faith Estimate, settlement process information booklet and other disclosures required under TILA — ensuring that borrowers have no meaningful opportunity to review them or to learn the true terms and costs of their loan transactions.

### C.    Ameriquest's Compensation System

        35.     Ameriquest has designed its compensation system to reward its AEs for "upselling" customers' loans, providing incentives for AEs to aggressively sell products in order to increase the amounts loaned to the maximum permitted by Ameriquest's underwriting goals, irrespective of the amounts requested by borrowers or supported by the actual value of the home. The effect of these "upsells" has been to "close the back door" on Ameriquest's customers by making loans that cannot be refinanced by Ameriquest's competitors.

        36.     Ameriquest's compensation scheme also rewards AEs based on quantity of loans closed per month. The minimum monthly quotas have risen consistently over time, reaching levels that are significantly higher than the number of loans closed by sales personnel at other companies. Given that Ameriquest's AEs must reach the minimum quotas in order to be paid at any reasonable rate, and that the quotas are very high, Ameriquest's policy all but ensures that its AEs will systematically engage in unfair and deceptive tactics to meet company quotas, with company knowledge of this widespread practice.

452833.3

## V.    THE TRANSACTIONS WITH PLAINTIFFS

### A.    Cheryl Williams

37.    Cheryl Williams owns a home at 2611 Frederick Douglas Blvd.,
New York, New York.

38.    In or around May 2003, Cheryl Williams responded to a solicitation from
Ameriquest and contacted Defendant about refinancing an existing mortgage loan. When Ms.
Williams informed the Ameriquest representative that the interest rate on her current loan was
7.6%, the AE assured her that if she refinanced with Ameriquest, she would receive a lower rate
than what she was currently paying, and that no prepayment penalty would be imposed. In
accordance with Ameriquest's common practice, the AE encouraged Ms. Williams to
consolidate her other debt into the mortgage. Based on Ameriquest's representations, and in
reliance thereon, Ms. Williams agreed to consolidate her debt and proceed to closing.
Ameriquest failed to provide Ms. Williams with any documents or disclosures, including any
HUD-1 or Good Faith Estimate, prior to closing.

39.    Shortly after the initial contact, Ameriquest met with Ms. Williams to
close the loan. Contrary to the express assurances and representations made by Ameriquest, the
closing documents reflected an interest rate of 7.8%, which was higher than the rate she was then
paying. Despite the fact that the AE had encouraged Ms. Williams to consolidate her other
debts, the AE justified the higher rate by stating that it was due to the fact that she was
consolidating other debt into the loan. The Ameriquest AE then promised Ms. Williams that if
she took the loan with the 7.8% interest rate, Ameriquest could lower the interest rate to below
7% in 2004 if she paid her mortgage on time.

40.    Ms. Williams was rushed through the closing process and did not have a
sufficient or meaningful opportunity to review the loan documents. Based on Ameriquest's

-12-

representations that her interest rate would be lowered in 2004, and in reliance thereon, Ms. Williams proceeded to refinance her loan for a fixed rate of 7.8%. Ms. Williams' monthly payment under her Ameriquest loan was $760.96, compared to her prior monthly payment of approximately $575.00.

41.    In or around May 2004, Ms. Williams contacted Ameriquest to obtain the lower interest rate she was promised. The Ameriquest representative told Ms. Williams that, even though she had made timely payments, she would need to refinance her existing loan and pay additional fees.

42.    Ms. Williams later discovered that despite Ameriquest's promises to the contrary, Ameriquest inserted a prepayment penalty in her mortgage loan. Ameriquest did not disclose or explain the prepayment penalty provision to Ms. William prior to or at the closing. Ms. Williams was not aware of the prepayment penalty until she was forced to pay the penalty when she later refinanced with another company in or about September 2004.

43.    In addition, the cost of the mortgage included a misleading and improper "discount" fee which did not lower the interest rate charged, as well as excessive loan processing fees.

44.    Ms. Williams did not receive a discount in exchange for her payment of discount points. Nor was she offered a loan at a higher rate without payment of points so that she could evaluate whether payment of "discount" points in exchange for a lower rate would be a sound financial decision.

452833.3

45.     Ms. Williams's mortgage included the following closing costs:

| Fee/Charge | Amount |
|---|---|
| Loan Discount Fee | $1,518.00 |
| Appraisal Fee | $360.00 |
| Lenders Processing Fee | $626.00 |
| Application Fee | $360.00 |
| Recording Fees | $235.00 |
| **TOTAL** | $3,099.00 |

**B.     Duval Naughton**

46.     Duval Naughton owns a home at 938 Bushwick Ave., Brooklyn, New York.

47.     In or about November 2003, Duval Naughton refinanced an existing mortgage loan through Ameriquest. At the time of this refinance, Ameriquest gave Mr. Naughton an adjustable interest rate of 5.4 percent.

48.     In or around August 2004, Mr. Naughton contacted Ameriquest regarding obtaining a home equity loan. The Ameriquest representative told Mr. Naughton that, in lieu of a home equity loan, Ameriquest would lower the interest rate on Mr. Naughton's existing Ameriquest loan and change it to a fixed rate if Mr. Naughton agreed to refinance again. The Ameriquest representative offered Mr. Naughton a fixed interest rate of 5% to refinance.

49.     Based on Ameriquest's representations, and in reliance thereon, Mr. Naughton proceeded to closing. Ameriquest failed to provide Mr. Naughton with any documents or disclosures, including a Good Faith Estimate or ARM disclosure, prior to closing. In addition, Ameriquest did not provide Mr. Naughton with any documents indicating that an appraisal had been done on his residence. Upon information and belief, an appraisal was never done on Mr. Naughton's residence at the time of this refinance transaction.

-14-

50.     Shortly before closing, Mr. Naughton was told that the interest rate on his refinanced loan would be slightly higher than the rate Ameriquest had initially represented. The AE justified what Ameriquest characterized as a minor change by stating it was due to problems with Mr. Naughton's credit score, despite the fact that Mr. Naughton's credit information had been known to Ameriquest throughout the loan transaction process. The Ameriquest representative promised Mr. Naughton that if he refinanced with Ameriquest and paid his mortgage on time, Ameriquest would lower Mr. Naughton's rate to a fixed interest rate of 5% within six months.

51.     At the closing, a notary met with Plaintiff Naughton. The AE was not present at the closing and did not review any documents or disclosures with Mr. Naughton. Ameriquest did not send Mr. Naughton copies of the signed closing documents.

52.     Contrary to the express assurances and representations made by Ameriquest, the closing documents reflected an interest rate of 6.6%, which was significantly higher than what he was told initially, higher than the rate he was later told he would be given, and significantly higher than the 5.4% interest rate of his prior loan. In addition, the documents reflected an adjustable interest rate instead of the fixed rate Ameriquest had promised.

53.     Mr. Naughton felt pressure to sign the mortgage documents, and could not back out of the loan because he had already made firm commitments to pay other obligations through the refinancing with Ameriquest.

54.     Mr. Naughton's monthly payment under his current Ameriquest loan is approximately $2,062.33, compared to his prior monthly payment of $1,545.00.

-15-

55.     The cost of the mortgage also included an improper and misleading "discount" fee which did not reduce the interest rate charged, an unwarranted appraisal fee and excessive loan processing fees.

56.     Mr. Naughton did not receive a discount in exchange for his payment of discount points. Nor was he offered a loan at a higher rate without payment of points so that he could evaluate whether payment of "discount" points in exchange for a lower rate would be a sound financial decision.

57.     Mr. Naughton's mortgage included the following closing costs:

| FEE/CHARGE | AMOUNT |
|---|---|
| Loan Discount Fee | $8,922.30 |
| Appraisal Fee | $207 |
| Flood Search Fee | $16 |
| Lenders Processing Fee | $626 |
| Application Fee | $360 |
| Recording Fees | $132 |
| Courier Fee | $125 |
| **TOTAL** | $10,388.30 |

58.     Ameriquest entered false and fabricated information on Mr. Naughton's loan application and inflated Mr. Naughton's net worth on the application to enable the closing of the loan. Mr. Naughton's net worth was listed on his application as $324,898.74, taking into account the full value of his home, but not accounting for the amount of the mortgage owed.

59.     Additionally, Ameriquest is misapplying payments to Mr. Naughton's current loan and, despite Mr. Naughton's explicit instruction, has failed to apply extra payments to the principal balance.

60.     Ameriquest is again seeking to refinance Mr. Naughton's loan.

452833.3

61.    As a result of Ameriquest's conduct, Mr. Naughton has suffered and continues to suffer actual damages and other harm.

## VI.    CLASS ACTION ALLEGATIONS

62.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23 on their own behalf and on the behalf of all other members of the classes described below.

63.    Plaintiffs seek certification of a nationwide class consisting of all Ameriquest borrowers across the country except those who are Class members in AMERIQUEST CASES, Judicial Council Coordination Proceeding No. 4162 (Cal. Sup. Ct., County of San Mateo). The nationwide class is defined as:

> All persons (i) who presently own, or during the Class Period owned, property (including mobile homes) in the United States, and (ii) who entered into a mortgage loan transaction relating to such property with any named Defendant or their predecessors, directly or indirectly, at any time between July 1, 1999, and the present (the "Nationwide Class").

> Excluded from the Nationwide Class are class members in Ameriquest Cases, Judicial Council Coordination Proceeding No. 4162 (Cal. Sup. Ct., County of San Mateo); any judicial officer assigned to this matter; Defendant; the parents, subsidiaries and affiliates, officers and directors of Defendant or any entity in which Defendant has a controlling interest; and the legal representatives, successors, or assigns of any such excluded persons.

64.    Plaintiffs Naughton and Williams, on behalf of themselves and all others similarly situated, seeks certification of the following Subclass:

> All persons (i) who presently own, or during the Class Period owned, property (including mobile homes) in the State of New York, and (ii) who entered into a mortgage loan transaction relating to such New York property with any named Defendant or their predecessors, directly or indirectly, at any time between – July 1, 1999, and the present (the "New York Subclass").

-17-

> Excluded from the New York Subclass are any judicial officer assigned to this matter; Defendant; the parents, subsidiaries and affiliates, officers and directors of Defendant or any entity in which Defendant has a controlling interest; and the legal representatives, successors, or assigns of any such excluded persons.

65.     The members of the Nationwide Class and New York Subclass (together, "Class") are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, Plaintiffs believe that there are hundreds of thousands of Class members and tens of thousands of Subclass members. Detailed information on the Class can be ascertained through appropriate discovery and from records maintained by Defendant and its agents.

66.     Plaintiffs' claims are typical of the claims of the members of the Class, as Plaintiffs and all other members of the Class and Subclass sustained damages arising out of the same wrongful conduct by Ameriquest. Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class and Subclass and have retained counsel competent and experienced in class action and consumer litigation.

67.     A class action is superior to other available methods for the fair and efficient adjudication of Defendant's uniform unlawful practices because joinder of all members is impracticable. Prosecution of separate actions by individual Class and Subclass members would create an inherent risk of inconsistent and varying adjudications, with the concomitant risk of the establishment of incompatible and conflicting standards of conduct for Defendant. In addition, due to the vastly unequal market power between the parties, and the fact that many Class members are in ongoing commercial relationships with Defendant, a Class action may be the only way, as a practical matter, that the cases will be prosecuted. Plaintiffs foresee no significant difficulties in managing this action as a class action.

-18-

68.     Common questions of law and fact exist as to all members of the Class
and Subclass and predominate over any questions affecting solely individual Class and Subclass
members.  Among the questions of law and fact common to the Class and/or Subclass are:

a.     Whether Defendant systematically failed to provide the disclosures
required by law, including TILA disclosures, clearly and conspicuously, in writing and in a form
that Class Members can keep and/or understand;

b.     Whether Defendant has been or are engaged in a "bait and switch"
scheme, in which Class Members have been lured in with promises of a particular set of loan
terms, and are then given different and far less beneficial terms;

c.     Whether documents, contracts, and practices relating to the
transactions between members of the Class and Defendant were unfair, unconscionable,
deceptive, untrue, misleading, or omitted material facts and disclosures;

d.     Whether Defendant misrepresented, concealed, and/or failed to
disclose loan terms;

e.     Whether Defendant misled Plaintiffs and the Class in connection
with marketing, solicitation, sale, operation, and administration of the mortgage loans; and

f.     Whether Plaintiffs and the Class are entitled to the imposition of a
constructive trust as a result of, among other things, Defendant's unjust enrichment.

g.     Whether defendants have been or are engaged in unfair and
unlawful business practices, and whether the alleged conduct violated the N.Y. Gen. Bus. Law
§ 349 or herein violated other applicable laws;

h.     Whether declaratory relief giving Class Members the right to
rescind their mortgage loans should be issued;

i.      Whether Plaintiffs and the Class are entitled to damages and the

appropriate measure of such damages;

j.      Whether Plaintiffs and the Class are entitled to punitive damages.

### CAUSES OF ACTION

### COUNT I

**Violations of the Truth in Lending Act, 15 U.S.C. § 1601, et seq.
and Federal Reserve Regulation Z, 12 C.F.R. § 226.1 et seq.
(By Plaintiffs on Behalf of Themselves and the Class)**

69.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set

forth herein.

70.     Defendant Ameriquest Mortgage Company is a creditor within the

meaning of the Truth and Lending Act ("TILA") as implemented by Regulation Z.

71.     Defendant Ameriquest Mortgage Company violated TILA and

Regulation Z by:

a.      Failing to provide Plaintiffs and Class Members with material

disclosures in a form they could keep prior to consummation; and

b.      For non-purchase money mortgages, failing to provide Plaintiffs

and Class Members with notices of right to cancel that were clear, conspicuous or consistent with

the forms and regulations of the Federal Reserve Board found at 12 C.F.R. 226.23

(Regulation Z) and Appendix H.

72.     Any and all statute of limitations relating to disclosures and notices

required under 15 U.S.C. § 1601 *et seq.* are tolled due to the Defendant's failure to effectively

provide the disclosures and notices.

452833.3

73.     As a direct and proximate result of these violations, Plaintiffs and Class Members have suffered and continue to suffer actual damages, including, but not limited to, all amounts paid or to be paid to Defendant, excluding principal payments, and are also entitled to statutory damages.  Plaintiffs and the Class also seek declaratory relief that they have a right to rescind that may be exercised within three years from the date of closing.

## COUNT II

**Violation of Equal Credit Opportunity Act, 15 U.S.C. § 1691(d)**
**(By Plaintiffs on Behalf of Themselves and the Class)**

74.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

75.     Defendant Ameriquest is a creditor within the meaning of 15 U.S.C. § 1691a(e).

76.     Plaintiffs and the Class were applicants within the meaning of 15 U.S.C. § 1691a(b).

77.     Ameriquest violated 15 U.S.C. § 1691(d) as to Plaintiffs and the Class in that it did not provide them with the notice of adverse action as required by the provision when Ameriquest refused to grant credit to Plaintiffs and the Class on the terms requested, but pursuant to its bait and switch tactics, provided substantially different terms.

78.     As a result of Ameriquest's conduct, Plaintiffs and the Class have suffered actual damages, and are entitled to recover such actual damages as well as punitive damages, equitable and declaratory relief, costs and attorney fees.

452833.3

## COUNT III

### Violation of Fair Credit Reporting Act, 15 U.S.C. § 1681m(a)
### (By Plaintiffs on Behalf of Themselves and the Class)

79.     Plaintiffs reallege and incorporate the preceding paragraphs.

80.     Ameriquest is a user of consumer reports from consumer reporting agencies, in connection with the extension of credit to consumers, for purposes of 15 U.S.C. § 1681a.

81.     Ameriquest's failure to provide credit on the terms in initially promised to Plaintiffs and the Class, and to instead offer credit at less favorable more costly terms, constituted an adverse action, pursuant to 15 U.S.C. § 1681a(k).

82.     The adverse action taken by Ameriquest was based wholly or partly on information contained in a consumer report, or alternatively was based on information obtained from a person other than a consumer reporting agency, bearing upon the credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living of the Plaintiffs and class members.

83.     Ameriquest failed to provide notices of adverse action to each of the Plaintiffs and class members as required by 15 U.S.C. § 1681m(a).

84.     In the alternative, Ameriquest violated the Fair Credit Reporting Act ("FCRA") by failing to provide adverse action notices which provided an accurate or meaningful description of the basis for such adverse taken, or which otherwise fail to comply with FCRA.

85.     Ameriquest's failure to comply with 15 U.S.C. § 1681m(a) was willful.

86.     In the alternative, Ameriquest's failure to comply with 15 U.S.C. § 1681m(a) was negligent.

452833.3

87.    The Plaintiffs and class members suffered damages as a result of

Ameriquest's failure.

## COUNT IV

### Unjust Enrichment
### (By Plaintiffs on Behalf of Themselves and the Class)

88.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set

forth herein.

89.    By its wrongful acts and omissions, Defendant Ameriquest Mortgage

Company has been unjustly enriched at the expense of Plaintiffs and the Class.

90.    Through their mortgage payments on the predatory and unfair mortgage

loans described herein, Plaintiffs and Class members have been required to pay Defendant

excessive fees, inflated interest rates and monthly payments higher than what they were

promised.  As such, Plaintiffs and the Class have conferred benefits upon Ameriquest.

91.    Defendant Ameriquest has knowledge of these benefits that Plaintiffs and

the Class have conferred and continue to confer upon them; and Defendant has accepted and

retained such benefits.

92.    Due to the circumstances described herein, it would be inequitable, unjust

and unfair for Defendant to retain the benefits conferred upon it by Plaintiffs and the Class.

93.    Plaintiffs and the Class seek restitution from Defendant and seek an order

of this Court requiring that Ameriquest disgorge all profits, benefits, and other compensation

obtained through its wrongful conduct.

452833.3

## COUNT V

### Unfair, Unlawful, and Deceptive Business Practices in Violations of New York Gen. Bus. Law § 349 (By Plaintiffs Naughton and Williams on Behalf of Themselves and the New York Subclass only)

94.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

95.     N.Y. Gen. Bus. Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

96.     N.Y. Gen. Bus. Law § 349 (h) provides that "any person who has been injured by reason of any violation of this section may bring . . . an action to recover his actual damages or fifty dollars, whichever is greater . . . The court may award reasonable attorney's fees to a prevailing plaintiff."

97.     Ameriquest systematically engages in materially deceptive practices towards consumers, including but not limited to:

a.     Marketing and selling mortgage loans to Plaintiffs and the New York Subclass in a manner intended to hide the true cost of various loan terms and the true disadvantages of the loan terms;

b.     Failing to provide consumers with good faith estimates of the closing costs, prior to closing;

c.     Presenting incomplete or misleading information related to the cost of loans, particularly in comparison with existing obligations;

d.     Failing to provide required disclosures prior to the closing of the loans;

452833.3

e.    Presenting different unfavorable loan terms to borrowers only at closing so as to put consumers in a position where they have no choice but to accept the unfavorable loan terms; and

f.    Unilaterally charging discount points that are not justified by any discount to the interest rate provided to Plaintiffs and the New York Subclass.

98.    By virtue of the patterns of deceptive conduct alleged herein, Ameriquest has engaged in consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which has resulted in consumer injury, has broad adverse impact on the public at large, and harmed the public interest of New York State.

99.    Defendant Ameriquest's deceptive conduct caused injury to Plaintiffs and the New York Subclass. Plaintiffs and the Subclass seek actual damages for their injuries caused by these violations in an amount to be determined at trial.

100.    Defendant's conduct, as described above, entitles Plaintiffs to an award of attorneys' fees pursuant to N.Y. Gen. Bus. Law § 349 (h).

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and members of the Nationwide Class and New York Subclass, respectfully pray for judgment against Defendant as follows:

1.    Certification of the case as a class action on behalf of the proposed Nationwide Class and New York Subclass, and designation of Plaintiffs as Nationwide Class and Subclass representatives and their counsel as Nationwide Class Counsel and Subclass Counsel;

2.    Restitution and disgorgement according to proof;

3.    Actual and statutory damages according to proof;

452833.3

4.    Declaratory judgment declaring that Defendant's conduct is unlawful and declaring Plaintiffs and Nationwide Class Members the right to rescind their loan contracts with Defendant;

5.    Prejudgment interest at the applicable rates;

6.    Reasonable attorneys' fees and costs; and

7.    All such other and further relief the court deems proper and just.

### DEMAND FOR JURY TRIAL

Plaintiffs and the Class demand a jury trial in this action for all claims so triable.

Dated: July 1, 2005

Respectfully submitted,

Rachel Geman (RG 0998)
Gena E. Wiltsek (GW 6653)
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
780 Third Avenue, 48th Floor
New York, NY 10017-2024
Telephone: (212) 355-9500
Facsimile: (212) 355-9592

Kelly M. Dermody
Caryn Becker
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1100
Facsimile: (415) 956-1008

-26-

452833.3

Gary Klein
RODDY, KLEIN & RYAN
727 Atlantic Avenue, 2nd Floor
Boston, MA 02111
Telephone: (617) 357-5500
Facsimile: (617) 357-5030

Laurence Tien
Kamran Mashayekh
THE TIEN LAW FIRM, LLP
10235 West Little York Road, Suite 470
Houston, TX 77040
Telephone: (713) 937-0223
Facsimile: (713) 937-0220

Attorneys for Plaintiffs and the Class

452833.3

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| IN RE AMERIQUEST MORTGAGE CO. MORTGAGE LENDING PRACTICES LITIGATION | MDL No. 1715<br>Lead Case No. 05-cv-07097<br><br>Centralized before the<br>Honorable Marvin E. Aspen |

## BORROWERS' CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs, by their attorneys, hereby consolidate the complaints filed in the following actions:

*Barber v. Ameriquest Capital Corp.*, Case No. 04-CV-01296 (TJC-TEM), U.S. District Court for the Middle District of Florida;

*Becker v. J.M. Closing Services, Inc., et al.*, Case No. 1:06-cv-02810 (RDB), U.S. District Court for the District of Maryland;

*Brown v. Ameriquest Capital Corp.*, Case No. SACV05-285 (AHS), U.S. District Court for the Central District of California;

*Campbell v. Ross v. Ameriquest Mortgage Co.*, Case No. 05-CV-00107 (WLS), U.S. District Court for the Middle District of Georgia;

*Capasso v. Ameriquest Mortgage Co.*, Case No. 06-CV-01221 (JCL), U.S. District Court for the District of New Jersey;

*Carlson v. Ameriquest Mortgage Co.*, Case No. 06-CV-03129 (PAM), U.S. District Court for the District of Minnesota;

*D'Ambrogi v. Ameriquest Mortgage Co.*, Case No. 05-CV-04427 (CMR), U.S. District Court for the Eastern District of Pennsylvania;

*Doherty v. Town & Country Credit Corp.*, Case No. 05-CV-00589 (JRT), U.S. District Court for the District of Minnesota.

*Harless v. Ameriquest Mortgage Co.*, Case No. 06-CV-0695 (LJM), U.S. District Court for the Southern District of Indiana;

*Jewell v. Ameriquest Mortgage Co.*, Case No. 06-CV-00269, U.S. District Court for the Northern District of Illinois;

*Juillerat v. Ameriquest Mortgage Co.*, Case No. 8:05-CV-01117 (DOC), U.S. District Court for the Central District of California;

*Kahrer v. Ameriquest Mortgage Co.*, Case No. CIV.A.05-391, U.S. District Court for the Western District of Pennsylvania;

*Knox v. Ameriquest Mortgage Co.*, Case No. C 05 00240 (SC), U.S. District Court for the Northern District of California;

*Madrazo v. Ameriquest Mortgage Co.*, Case No. CV 05 3987 (BRK), U.S. District Court for the Eastern District of New York;

*Montanez v. Ameriquest Mortgage Co.*, Case No. 06 CV 10244 (RWZ), U.S. District Court for the District of Massachusetts;

*Murphy v. Ameriquest Mortgage Co.*, Case No. 04-CV-12651 (RWZ), U.S. District Court for the District of Massachusetts;

*Saunders v. Ameriquest Mortgage Co.*, Case No. 5-CV-01126 (CAB), U.S. District Court for the Northern District of Ohio;

*Ungar v. Ameriquest Mortgage Co.*, Case No. 05 CIV 01849 (JDW), U.S. District Court for the Middle District of Florida;

*Williams v. Ameriquest Mortgage Co.*, Case No. 05 CV 6189 (LTS), U. S. District Court for the Southern District of New York; and

*Williams v. Ameriquest Mortgage Co.*, Case No. 05-CV-01036 (EAK), U.S. District Court for the Middle District of Florida.

By this consolidation, the allegations in each of these complaints are intended to be preserved as if reasserted and alleged herein.  Plaintiffs allege the following upon information and belief based, among other things, upon the investigation made by Plaintiffs by and through their attorneys:

<u>**INTRODUCTION**</u>

1.      Plaintiffs bring this class action on behalf of themselves, and a nationwide class of similarly-situated individuals (the "Class") as described in the paragraphs set forth herein.

2.      This case involves the actions of Defendants Ameriquest Mortgage Company ("AMC") and its subsidiaries, affiliates and agents (together, "Ameriquest"). Ameriquest originates and services residential mortgage loans.

3.      Ameriquest has engaged and is engaged in uniform unfair, unconscionable, deceptive and unlawful commercial practices in soliciting and closing residential mortgage transactions nationwide.

4.      According to the 2003 and 2004 Mortgage Market Statistical Annuals, Ameriquest was the third largest subprime lender by volume during the period October 1999 through December 2003, with $61.8 billion in total originations during the period.  Based on estimates from Ameriquest's securitization-filing, Ameriquest has risen to be the top "direct to consumer" subprime mortgage originator in the United States and originated an estimated $16.84 billion in loans for the first 6 months of 2004, representing a 76% rise over the same period in 2003.  This growth has occurred as a result of Ameriquest's unfair and predatory practices, alleged herein.

5.      Ameriquest targets consumers for predatory, "subprime" home loans and induces borrowers to enter into unfair and deceptive residential mortgages without regard for the homeowners' interests or ability to pay.  By its predatory loan practices, Ameriquest engages in a persistent "bait and switch" scheme through which it lures borrowers with promises of favorable

interest rates, monthly payments and/or loan terms, and then switches the terms at closing to less favorable ones.

6.     Plaintiffs and the Class members whose loans were financed by Ameriquest each received a loan which, to their surprise, contained one or more of the following unfavorable terms: (a) confusing and unfair variable interest rate structure which provides only for an increase and not decrease in the borrower's interest rate; (b) a misleading charge for "discount points" or a "discount fee" often totaling thousands of dollars added to the principal of the loan, although Ameriquest provided no "discount" to the interest rate; (c) prepayment penalty that hinders borrowers from refinancing on better terms with other lenders; and (d) duplicative and excessive costs and closing fees in amounts designed to strip home equity and prevent borrowers from refinancing without incurring high costs.

7.     Ameriquest also routinely fails to provide required disclosures, including the statutorily mandated Notice of Right to Cancel, and/or circumvents statutory protections by failing to leave a true copy of completed loan documents in borrowers' possession so that borrowers cannot review the loan terms.

8.     When borrowers inquire at closing about why they are not receiving their loans on the promised terms, they are typically promised early refinancing on more favorable terms. That promise is false, either because no refinance is made or because the available refinance is not on more favorable terms. If a refinance is offered by Ameriquest, it involves an additional set of expensive duplicate and unnecessary closing fees.

9.     Borrowers whose loans are serviced by Ameriquest are subject to a distinct - but similarly common, illegal, and unfair – scheme as Ameriquest's loan-financing scheme: Ameriquest routinely seeks to collect, and does collect, various fees, costs, and charges that are not legally due under the mortgage contracts, it mishandles payments made by borrowers, and engages in unlawful collection practices, breaching the mortgage loan terms.

10.     Ameriquest's unfair practices allow Ameriquest to profit by leaving borrowers with a three-way Hobson's choice. Either the borrower can 1) choose to remain in a

loan with unacceptable terms; 2) find another lender offering better terms and pay Ameriquest a substantial and unjustified prepayment penalty while losing equity on additional closing costs; or 3) refinance with Ameriquest and thereby provide Ameriquest with an opportunity to capitalize the points and closing costs from the first loan while charging another set of points and/or closing costs in an equal or larger amount.

11.     By the practices described in this Complaint, Ameriquest violated numerous federal and state laws.

12.     These federal laws include, for example, the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681m(a), the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691(d), the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601 *et seq.*, and the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §§ 2601 *et seq.*.

13.     These state laws include, but are not limited to, the common law of contract and equity, state predatory lending laws, and the consumer protection laws of the State of California (where Ameriquest is based and from where the scheme originated) or, alternatively, the various states' consumer protection and deceptive and unfair trade practices acts.

14.     By virtue of this conduct, Plaintiffs and the Class have been harmed and continue to incur damages and suffer harm.  Through this action, Plaintiffs seek, on behalf of themselves and all others similarly situated, damages, restitution, a declaration of the right to rescind, attorneys fees, costs, and any other relief the Court deems proper.

## <u>JURISDICTION AND VENUE</u>

15.     This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. §§ 1640(e), 1681p, 1691p, and 2614.

16.     This Court also has original jurisdiction over the state-law claims in this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because this is a class action in which: (1) there are 100 or more members in the proposed classes; (2) many Plaintiffs and Class members have a different citizenship from the Defendants; and (3) the claims of the proposed

Class members exceed $5,000,000 in the aggregate.  In addition, this Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' state-law claims because those claims and the federal law claims derive from a common nucleus of operative facts.

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), in that Defendants transact substantial business in this district, and pursuant to the transfer order of the Judicial Panel on Multidistrict Litigation.

## PARTIES

### I.     PLAINTIFFS

18.     Individual and Representative Plaintiffs George and Crisella Barber are residents of Lake City, Florida, and have been victims of Ameriquest's practices during the period covered by this consolidated action.

19.     Individual and Representative Plaintiff Debra Holloway is a resident of Tampa, Florida, and has been a victim of Ameriquest's practices during the period covered by this consolidated action.

20.     Individual and Representative Plaintiff Laurence Osten is a resident of Fort Wright, Florida, and has been a victim of Ameriquest's practices during the period covered by this consolidated action.

21.     Individual and Representative Plaintiff Barbara Ann Becker is a resident of Baltimore, Maryland, and has been a victim of Ameriquest's practices during the period covered by this consolidated action.

22.     Individual and Representative Plaintiff Tonya Summer Brown is a resident of Stone Mountain, Georgia, and has been a victim of Ameriquest's practices during the period covered by this consolidated action.

23.     Individual and Representative Plaintiff Guadalupe Hernandez is a resident of Brownsville, Texas, and has been a victim of Ameriquest's practices during the period covered by this consolidated action.

24.     Individual and Representative Plaintiffs Kevin and Maria Cusanelli are residents of Hamden, Connecticut, and have been victims of Ameriquest's practices during the period covered by this consolidated action.

25.     Individual and Representative Plaintiff Johnnie Ross is a resident of Albany, Georgia, and has been a victim of Ameriquest's practices during the period covered by this consolidated action.

26.     Individual and Representative Plaintiff Charles Meadows is a resident of Sparks, Georgia, and has been a victim of Ameriquest's practices during the period covered by this consolidated action.

27.     Individual and Representative Plaintiffs Joseph and Nicole Riggins are residents of Valdosta, Georgia, and have been victims of Ameriquest's practices during the period covered by this consolidated action

28.     Individual and Representative Plaintiff Kerri Capasso is a resident of New Milford, New Jersey, and has been a victim of Ameriquest's practices during the period covered by this consolidated action.

29.     Individual and Representative Plaintiffs Raymond and Rebecca Carlson are residents of St. Paul, Minnesota, and have been victims of Ameriquest's practices during the period covered by this consolidated action.

30.     Individual and Representative Plaintiff Patrick Galvan is a resident of Saginaw, Michigan, and has been a victim of Ameriquest's practices during the period covered by this consolidated action (during which time he resided in St. Paul, Minnesota).

31.     Individual and Representative Plaintiffs Robert and Debra Peabody are residents of St. Paul, Minnesota, and have been victims of Ameriquest's practices during the period covered by this consolidated action.

32.     Individual and Representative Plaintiffs Michele and Craig D'Ambrogi are residents of Hanover, Pennsylvania, and has been a victim of Ameriquest's practices during the period covered by this consolidated action.

33.     Individual and Representative Plaintiffs Kathryn and William Birkholz are residents of West Middlesex, Pennsylvania, and has been a victim of Ameriquest's practices during the period covered by this consolidated action.

34.     Individual and Representative Plaintiffs Thomas B. and Elvie Doherty are residents of Minneapolis, Minnesota, and have been victims of Town & Country's practices during the period covered by this consolidated action.

35.     Individual and Representative Plaintiff Mary Harless is a resident of Anderson, Indiana, and has been a victim of Ameriquest's practices during the period covered by this consolidated action.

36.     Individual and Representative Plaintiffs James and Jennifer Jewell are residents of Springfield, Ohio, and have been victims of Ameriquest's practices during the period covered by this consolidated action.

37.     Individual and Representative Plaintiff Deborah Juillerat is a resident of Golden Valley, Minnesota, and has been a victim of Ameriquest's practices during the period covered by this consolidated action.

38.     Individual and Representative Plaintiff Karen M. Kahrer is a resident of New Castle, Pennsylvania, and has been a victim of Ameriquest's practices during the period covered by this consolidated action.

39.     Individual and Representative Plaintiffs Nona and Albert Knox are residents of East Palo Alto, California, and have been victims of Ameriquest's practices during the period covered by this consolidated action.

40.     Individual and Representative Plaintiff Maria Torres is a resident of East Palo Alto, California, and has been a victim of Ameriquest's practices during the period covered by this consolidated action.

41.     Individual and Representative Plaintiffs Heladio and Maria Arellanes are residents of Richmond, California, and have been victims of Ameriquest's practices during the period covered by this consolidated action.

42.     Individual and Representative Plaintiff Richard A. Madrazo is a resident of Staten Island, New York, and has been a victim of Ameriquest's practices during the period covered by this consolidated action.

43.     Individual and Representative Plaintiff Yamal Montanez is a resident of Chicopee, Massachusetts, and has been a victim of Ameriquest's practices during the period covered by this consolidated action.

44.     Individual and Representative Plaintiffs Isabelle M. and David R. Murphy are residents of Plympton, Massachusetts, and have been victims of Ameriquest's practices during the period covered by this consolidated action.

45.     Individual and Representative Plaintiff Lynn Gay is a resident of Bridgewater, Massachusetts, and has been a victim of Ameriquest's practices during the period covered by this consolidated action.

46.     Individual and Representative Plaintiffs David M. and Janet Wakefield are residents of Wareham, Massachusetts, and have been victims of Ameriquest's practices during the period covered by this consolidated action.

47.     Individual and Representative Plaintiffs Frank and Martha White are residents of Mattapam, Massachusetts, and have been victims of Ameriquest's practices during the period covered by this consolidated action.

48.     Individual and Representative Plaintiff Harriet Holder is a resident of Mattapan, Massachusetts, and has been a victim of Ameriquest's practices during the period covered by this consolidated action.

49.     Individual and Representative Plaintiff Pegi Saunders is a resident of Maple Heights, Ohio, and has been a victim of Ameriquest's practices during the period covered by this consolidated action.

50.     Individual and Representative Plaintiffs Matthew and Tracey Lloyd are residents of Oakwood Village, Ohio, and have been victims of Ameriquest's practices during the period covered by this consolidated action.

51.     Individual and Representative Plaintiff Dorothy Stevens is a resident of Shaker Heights, Ohio, and has been a victim of Ameriquest's practices during the period covered by this consolidated action.

52.     Individual and Representative Plaintiffs Aris and Ricardo Gay are residents of Cleveland Heights, Ohio, and have been victims of Ameriquest's practices during the period covered by this consolidated action.

53.     Individual and Representative Plaintiff Steven H. Ungar is a resident of Venice, Florida, and has been a victim of Ameriquest's practices during the period covered by this consolidated action.

54.     Individual and Representative Plaintiff Cheryl Williams is a resident of New York, New York, and has been a victim of Ameriquest's practices during the period covered by this consolidated action.

55.     Individual and Representative Plaintiff Duval Naughton is a resident of Brooklyn, New York, and has been a victim of Ameriquest's practices during the period covered by this consolidated action.

56.     Individual and Representative Plaintiff Latonya and Dwayne Williams are residents of St. Petersburg, Florida and have been victims of Ameriquest's practices during the period covered by this consolidated action.

57.     Individual and Representative Plaintiff William F. and Daisybel Tolbert are residents of St. Petersburg, Florida, and have been victims of Ameriquest's practices during the period covered by this consolidated action.

58.     Individual and Representative Plaintiffs Timothy and Francis Adamowicz are residents of Wilmington, Delaware, and have been victims of Ameriquest's practices during the period covered by this consolidated action.

59.     Individual and Representative Plaintiff Christopher Bourassa is a resident of New Bedford, Massachusetts and has been a victim of Ameriquest's practices during the period covered by this consolidated action.

60.     Individual and Representative Plaintiff Venitra Brown is a resident of Waldorf, Maryland and has been a victim of Ameriquest's practices during the period covered by this consolidated action.

61.     Individual and Representative Plaintiffs Edrick and Debra Centeno are residents of Las Vegas, Nevada and have been victims of Ameriquest's practices during the period covered by this consolidated action.

62.     Individual and Representative Plaintiff Vaughn DeBold is a resident of Cocoa, Florida and has been a victim of Ameriquest's practices during the period covered by this consolidated action.

63.     Individual and Representative Plaintiffs Gregory and Marcell DeMeo are residents of Wakefield, Massachusetts and have been victims of Ameriquest's practices during the period covered by this consolidated action.

64.     Individual and Representative Plaintiff James Devlin is a resident of Plymouth, Massachusetts and has been a victim of Ameriquest's practices during the period covered by this consolidated action.

65.     Individual and Representative Plaintiffs Timothy and Cynthia Dion are residents of Bridgewater, Massachusetts and have been victims of Ameriquest's practices during the period covered by this consolidated action.

66.     Individual and Representative Plaintiff Karen Dudeck is a resident of South Boston, Massachusetts and has been a victim of Ameriquest's practices during the period covered by this consolidated action.

67.     Individual and Representative Plaintiff Christopher Gabrielli is a resident of Marlborough, Massachusetts and has been a victim of Ameriquest's practices during the period covered by this consolidated action.

68.     Individual and Representative Plaintiff Patricia Masson is a resident of Tyngsboro, Massachusetts and has been a victim of Ameriquest's practices during the period covered by this consolidated action.

69.    Individual and Representative Plaintiffs John and Kathleen O'Callaghan are residents of Quincy, Massachusetts and have been victims of Ameriquest's practices during the period covered by this consolidated action.

70.    Individual and Representative Plaintiff Glen Powell is a resident of Cambridge, Massachusetts and has been a victim of Ameriquest's practices during the period covered by this consolidated action.

71.    Individual and Representative Plaintiff Michele Powell is a resident of Worcester, Massachusetts and has been a victim of Ameriquest's practices during the period covered by this consolidated action.

72.    Individual and Representative Plaintiff Michael Russo is a resident of Leominster, Massachusetts and has been a victim of Ameriquest's practices during the period covered by this consolidated action.

73.    Individual and Representative Plaintiff Kenneth Sawyer is a resident of Sharon, Massachusetts and has been a victim of Ameriquest's practices during the period covered by this consolidated action.

74.    Individual and Representative Plaintiffs Frank and Linda Shea are residents of Methuen, Massachusetts and have been victims of Ameriquest's practices during the period covered by this consolidated action.

75.    Individual and Representative Plaintiffs Scott Ventola and Steven Bourassa are residents of Princeton, Massachusetts and have been victims of Ameriquest's practices during the period covered by this consolidated action.

76.    Individual and Representative Plaintiff Joshua Wilgoren is a resident of Framingham, Massachusetts and has been a victim of Ameriquest's practices during the period covered by this consolidated action.

II.     **DEFENDANTS**

77.     Defendant Ameriquest Mortgage Company ("AMC") is a privately-held Delaware corporation that has its principal place of business in California.  AMC is the nation's largest privately held sub-prime lender, with more than 270 offices nationwide.

78.     Defendant ACC Capital Holdings Corporation is a privately-held Delaware corporation that has its principal place of business in California.  It is the owner of AMC and other Ameriquest entities, as set forth below.

79.     Defendant AMC Mortgage Services, Inc. is a Delaware corporation with its principal place of business in California.  It is a wholly-owned subsidiary of ACC Capital Holdings Corporation.  It services many of the loans originated by AMC.

80.     Defendant Ameriquest Mortgage Securities, Inc. is a Delaware corporation with a principal place of business in California.  It holds legal title to many of the loans originated by AMC.

81.     Defendant Town & Country Credit Corporation is a Delaware corporation with a principal place of business in California.  Town and Country is a wholly owned subsidiary of ACC Capital Holdings Corporation.

82.     Defendant Argent Mortgage Co., LLC is a Delaware company with a principal place of business in California.  Argent is a wholly-owned subsidiary of ACC Capital Holdings Corporation.

83.     Collectively, AMC, ACC Capital Holdings Corporation, AMC Mortgage Services, Inc., Ameriquest Mortgage Securities, Inc., Town & Country Credit Corp., and Argent Mortgage Co., LLC are referred to as "Ameriquest."

84.     Defendant JM Closing is a Maryland-based corporation that performs title and mortgage loan closings.  Defendant Jonathan Means was the owner of JM Closing at all relevant times.

85.     Collectively, the Ameriquest defendants plus the defendants listed in the previous paragraphs are the "Defendants."

III.    **AGENCY/JOINT VENTURE**

86.    At all times herein mentioned, Defendants, both individually and collectively, and affiliates not herein named, are and were agents or joint venturers of each of the other Defendants, and in doing the acts alleged herein were acting within the course and scope of such agency.  Each Defendant had actual and/or constructive knowledge of the acts of each of the other Defendants, and ratified, approved, joined in, acquiesced in, and/or authorized the wrongful acts of each co-Defendant, and/or retained the benefits of said wrongful acts.

87.    Ameriquest controlled the actions of all the Defendants and of each of them by a program of centralized policy-making, policy dissemination, and training, emanating from central offices in California.

88.    Ameriquest has also implemented centralized decision-making and policy control by and through its overlapping officers and/or by a process of policy dissemination emanating from Roland Arnall, the founder and controlling shareholder of each Ameriquest entity.

IV.    **AIDING AND ABETTING**

89.    Defendants, and each of the lending subsidiaries, aided and abetted, encouraged, and rendered substantial assistance to the other Defendants in breaching their obligations to Plaintiffs and the Classes.  In taking action, as alleged herein, to aid and abet and substantially assist the commissions of these wrongful acts and other wrongdoings complained of, each of the Defendants acted with an awareness of its primary wrongdoing and realized that its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

V.    **CONSPIRACY**

90.    Defendants, and each of them, knowingly and willfully conspired, engaged in a common enterprise, and engaged in a common course of conduct to accomplish the wrongs complained of herein.  The purpose and effect of the conspiracy, common enterprise, and common course of conduct complained of was, *inter alia*, to financially benefit Defendants at the

expense of Plaintiffs by engaging in fraudulent activities.  Defendants accomplished their

conspiracy, common enterprise, and common course of conduct by misrepresenting and

concealing material information regarding the servicing of loans, and by taking steps and making

statements in furtherance of their wrongdoing as specified herein.  Each Defendant was a direct,

necessary and substantial participant in the conspiracy, common enterprise and common course

of conduct complained of herein, and was aware of its overall contribution to and furtherance

thereof.  Defendants' wrongful acts include, *inter alia*, all of the acts that each of them are

alleged to have committed in furtherance of the wrongful conduct complained of herein.

91.    Plaintiffs are informed and believe that the above-described conspiracy is

ongoing, making it pointless for Plaintiffs to allege when the last overt act of the conspiracy

occurred.

## FACTUAL BACKGROUND

I.    **AMERIQUEST'S COMMON PATTERN AND PRACTICE OF UNFAIR, UNLAWFUL, AND DECEPTIVE PRACTICES IN CONNECTION WITH MORTGAGE LOAN FINANCING**

92.    Ameriquest has engaged in and continues to engage in a uniform common

plan and scheme to prey upon unsuspecting consumers by routinely causing borrowers to enter

into residential loans with unfavorable terms, misleading and inappropriate "discount" fees, high

and adjustable interest rates, prepayment penalties, and excessive loan principal compared to

equity and ability to pay.

A.    **Bait and Switch Practices of Ameriquest**

93.    Ameriquest engages in "bait and switch" tactics in its residential loan

transactions.  Ameriquest systematically baits customers into residential mortgage loan

transactions with promises of fixed interest rates, low interest rates, low or no fees, lower

monthly payments compared to then current payments, no prepayment penalties, and/or the

existence or absence of particular terms.

94.    When the paperwork is presented to customers for signature at closing, the

terms are contrary to the terms promised.  Due to the complexity of the paperwork, hurried

closings, and improper disclosure procedures, borrowers are often unaware that the terms of the mortgage documents do not match Ameriquest's prior representations.

95.     This practice goes hand in hand with Ameriquest's uniform practice of failing to make statutory disclosures and misrepresenting or concealing loan terms, as well as its aggressive and unfair sales tactics.  While each practice is separately unlawful and unfair, in tandem these practices allow Ameriquest systematically to close loans that benefit Ameriquest to the detriment and misfortune of Plaintiffs and the Class.

96.     After presenting new or different loan terms, if the borrower becomes aware of the changes, Ameriquest engages in scare and pressure tactics to cause customers to proceed with the transaction anyway.  Ameriquest further uses their borrowers' concern about loan terms in the initial transaction as an opportunity to bait the hook for a second loan, by promising an early refinancing on better terms.  The refinance loans then capitalize finance charges, provide an excuse for new and additional points and other closing costs and provide an opportunity for Ameriquest to reap other additional hidden profits at their borrowers' expense.

97.     Ameriquest misleads the borrowers into signing loan documents without reading them by misrepresenting their contents and telling borrowers there is no need or time to read them and pressuring them to "just sign the papers."

**B.     Ameriquest's Failure to Provide Proper Disclosures**

98.     Ameriquest also fails timely to deliver copies of various loan papers, including required disclosures under the Truth in Lending Act, until after the loan is consummated.  This prevents consumers from understanding the loan terms, including most importantly, the true cost of the loan.

99.     When the disclosures are provided, they are often inaccurate, misleading, incomplete, or otherwise not in compliance with statutory requirements.

100.    Ameriquest has a uniform practice of removing certain documents, such as those relating to the prepayment penalty, before presenting the documents to the customer for signing.  For this reason and others, customers are systematically denied any meaningful

opportunity to discover that the terms on the final documents do not match the prior representations.

101.    At closing, Ameriquest also routinely presents and compels borrowers to sign acknowledgments of various events, including acknowledgements concerning last-minute changes in loan terms that are inconsistent with previous oral representations, and disclosures that are otherwise not compliance with Ameriquest's legal obligations to borrowers.

### C.    Ameriquest's Scheme Relating to Discount Points

102.    During a substantial portion of the period covered by this consolidated action, Ameriquest now acknowledges that it charged and collected discount points without providing a discount interest rate.  Because these points are calculated as a percentage of the total amount of the loan, discount points typically cost the consumer thousands or tens of thousands of dollars.

103.    During the balance of the period covered by this consolidated and amended complaint, Ameriquest claims to have provided an unspecified rate discount whenever it charged and collected discount points. However, because Ameriquest never specifically discloses the amount of the rate discount being provided, it is impossible for its customers to determine whether the rate discount is reasonable consideration for the substantial cost of the discount points.

104.    When Ameriquest markets and sells its loans to new customers, it never informs them that the quoted loan amount will be reduced by the substantial cost of discount points.  The discount points are therefore hidden until closing.

105.    Ameriquest often encourages its customers to refinance quickly, but fails to inform those customers that discount points in the previously loan will be capitalized upon refinancing (so that interest is due thereon) and that a new set of discount points will be charged. This hidden impact of refinancing is a substantial benefit to Ameriquest and a substantial cost to its refinance customers.

### D.    <u>Ameriquest's Sales and Marketing Scheme</u>

106.    Ameriquest has a business practice of using oppressive and unfair marketing techniques to prey upon homeowners nationwide.

107.    Ameriquest targets and hires loan officers, called account executives ("AEs"), that have little to no experience in the mortgage lending industry. Ameriquest then trains and encourages its AEs to engage in any conduct necessary to close the greatest number of loans as quickly as possible and to maximize the total loan principal.

108.    Under Ameriquet's loan closing system, the actual terms that may ultimately be available to a particular customer are not accessible by an AE until at or around the time of closing.  AE's are thus required to make promises to customers about loan terms that have no basis other than the AE's perception of what is necessary to keep the borrower on the sales hook until the loan is closed.

109.    AEs across the country receive daily leads on new customers that are generated by software at Ameriquest's Orange, California, headquarters.  These leads target homeowners who are carrying both a mortgage and significant credit card and/or other consumer debt; persons who have mobile home mortgages; persons with less than perfect credit; and other financially-vulnerable persons.  These homeowners are solicited through repeated mailers, telephone calls, and/or personal visits by Ameriquest sales personnel, all inviting them to consolidate their debts or to obtain money for expenses, with false and misleading promises of more favorable loan terms and/or reduced monthly payments.  Ameriquest profits by obtaining high fees upfront and high interest rates in the interim, and often by selling its loan portfolios to other companies.

110.    Ameriquest systematically trains its sales personnel through standardized sales presentations (videos) developed under the control of Ameriquest's corporate headquarters in Orange, California as well as by use of the movie "Boiler Room" which depicts unethical and illegal high-pressure sales practices by a securities brokerage firm.  These videos demonstrate

high-pressure mortgage sales, while failing to train employees on the legal requirements and regulations for mortgage lending.

111.     Ameriquest also trains its sales personnel to routinely rush borrowers through the lengthy, complex documentation of the regulated closing process so as to divert the borrowers' attention from the documented terms of the loans.  Moreover, Ameriquest trains its Account Executives to overcome objections raised by borrowers at closing by such tactics as threatening delay or cancellation of the closing, asserting that rates will increase, claiming that other lenders will foreclose or repossess property, offering immediate cash pending the closing of the loan, and by assuring borrowers that they can refinance with better terms after improving their credit score, without disclosing that they could be subject to the prepayment penalty, higher interest rates and other fees if they did so.

112.     At all times relevant to this action, Ameriquest's uniform and fundamental business strategy with respect to the sale of home-secured loans has been to:

a.     uniformly hold out to all prospective customers, through the use of misleading promotions and material omissions regarding loan terms, that refinancing and/or consolidating their debts with Ameriquest will be beneficial and will save them money when in fact it will not;

b.     employ aggressive, misleading, and unfair high-pressure sales tactics to obfuscate loan terms both prior to closing and at closing, if and when customers question loan terms, in order to force the customers to close the loan;

c.     force borrowers into mortgage loan that include one or more of the following terms:  (1) a high and/or mis-disclosed adjustable interest rate; (2) a "discount" fee that does not lower the interest rate; (3) excessive closing fees; and/or (4) a prepayment penalty provision;

d.     sell loans to these homeowners in amounts so high in relation to the value of their homes that the resulting debt-to-value ratio (coupled with prepayment penalties and other restrictions) effectively strips their homes of equity and prevents the borrowers from

refinancing their loans with Ameriquest's competitors, often by inflating appraisal values or the borrowers' income or asset statements; and

      e.      engage in "flipping," or aggressive solicitation of targeted borrowers, including existing Ameriquest customers, to refinance existing loans without significant benefit to the homeowner, thus generating additional debt, capitalizing previously charged points and fees, incorporating new and excessive costs and fees into the principal of the loan, and often increasing the borrower's interest rate.

      113.      Because Ameriquest profits from the origination and "flipping" of loans, and the subsequent sale of those loans to investment bankers and others as assets for mortgage-based securities, Ameriquest has little concern for the actual risk that the loans might default or with the continued profitability of the loans after origination, except to the extent that Ameriquest can induce existing borrowers to borrow more.

      114.      Ameriquest unfairly and deceptively holds out its mortgage loans as sound financial transactions that will save borrowers money. Ameriquest fails to disclose prior to closing and/or intentionally obfuscates and/or conceals before and at closing the following:

      a.      required TILA disclosures clearly and conspicuously, in a form that borrowers can understand, at or before the time the loan is consummated, in order to mislead consumers as to the true terms and costs of their loan transactions;

      b.      the high and/or adjustable interest rates charged on its loans, as well as the risks associated with adjustable rate mortgage ("ARM") loans;

      c.      the high and deceptive "discount" fees and closing fees routinely added to the loan principal;

      d.      the fact that, under 15 U.S.C. § 1635(a), 12 C.F.R. § 226.23(b)(1), borrowers have the right to rescind certain transactions up to three days following the consummation of the transaction or the delivery of the information and disclosures required by statute;

e.      the existence of a prepayment penalty, and that such prepayment penalty would make refinancing impossible and/or highly unfavorable for the borrower;

f.      the fact that the borrowers would have to pay, in addition to monthly loan payments, the cost of homeowners' insurance and property taxes that other lenders include in monthly escrow payments, and instead implies or allows borrowers to believe that the monthly payment will include these costs; and

g.      the fact that far from saving borrowers money (as Ameriquest systematically claims), the Ameriquest loans, increase the total amount of debt outstanding, exacerbate overall interest obligations, and place vulnerable borrowers at high risk of foreclosure.

115.    In addition, Ameriquest routinely fails to provide required disclosures to borrowers prior to closing — including, but not limited to, the HUD-1 statement, Notice of Right to Cancel, a "good faith" Good Faith Estimate, settlement process information booklet and other disclosures required under TILA — ensuring that borrowers have no meaningful opportunity to review them or to learn the true terms and costs of their loan transactions.

E.      **Ameriquest's Compensation System**

116.    Ameriquest has designed its compensation system to reward its AEs for "upselling" customers' loans, providing incentives for AEs aggressively to increase the amounts loaned to the maximum permitted by Ameriquest's underwriting goals, irrespective of the amounts requested by borrowers or supported by the actual value of the home. The effect of these "upsells" has been to "close the back door" on Ameriquest's customers by making loans that cannot be refinanced by Ameriquest's competitors.

117.    Ameriquest's compensation scheme also rewards AEs based on quantity of loans closed per month. The minimum monthly quotas have risen consistently over time, reaching levels that are significantly higher than the number of loans closed by sales personnel at other companies. Given that Ameriquest's AEs must reach the minimum quotas in order to be paid at any reasonable rate, and that the quotas are very high, Ameriquest's policy all but ensures

that its AEs will, as trained by Ameriquest, systematically engage in unfair and deceptive tactics to meet company quotas, with company knowledge of this widespread practice.

## II. AMERIQUEST'S COMMON PATTERN AND PRACTICE OF UNFAIR, UNLAWFUL, AND DECEPTIVE PRACTICES IN CONNECTION WITH MORTGAGE LOAN SERVICING

118. Ameriquest, in the servicing of residential loans originated by Ameriquest or others, mishandles borrowers' mortgage payments, unlawfully demands amounts that are not due under the threat of foreclosure, force-places insurance on properties it knows or should know to be insured, and fails to timely or properly credit payments received, resulting in late charges, delinquencies or default.

119. Ameriquest fails to deliver timely payoff information to subsequent lenders and improperly accounts for monies held in escrow.

120. Ameriquest routinely demands prepayment penalties in amounts that exceed the amount due under their loan agreements.

121. Ameriquest routinely and systematically treats borrowers as if they are in default on their loans even though borrowers have timely and sufficiently tendered mortgage payments or have otherwise complied with mortgage requirements.

122. Ameriquest has also routinely engaged in improper debt collection practices.

## CLAIMS OF NAMED PLAINTIFFS

123. Ameriquest refinanced Plaintiffs George and Crisella Barber's mortgage loan on January 15, 2003. During and after this process, Ameriquest made standard misrepresentations and/or failed to provide the Barbers with appropriate documentation and/or disclosures. As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

124. Ameriquest refinanced Plaintiff Debra Holloway's mortgage loan on February 21, 2003. During and after this process, Ameriquest made standard misrepresentations and/or failed to provide Holloway with appropriate documentation and/or disclosures. As a

result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

125.    Ameriquest refinanced Plaintiff Laurence Osten's mortgage loan on February 4, 2004. During and after this process, Ameriquest made standard misrepresentations and/or failed to provide Osten with appropriate documentation and/or disclosures. As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

126.    Ameriquest refinanced Plaintiff Barbara Ann Becker's mortgage loan on August 23, 2005. During and after this process, Ameriquest made standard misrepresentations and/or failed to provide Becker with appropriate documentation and/or disclosures, including but not limited to nondisclosures relating to kickback and referral fees.

127.    Ameriquest refinanced Plaintiff Tonya Summer Brown's mortgage loan on April 22, 2004. During and after this process, Ameriquest made standard misrepresentations and/or failed to provide Brown with appropriate documentation and/or disclosures. As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

128.    Ameriquest refinanced Plaintiff Guadalupe Hernandez's mortgage loan on January 28, 2004. During and after this process, Ameriquest made standard misrepresentations and/or failed to provide Hernandez with appropriate documentation and/or disclosures. As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

129.    Argent Mortgage, LLC refinanced Plaintiff Kevin and Maria Cusanelli's mortgage loan on October 14, 2003. Subsequently, the servicing of the loan was transferred to Ameriquest. Ameriquest engaged in unlawful servicing and debt collection practices, including but not limited to repeated violations of the terms of the mortgage loan contract.

130.    Ameriquest issued a high-cost home loan as defined under the Georgia Fair Lending Act ("GAFLA") in the name of Plaintiff Johnnie Ross in September, 2004. In

issuing such loan and charging fees and points which constitute a high-cost home loan, Ameriquest violated the requirements of GAFLA.

131.    Ameriquest issued a high-cost home loan as defined under the Georgia Fair Lending Act ("GAFLA") in the name of Plaintiff Charles Meadows in March, 2005.  In issuing such loan and charging fees and points which constitute a high-cost home loan, Ameriquest violated the requirements of GAFLA.

132.    Ameriquest issued a high-cost home loan as defined under the Georgia Fair Lending Act ("GAFLA") in the name of Plaintiffs Joseph and Nicole Riggins in March, 2005.  In issuing such loan and charging fees and points which constitute a high-cost home loan, Ameriquest violated the requirements of GAFLA.

133.    Ameriquest refinanced Plaintiff Kerri Capasso's mortgage loan on August 3, 2005.  During and after this process, Ameriquest made standard misrepresentations and/or failed to provide Capasso with appropriate documentation and/or disclosures. As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

134.    Ameriquest refinanced Plaintiffs Raymond and Rebecca Carlson's mortgage loan on May 13, 2003.  During and after this process, Ameriquest made standard misrepresentations and/or failed to provide the Carlsons with appropriate documentation and/or disclosures. As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

135.    Ameriquest refinanced Plaintiff Patrick Galvan's mortgage loan on December 9, 2003.  During and after this process, Ameriquest made standard misrepresentations and/or failed to provide Galvan with appropriate documentation and/or disclosures. As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

136.    Ameriquest refinanced Plaintiffs Robert and Debra Peabody's mortgage loan on September 5, 2001 and April 28, 2003.  During and after this process, Ameriquest made standard misrepresentations and/or failed to provide the Peabodys with appropriate

documentation and/or disclosures. As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

137.    Ameriquest refinanced Plaintiffs Craig and Michele D'Ambrogi's mortgage loan on May 6, 2004 and December 11, 2004.  During and after this process, Ameriquest made standard misrepresentations and/or failed to provide the D'Ambrogis with appropriate documentation and/or disclosures. As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

138.    Ameriquest refinanced Plaintiff William and Kathryn Birkholz's mortgage loan on July 21, 1999.  During and after this process, Ameriquest made standard misrepresentations and/or failed to provide the Birkholzes with appropriate documentation and/or disclosures. As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

139.    The Dohertys closed on a mortgage written by Town & Country on December 24, 2002.  During and after this process, Town & Country made standard misrepresentations and/or failed to provide the Dohertys with appropriate documentation and/or disclosures. As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

140.    Ameriquest refinanced Plaintiff Mary Harless' mortgage loan on September 14, 2005.  During and after this process, Ameriquest made standard misrepresentations and/or failed to provide Harless with appropriate documentation and/or disclosures. As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

141.    Ameriquest refinanced Plaintiffs James and Jennifer Jewell's mortgage loan on June 21, 2005.  During and after this process, Ameriquest made standard misrepresentations and/or failed to provide the Jewells with appropriate documentation and/or disclosures.  As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

142.    Ameriquest refinanced Plaintiff Deborah Juillerat's mortgage loan on January 24, 2002.  During and after this process, Ameriquest made standard misrepresentations and/or failed to provide Juillerat with appropriate documentation and/or disclosures.  As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

143.    Ameriquest refinanced Plaintiff Karen M. Kahrer's mortgage loan on June 21, 2004.  Upon information and belief, Kahrer alleges that the referral of Kahrer to Ameriquest by Sears at Sherman Acquisition was made in exchange for Ameriquest's promise to direct plaintiff, as a condition of loan approval, to pay the entire amount of the debt owed to Sears German acquisition, in violation of the Real Estate Procedures Act ("RESPA"), 12 U.S.C. § 2607 *et seq.*

144.    Ameriquest refinanced Plaintiffs Nona and Albert Knox's mortgage loan in or around 2002.  During and after this process, Ameriquest made standard misrepresentations and/or failed to provide the Knoxes with appropriate documentation and/or disclosures.  As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

145.    Ameriquest refinanced Plaintiff Maria Torres's mortgage loan on December 21, 2002.  During and after this process, Ameriquest made standard misrepresentations and/or failed to provide Torres with appropriate documentation and/or disclosures.  As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

146.    Argent Mortgage Company refinanced Plaintiffs Heladio and Maria Arellanes' mortgage loan on January 15, 2003.  During and after this process, Argent made standard misrepresentations and/or failed to provide the Arellanes with appropriate documentation and/or disclosures.  As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

147. Ameriquest refinanced Plaintiff Richard A. Madrazo's mortgage loan on November 5, 2004. During and after this process, Ameriquest made standard misrepresentations and/or failed to provide Madrazo with appropriate documentation and/or disclosures. As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

148. Ameriquest refinanced Plaintiff Yamal Montanez's mortgage loan on December 10, 2003. During and after this process, Ameriquest made standard misrepresentations and/or failed to provide Montanez with appropriate documentation and/or disclosures. As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

149. Ameriquest refinanced Plaintiffs Isabelle M. and David R. Murphy's mortgage loan on April 22, 2004. During and after this process, Ameriquest made standard misrepresentations and/or failed to provide the Murphys with appropriate documentation and/or disclosures. As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

150. Ameriquest refinanced Plaintiff Lynn Gay's mortgage loan on March 14, 2003 and September 2, 2003. During and after this process, Ameriquest made standard misrepresentations and/or failed to provide Gay with appropriate documentation and/or disclosures. As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

151. Argent Mortgage Company refinanced Plaintiffs David M. and Janet Wakefield's mortgage loan on January 15, 2004 and April 2, 2004. During and after this process, Argent made standard misrepresentations and/or failed to provide the Wakefields with appropriate documentation and/or disclosures. As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

152. Ameriquest refinanced Plaintiffs Frank and Martha White's mortgage loan on May 23, 2003 and December 19, 2003. During and after this process, Ameriquest made

standard misrepresentations and/or failed to provide the Whites with appropriate documentation and/or disclosures.  As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

153.    Ameriquest refinanced Plaintiff Harriet Holder's mortgage loans on November 24, 2003 and May 12, 2004.  During and after this process, Ameriquest made standard misrepresentations and/or failed to provide Holder with appropriate documentation and/or disclosures.  As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

154.    Ameriquest serviced the mortgage loans of Plaintiffs Pegi Saunders, Matthew and Tracey Lloyd, Dorothy Stevens, and Aris and Ricardo Gay.  Ameriquest serviced each of these loans in an unlawful manner and/or in violation of the loan agreements.  For example, and not by way of limitation, Ameriquest assessed each of these plaintiffs with late charges when payments were timely, in violation of loan agreements.  Ameriquest also engaged in abusive debt collection practices.

155.    Ameriquest refinanced Plaintiff Steven H. Ungar's mortgage loan on May 24, 2005. During and after this process, Ameriquest made standard misrepresentations and/or failed to provide Gay with appropriate documentation and/or disclosures.  As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

156.    Ameriquest refinanced Plaintiff Cheryl Williams' mortgage loan on May 20, 2003.  During and after this process, Ameriquest made standard misrepresentations and/or failed to provide Williams with appropriate documentation and/or disclosures.  As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

157.    Ameriquest refinanced Plaintiff Duval Naughton's mortgage loan on September 14, 2004.  During and after this process, Ameriquest made standard misrepresentations and/or failed to provide Naughton with appropriate documentation and/or disclosures.  As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

158.     Ameriquest refinanced Plaintiffs Latonya and Dwayne Williams'
mortgage loan on January 15, 2004.  During and after this process, Ameriquest made standard
misrepresentations and/or failed to provide the Williams with appropriate documentation and/or
disclosures.  As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal
interest, fees and penalties.

159.     Ameriquest refinanced Plaintiffs William and Daisybel Tolbert's
mortgage loan on January 7, 2004.  During and after this process, Ameriquest made standard
misrepresentations and/or failed to provide the Tolberts with appropriate documentation and/or
disclosures.  As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal
interest, fees and penalties.

160.     Ameriquest refinanced Plaintiffs Timothy and Francis Adamowicz's
mortgage loan on December 22, 2003. During and after this process, Ameriquest made standard
misrepresentations and/or failed to provide the Adamowiczs with appropriate documentation
and/or disclosures.  As a result, the costs of the mortgage included excessive, undisclosed, and/or
illegal interest, fees and penalties.

161.     Ameriquest refinanced Plaintiff Christopher Bourassa's mortgage loan on
October 15, 2004.  During and after this process, Ameriquest made standard misrepresentations
and/or failed to provide Mr. Bourassa with appropriate documentation and/or disclosures.  As a
result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and
penalties.

162.     Ameriquest refinanced Plaintiff Venitra Brown's mortgage loan on August
9, 2002 and October 24, 2003. During and after this process, Ameriquest made standard
misrepresentations and/or failed to provide Ms. Brown with appropriate documentation and/or
disclosures.  As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal
interest, fees and penalties.

163.     Ameriquest refinanced Plaintiffs Edrick and Debra Centeno's mortgage
loan on September 23, 2004. During and after this process, Ameriquest made standard

misrepresentations and/or failed to provide the Centenos with appropriate documentation and/or disclosures.  As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

164.    Ameriquest refinanced Plaintiff Vaughn DeBold's mortgage loan on November 24, 2004. During and after this process, Ameriquest made standard misrepresentations and/or failed to provide Mr. DeBold with appropriate documentation and/or disclosures.  As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

165.    Town and Country refinanced Plaintiffs Gregory and Marcell DeMeo's mortgage loan on August 24, 2005. During and after this process, Ameriquest made standard misrepresentations and/or failed to provide the DeMeos with appropriate documentation and/or disclosures.  As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

166.    Ameriquest refinanced Plaintiff James Devlin's mortgage loan on February 17, 2004. During and after this process, Ameriquest made standard misrepresentations and/or failed to provide Mr. Devlin with appropriate documentation and/or disclosures.  As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

167.    Ameriquest refinanced Plaintiffs Timothy and Cynthia Dion's mortgage loan on January 9, 2004. During and after this process, Ameriquest made standard misrepresentations and/or failed to provide the Dions with appropriate documentation and/or disclosures.  As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

168.    Ameriquest refinanced Plaintiff Karen Dudeck's mortgage loan on two occasions: February 12, 2004 and November 12, 2002. During and after this process, Ameriquest made standard misrepresentations and/or failed to provide Ms. Dudeck with appropriate

documentation and/or disclosures.  As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

169.    Ameriquest refinanced Plaintiff Christopher Gabrielli's mortgage loan on November 17, 2003, June 23, 2004 and May 12, 2005.  During and after this process, Ameriquest made standard misrepresentations and/or failed to provide Mr. Gabrielli with appropriate documentation and/or disclosures.  As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

170.    Ameriquest refinanced Plaintiff Patricia Masson's mortgage loan on April 23, 2005.  During and after this process, Ameriquest made standard misrepresentations and/or failed to provide Ms. Masson with appropriate documentation and/or disclosures.  As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

171.    Ameriquest refinanced Plaintiffs John and Kathleen O'Callaghan's mortgage loan on October 12, 2004.  During and after this process, Ameriquest made standard misrepresentations and/or failed to provide the O'Callaghans with appropriate documentation and/or disclosures.  As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

172.    Ameriquest refinanced Plaintiff Glen Powell's mortgage loans on two occasions: May 13, 2003 and October 9, 2003 respectively. During and after this process, Ameriquest made standard misrepresentations and/or failed to provide Mr. Powell with appropriate documentation and/or disclosures.  As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

173.    Ameriquest refinanced Plaintiff Michele Powell's three mortgage loans on October 18, 2003, December 4, 2002 and July 17 2002, respectively. During and after this process, Ameriquest made standard misrepresentations and/or failed to provide Ms. Powell with appropriate documentation and/or disclosures.  As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

174.    Ameriquest refinanced Plaintiff Michael Russo's mortgage loan on December 27, 2004. During and after this process, Ameriquest made standard misrepresentations and/or failed to provide Mr. Russo with appropriate documentation and/or disclosures.  As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

175.    Ameriquest refinanced Plaintiff Kenneth Sawyer's mortgage loan on June 9, 2003.  During and after this process, Ameriquest made standard misrepresentations and/or failed to provide Mr. Sawyer with appropriate documentation and/or disclosures.  As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

176.    Ameriquest refinanced Plaintiffs Frank and Linda Shea's mortgage loan on July 7, 2004. During and after this process, Ameriquest made standard misrepresentations and/or failed to provide the Sheas with appropriate documentation and/or disclosures.  As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

177.    Ameriquest refinanced Plaintiffs Scott Ventola's and Steven Bourassa's mortgage loan on September 23, 2005.  During and after this process, Ameriquest made standard misrepresentations and/or failed to provide Mr. Ventola and/or Mr. Bourassa with appropriate documentation and/or disclosures.  As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

178.    Ameriquest refinanced Plaintiff Joshua Wilgoren's mortgage loan on September 8, 2005. During and after this process, Ameriquest made standard misrepresentations and/or failed to provide Mr. Wilgoren with appropriate documentation and/or disclosures.  As a result, the costs of the mortgage included excessive, undisclosed, and/or illegal interest, fees and penalties.

## CLASS ACTION ALLEGATIONS

### I.    LOAN ORIGINATION CLASS

179.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) on their own behalf and on the behalf of all other members of the classes described below.

180.    Plaintiffs seek certification of a nationwide class of individuals (excluding Defendants; the parents, subsidiaries and affiliates, officers and directors of Defendants or any entity in which Defendants have a controlling interest; and the legal representatives, successors, or assigns of any such excluded persons) who presently own, or during the Class Period owned, property (including mobile homes) in the United States, and who entered into a mortgage loan transaction relating to such property with Ameriquest or its predecessors, at any time between July 1, 1999, and the present (the "Origination Class").

181.    Also excluded from the Origination Class are individuals who released claims in the Judicial Council Coordination Proceeding No. 4162, to the extent such individuals' released claims are covered by the Origination Class (Superior Court of the State of California, San Mateo County).

182.    The Representative Plaintiffs of the Origination Class are referred to herein as the "Origination Plaintiffs."

183.    The members of the Origination Class are so numerous and geographically dispersed across the country that joinder of all members is impracticable.  While the exact number of Class members is unknown to the Origination Plaintiffs at this time, Plaintiffs believe that there are hundreds of thousands of Origination Class members.  Detailed information on the Class can be ascertained through appropriate discovery and from records maintained by Ameriquest.

184.    The Origination Plaintiffs' claims are typical of the claims of the members of the Origination Class, as the Origination Plaintiffs and all other members of the Origination Class sustained damages arising out of the same wrongful conduct by Ameriquest.  The

Origination Plaintiffs will fairly and adequately represent and protect the interests of the members of the Origination Class and have retained counsel competent and experienced in class action and consumer litigation.

185.    Common questions of law and fact exist as to all members of the Origination Class and predominate over any questions affecting solely individual Origination members.  Among these common questions of law and fact common are:

a.    Whether Ameriquest systematically failed to provide the disclosures required by law, including TILA disclosures, clearly and conspicuously, in writing and in a form that Class Members can keep and/or understand;

b.    Whether Ameriquest charged borrowers an improper discount fee or charge;

c.    Whether Ameriquest has been or are engaged in a "bait and switch" scheme, in which Origination Class Members have been lured in with promises of a particular set of loan terms, and are then given different and far less beneficial terms;

d.    Whether documents, contracts, and practices relating to the transactions between members of the Origination Class and Ameriquest were unfair, unconscionable, deceptive, untrue, misleading, or omitted material facts and disclosures;

e.    Whether Ameriquest misrepresented, concealed, and/or failed to disclose loan terms;

f.    Whether Ameriquest misled the Origination Plaintiffs and the Origination Class in connection with marketing, solicitation, sale, operation, and administration of the mortgage loans; and

g.    Whether the Origination Plaintiffs and the Origination Class are entitled to the imposition of a constructive trust or other equitable or injunctive relief as a result of, among other things, Ameriquest's unjust enrichment.

h.      Whether Ameriquest has been or is engaged in unfair and unlawful business practices, and whether the alleged conduct violated the California Business and Professions Code and the California Consumer Legal Remedies Act;

i.      Whether the law of the State of California can apply to all Origination Class Members;

j.      Whether declaratory relief giving Origination Class Members the right to rescind their mortgage loans should be issued;

k.      Whether Origination Plaintiffs and the Origination Class are entitled to damages and the appropriate measure of such damages; and

l.      Whether Origination Plaintiffs and the Origination Class are entitled to punitive damages.

186.    A class action is superior to other available methods for the fair and efficient adjudication of Ameriquest's uniform unlawful practices because joinder of all members is impracticable.  Prosecution of separate actions by individual Origination Class members would create an inherent risk of inconsistent and varying adjudications, with the concomitant risk of the establishment of incompatible and conflicting standards of conduct for Ameriquest.  In addition, due to the vastly unequal market power between the parties, and the fact that many Origination Class members are in ongoing commercial relationships with Ameriquest, a Class action may be the only way, as a practical matter, that the cases will be prosecuted.  The Origination Plaintiffs foresee no significant difficulties in managing this action as a class action.

187.    The Origination Plaintiffs also seek claims on behalf of two single-state state law subclass:  a class of Florida residents, who assert claims under the Florida Mortgage Lending Act, as set forth below; and a class of Georgia residents, who assert claims under GAFLA, as set forth below.  The subclasses repeat and reallege the paragraphs above, and allege that addition common questions include, respectively, whether Ameriquest violated the Florida Mortgage Lending Act and GAFLA.

II.    **LOAN ORIGINATION SUBCLASSES: TILA SUBCLASS; DISCOUNT POINTS SUBCLASS; BAIT AND SWITCH SUBCLASS; AND RESPA ILLEGAL REFERRAL SUBCLASS**

A.    **TILA Subclass**

188.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2) and (b)(3) on their own behalf and on the behalf of all other members of the subclass described below.

189.    Plaintiffs seek certification of a nationwide subclass of individuals (excluding Defendants; the parents, subsidiaries and affiliates, officers and directors of Defendants or any entity in which Defendants have a controlling interest; and the legal representatives, successors, or assigns of any such excluded persons) who (a) presently own, or during the Class Period owned, property (including mobile homes) in the United States and (b) who entered into a mortgage loan transaction relating to such property with Ameriquest or its predecessors at any time on or after July 1, 2004 or, for residents in Massachusetts, on or after November 5, 2000 (the "TILA Subclass").

190.    Also excluded from the TILA Subclass are individuals who released claims in the Judicial Council Coordination Proceeding No. 4162 (Superior Court of the State of California, San Mateo County).

191.    For purposes of any claims related to the right of rescission under 15 U.S.C. § 1635, the TILA Subclass includes any individual whose rights have not terminated pursuant to 15 U.S.C.  § 1635(f) and individuals whose rights were expressly preserved by the Stipulation for Standstill entered by the Court on February 21, 2006.  This inclusion applies regardless of the origination date of the transaction.

192.    The Representative Plaintiffs of the TILA Subclass are referred to herein as the "TILA Plaintiffs."

193.    The members of the TILA Subclass are so numerous and geographically dispersed across the country that joinder of all members is impracticable.  While the exact number of Subclass members is unknown to the Plaintiffs at this time, Plaintiffs believe that

there are at least thousands of TILA Subclass members. Detailed information on the Subclass can be ascertained through appropriate discovery and from records maintained by Ameriquest.

194.    The TILA Plaintiffs' claims are typical of the claims of the members of the TILA Subclass, as the TILA Plaintiffs and all other members of the TILA Subclass entered into transactions that were subject to the TILA-provided right to cancel and were injured based on Ameriquest's conduct.

195.    The TILA Plaintiffs will fairly and adequately represent and protect the interests of the members of the TILA Subclass and have retained counsel competent and experienced in class action and consumer litigation.

196.    Common questions of law and fact exist as to all members of the TILA Subclass and predominate over any questions affecting solely individual members of the Subclass. Among these common questions of law and fact common are:

a.    Whether Ameriquest is a creditor within the meaning of TILA and whether the transactions between TILA Subclass members and Ameriquest were "consumer credit" transactions as defined by TILA and Regulation Z, 15 U.S.C. § 1602(h) and 12 C.F.R. § 226.2(a)(12) and(17).

b.    Whether the transactions between TILA Subclass members and Ameriquest were "closed end" credit transactions;

c.    Whether Ameriquest had a common practice of failing to provide required disclosures under TILA;

d.    Whether Ameriquest had a common practice of providing deficient disclosures under TILA;

e.    Whether the TILA Plaintiffs and Subclass members are entitled to a declaration that they have the right to rescind their transactions; and

f.    Whether the TILA Plaintiffs and Subclass members are entitled to statutory damages.

197.    A class action is superior to other available methods for the fair and efficient adjudication of Ameriquest's uniform unlawful practices because joinder of all members is impracticable.  Prosecution of separate actions by individual TILA Subclass members would create an inherent risk of inconsistent and varying adjudications, with the concomitant risk of the establishment of incompatible and conflicting standards of conduct for Ameriquest.  In addition, due to the vastly unequal market power between the parties, and the fact that many TILA Subclass members are in ongoing commercial relationships with Ameriquest, a Class action may be the only way, as a practical matter, that the cases will be prosecuted.  The TILA Plaintiffs foresee no significant difficulties in managing this action as a class action.

**B.    Discount Points Subclass**

198.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2) and (b)(3) on their own behalf and on the behalf of all other members of the subclass described below.

199.    Plaintiffs seek certification of a nationwide subclass of individuals (excluding Defendants; the parents, subsidiaries and affiliates, officers and directors of Defendants or any entity in which Defendants have a controlling interest; and the legal representatives, successors, or assigns of any such excluded persons) who (a) presently own, or during the Class Period owned, property (including mobile homes) in the United States, (b) who entered into a mortgage loan transaction relating to such property with Ameriquest or its predecessors at any time between July 1, 1999 and the present, and (c) who paid a charge for "discount points" or "discount fees" (the "Discount Points Subclass").

200.    Also excluded from the Discount Points Subclass are individuals who released claims in the Judicial Council Coordination Proceeding No. 4162 (Superior Court of the State of California, San Mateo County).

201.    The Representative Plaintiffs of the Discount Points Subclass are referred to herein as the "Discount Points Plaintiffs."

202.    The members of the Discount Points Subclass are so numerous and geographically dispersed across the country that joinder of all members is impracticable.  While the exact number of Subclass members is unknown to the Plaintiffs at this time, Plaintiffs believe that there are at least thousands of Discount Points Subclass members.  Detailed information on the Subclass can be ascertained through appropriate discovery and from records maintained by Ameriquest.

203.    The Discount Points Plaintiffs' claims are typical of the claims of the members of the Discount Points Subclass, as the Discount Points Plaintiffs and all other members of the Discount Points Subclass paid discount fees or charges and sustained damages arising out of the same wrongful conduct by Ameriquest.

204.    The Discount Points Plaintiffs will fairly and adequately represent and protect the interests of the members of the Discount Points Subclass and have retained counsel competent and experienced in class action and consumer litigation.

205.    Common questions of law and fact exist as to all members of the Discount Points Subclass and predominate over any questions affecting solely individual members of the Subclass.  Among these common questions of law and fact common are:

    a.    Whether borrowers paid discount fees or charges;

    b.    Whether Ameriquest disclosed the loan discount associated with payment of the fee;

    c.    Whether Ameriquest had a common policy and practice of promising borrowers that they would receive consideration in exchange for the payment of these discounts fees;

    d.    Whether Ameriquest had a common practice of depriving borrowers of consideration in exchange for the payment of discount fees;

    e.    Whether Ameriquest failed to offer borrowers an alternative loan without the loan discount fees for the purpose of allowing borrowers to decide whether the loan discount was acceptable;

       f.      Whether Ameriquest has breached contracts with borrowers by charging discount points;

       g.      Whether Ameriquest has been unjustly enriched;

       h.      Whether Ameriquest has violated state laws; and

       i.      The proper measure of damages and other relief for the Discount Points Subclass.

206.    A class action is superior to other available methods for the fair and efficient adjudication of Ameriquest's uniform unlawful practices because joinder of all members is impracticable.  Prosecution of separate actions by individual Discount Points Subclass members would create an inherent risk of inconsistent and varying adjudications, with the concomitant risk of the establishment of incompatible and conflicting standards of conduct for Ameriquest.  In addition, due to the vastly unequal market power between the parties, and the fact that many Discount Points Subclass members are in ongoing commercial relationships with Ameriquest, a Class action may be the only way, as a practical matter, that the cases will be prosecuted.  The Discount Points Plaintiffs foresee no significant difficulties in managing this action as a class action.

## C.    **The Bait and Switch Subclass**

207.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2) and (b)(3) on their own behalf and on the behalf of all other members of the subclass described below.

208.    Plaintiffs seek certification of a nationwide subclass of individuals (excluding Defendants; the parents, subsidiaries and affiliates, officers and directors of Defendants or any entity in which Defendants have a controlling interest; and the legal representatives, successors, or assigns of any such excluded persons) who (a) presently own, or during the Class Period owned, property (including mobile homes) in the United States, (b) who entered into a mortgage loan transaction relating to such property with Ameriquest or its predecessors at any time between July 1, 1999 and the present, and (c) who were offered one set

of loan terms during the loan marketing process but received different loan terms at closing (the "Bait and Switch Subclass").

209.    Also excluded from the Bait and Switch Points Subclass are individuals who released claims in the Judicial Council Coordination Proceeding No. 4162 (Superior Court of the State of California, San Mateo County).

210.    The Representative Plaintiffs of the Bait and Switch Subclass are referred to herein as the "Bait and Switch Plaintiffs."

211.    The members of the Bait and Switch Subclass are so numerous and geographically dispersed across the country that joinder of all members is impracticable.  While the exact number of Subclass members is unknown to the Plaintiffs at this time, Plaintiffs believe that there are at least thousands of Bait and Switch Subclass members.  Detailed information on the Subclass can be ascertained through appropriate discovery and from records maintained by Ameriquest.

212.    The Bait and Switch Plaintiffs' claims are typical of the claims of the members of the Bait and Switch Subclass, as the Bait and Switch Plaintiffs and all other members of the Bait and Switch Subclass were offered a different interest rate at closing than in earlier disclosures and sustained damages arising out of the same wrongful conduct by Ameriquest.

213.    The Bait and Switch Plaintiffs will fairly and adequately represent and protect the interests of the members of the Bait and Switch Subclass and have retained counsel competent and experienced in class action and consumer litigation.

214.    Common questions of law and fact exist as to all members of the Bait and Switch Subclass and predominate over any questions affecting solely individual members of the Subclass.  Among these common questions of law and fact common are:

a.    Whether borrowers were offered different interest rates before closing as during closing;

b.     Whether Ameriquest intended to switched mortgage loan terms at closings;

c.     Whether Ameriquest failed to provide Notices of Adverse Actions when it engaged in its bait-and-switch scheme;

d.     Whether Ameriquest has violated ECOA;

e.     Whether Ameriquest has violated the FCRA;

f.     Whether Ameriquest has breached its contracts with borrowers;

g.     Whether the bait-and-switch scheme violates state laws;

h.     The proper measure of damages and other relief for the Bait and Switch Subclass.

215.    A class action is superior to other available methods for the fair and efficient adjudication of Ameriquest's uniform unlawful practices because joinder of all members is impracticable.  Prosecution of separate actions by individual Bait and Switch Subclass members would create an inherent risk of inconsistent and varying adjudications, with the concomitant risk of the establishment of incompatible and conflicting standards of conduct for Ameriquest.  In addition, due to the vastly unequal market power between the parties, and the fact that many Bait and Switch Subclass members are in ongoing commercial relationships with Ameriquest, a Class action may be the only way, as a practical matter, that the cases will be prosecuted.  The Bait and Switch Plaintiffs foresee no significant difficulties in managing this action as a class action.

D.     **RESPA Illegal Referral Subclass**

216.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on their own behalf and on the behalf of all other members of the subclass described below.

217.    Plaintiffs seek certification of a nationwide subclass of individuals (excluding Defendants; the parents, subsidiaries and affiliates, officers and directors of Defendants or any entity in which Defendants have a controlling interest; and the legal

representatives, successors, or assigns of any such excluded persons) who (a) presently own, or during the Class Period owned, property (including mobile homes) in the United States, (b) who entered into a mortgage loan transaction relating to such property with Ameriquest or its predecessors at any time between March 23, 2004 and the present, and (c) who paid settlement, appraisal, and/or closing related fees that Ameriquest shared with other entities (the "RESPA Illegal Referral Subclass" or "RESPA Subclass").

218.     The Representative Plaintiffs of the RESPA Subclass, namely, Michele and Craig D'Ambrogi, Barbara Ann Becker, Kathryn and William Birkholz, Aris and Ricardo Gay, Karen M. Kaher, Matthew and Tracey Lloyd, Pegi Saunders, and Dorothy Stevens, are referred to herein as the "RESPA Plaintiffs."

219.     The members of the RESPA Subclass are so numerous and geographically dispersed across the country that joinder of all members is impracticable.  While the exact number of Subclass members is unknown to the RESPA Plaintiffs at this time, Plaintiffs believe that there are at least thousands of RESPA Subclass members.  Detailed information on the Subclass can be ascertained through appropriate discovery and from records maintained by Ameriquest.

220.     The RESPA Plaintiffs' claims are typical of the claims of the members of the RESPA Subclass, as the RESPA Plaintiffs and all other members of the RESPA Subclass sustained damages arising out of the same wrongful conduct by Ameriquest and the entities to which it provided or from which it received illegal fees, referrals, or kickbacks.

221.     The RESPA Plaintiffs will fairly and adequately represent and protect the interests of the members of the RESPA Subclass and have retained counsel competent and experienced in class action and consumer litigation.

222.     Common questions of law and fact exist as to all members of the RESPA Subclass and predominate over any questions affecting solely individual members of the Subclass.  Among these common questions of law and fact common are:

a.      Whether referrals from creditors to Ameriquest of the identity of the creditors' debtors in exchange for Ameriquest's requiring such debtors to repay their debts is a "thing of value" within the meaning of RESPA;

b.      Whether Ameriquest had a common practice of making contracts or agreements with third parties to charge for settlement or closing services that were not in fact performed; and

c.      Whether the RESPA Plaintiffs and the RESPA Subclass are entitled to treble damages.

223.    A class action is superior to other available methods for the fair and efficient adjudication of Ameriquest's uniform unlawful practices because joinder of all members is impracticable.  Prosecution of separate actions by individual RESPA Subclass members would create an inherent risk of inconsistent and varying adjudications, with the concomitant risk of the establishment of incompatible and conflicting standards of conduct for Ameriquest.  In addition, due to the vastly unequal market power between the parties, and the fact that many RESPA Subclass members are in ongoing commercial relationships with Ameriquest, a Class action may be the only way, as a practical matter, that the cases will be prosecuted.  The RESPA Plaintiffs foresee no significant difficulties in managing this action as a class action.

## III.    <u>LOAN SERVICING CLASS</u>

224.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) on their own behalf and on the behalf of all other members of the class described below.

225.    Plaintiffs seek certification of a nationwide class of individuals who have had residential loans serviced by Ameriquest at any time between July 1, 1999, and the present (the "Servicing Class").

226.    Excluded from the Servicing Class are Defendants; the parents, subsidiaries and affiliates, officers and directors of Defendants or any entity in which Defendants

have a controlling interest; and the legal representatives, successors, or assigns of any such excluded persons.

227.    The Representative Plaintiffs of the Servicing Class, namely, Kevin and Maria Cusanelli, Aris and Ricardo Gay, Matthew and Tracey Lloyd, Pegi Saunders, and Dorothy Stevens, are referred to herein as the "Servicing Plaintiffs."

228.    The members of the Servicing Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to the Servicing Plaintiffs at this time, Plaintiffs believe that there are tens of thousands of Servicing Class members.  Detailed information on the Class can be ascertained through appropriate discovery and from records maintained by Ameriquest.

229.    The Servicing Plaintiffs' claims are typical of the claims of the members of the Servicing Class, as the Servicing Plaintiffs and all other members of the Servicing Class sustained damages arising out of the same wrongful conduct by Ameriquest.  The Servicing Plaintiffs will fairly and adequately represent and protect the interests of the members of the Servicing Class and have retained counsel competent and experienced in class action and consumer litigation.

230.    A class action is superior to other available methods for the fair and efficient adjudication of Ameriquest's uniform unlawful practices because joinder of all members is impracticable.  Prosecution of separate actions by individual Servicing Class members would create an inherent risk of inconsistent and varying adjudications, with the concomitant risk of the establishment of incompatible and conflicting standards of conduct for Ameriquest.  In addition, due to the vastly unequal market power between the parties, and the fact that many Servicing Class members are in ongoing commercial relationships with Ameriquest, a Class action may be the only way, as a practical matter, that the cases will be prosecuted.  The Servicing Plaintiffs foresee no significant difficulties in managing this action as a class action.

231.    Common questions of law and fact exist as to all members of the Servicing Class and predominate over any questions affecting solely individual Servicing members.  Among these common questions of law and fact common are:

a.    Whether the Defendants have engaged in a common course of deceptive, misleading, or unfair conduct, including the acts and practices identified herein in the servicing of loans collateralized by real property and in collecting alleged debts in connection with these loans;

b.    Whether Ameriquest has engaged in a uniform practice of assessing improper late fees;

c.    Whether Ameriquest has improperly and illegally charged customers for force-placed insurance products;

d.    Whether Ameriquest engaged in unlawful collection practices and/or has unfairly initiated collections proceedings;

e.    Whether Ameriquest has systematically misapplied customer payments;

f.    Whether Ameriquest has breached contracts with customers;

g.    Whether Ameriquest has been unjustly enriched;

h.    Whether Servicing Plaintiffs and Servicing Class members are entitled to the injunctive and equitable relief requested herein; and

i.    Whether Servicing Plaintiffs and Servicing Class members have sustained damages, and the proper measure of damages.

### TOLLING OF STATUTES OF LIMITATIONS BY FRAUDULENT CONCEALMENT

232.    Any applicable statutes of limitations have been tolled by the Defendants' continuing, knowing, and active concealment of the facts alleged herein, including but not limited to Defendants' practices of concealing that they would not, despite promises, refinance loans.  Despite exercising reasonable diligence, Plaintiffs and members of the Class could not

have discovered, did not discover, and were prevented from discovering, the wrongdoing complained of herein.

233.    In the alternative, the Defendants should be estopped from relying on any statutes of limitations.  The Defendants have been under a continuing duty to disclose the true character, nature, and quality of their loan origination and servicing practices.  The Defendants owed Plaintiffs and other members of the Class an affirmative duty of full and fair disclosure, but knowingly failed to honor and discharge such duty.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(Violation of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601)**
**(By the TILA Plaintiffs on Behalf of Themselves and the TILA Subclass as Against Ameriquest)**

234.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs.

235.    Ameriquest is a creditor within the meaning of the TILA and Regulation Z, 15 U.S.C. §1602(f) and 12 C.F.R. §226.2(a)(17).

236.    Each of the transactions between the TILA Plaintiffs and the TILA Subclass and Ameriquest is a "consumer credit" transaction as defined in the TILA and Regulation Z. 15 U.S.C. §1602(h) and 12 C.F.R. §226.2(a)(12).

237.    Each of the transactions between the TILA Plaintiffs and the TILA Subclass and Ameriquest is a "closed end" credit transaction, as that term is defined in 12 C.F.R. §226.2(10), and is subject to the requirements for such transactions set forth in 15 U.S.C. §1638 and 12 C.F.R. §226.17 through 226.34.

238.    Because each of the transactions between the TILA Plaintiffs and the TILA Subclass and Ameriquest was secured by the Plaintiffs' homes, and was not entered into for purposes of the initial acquisition or construction of that home, it was subject to the right to cancel provided by 15 U.S.C. §1635 and 12 C.F.R. §226.23.

239.    In connection with each of Plaintiffs' loan transactions, Ameriquest failed to provide statutorily mandated material disclosures pursuant to 15 U.S.C. §§ 1635, 1638 and 12 C.F.R. §§ 226.18, 226.23.

240.    The disclosures were and are deficient for one or more of the following reasons:

a.    The Notice of Right to Cancel form not include the date the rescission period expires as required by 12 C.F.R. § 226.23(b)(1)(v); and/or

b.    The Notice of Right to Cancel form, in violation of 12 C.F.R. § 226.23(b)(2), was a general model rescission form promulgated by the Federal Reserve Board [H-8], even though the transactions required the use of form [H-9];

c.    The Notice of Right to Cancel form was contradicted by a "One Week Cancellation" form such that the actual expiration period for the right to cancel was not clearly and conspicuously disclosed; and/or

d.    The Truth in Lending disclosure form did not include the word "monthly" in the description of the timing of the scheduled payments in violation of 15 U.S.C. § 1638(a)(6);

e.    The disclosures were not clear and conspicuous because they were contradicted by other information provided at the time of the borrowers' loan transactions including, without limitation, information about non-refundable finance charges; and/or

f.    The disclosures were not provided until after the loan was consummated.

241.    By providing incorrect Notices of Right to Cancel, Ameriquest misinformed the TILA Plaintiffs and the TILA Subclass about the effects of rescission and/or the deadline for exercising the right to cancel.

242.    Failure to provide the required disclosures enlarges the rescission period up to three years from the date of the loan transaction. 15 U.S.C. § 1635(a), (f); 12 C.F.R. § 226.23(a)(3). In Massachusetts, failure to provide the required disclosures enlarges the

rescission period up to four years from the date of the loan transaction. M.G.L. c. 140D § 10(a), (f), 209 C.M.R. § 32,23(1)(c).

243. The TILA Plaintiffs and the members of the TILA Subclass are entitled to a declaration that they have the right to rescind their transactions and, if they choose to rescind, they are entitled to cancellation of finance charges in connection with their transaction and to a determination that Ameriquest's property interests in that borrower's real estate is void pursuant to 15 U.S.C. § 1635(b); 12 C.F.R. § 226.23(d).

244. The TILA Plaintiffs and the TILA Subclass are entitled to damages, costs and attorney's fees pursuant to 15 U.S.C. § 1640(a)(2).

### SECOND CAUSE OF ACTION
**(Violation of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691(b))**
**(By the Bait and Switch Plaintiffs on Behalf of Themselves and**
**the Bait and Switch Subclass as Against Ameriquest)**

245. Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs.

246. Ameriquest is a creditor within the meaning of 15 U.S.C. § 1691a(e).

247. The Bait and Switch Plaintiffs and Subclass were applicants within the meaning of 15 U.S.C. § 1691a(b).

248. Ameriquest violated 15 U.S.C. § 1691(d) as to Bait and Switch Plaintiffs and the Bait and Switch Subclass in that it did not provide them with the notice of adverse action as required by the provision when Ameriquest refused to grant credit to the Bait and Switch Plaintiffs and the Bait and Switch Subclass on the terms requested, but pursuant to its bait and switch tactics, provided substantially different terms.

249. As a result of Ameriquest's conduct, Bait and Switch Plaintiffs and the Bait and Switch Class have suffered actual damages, and are entitled to recover such actual damages as well as punitive damages, equitable and declaratory relief, costs and attorney fees.

**THIRD CAUSE OF ACTION**
**(Violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681(m))**
**(By the Bait and Switch Plaintiffs on Behalf of Themselves and**
**the Bait and Switch Subclass as Against Ameriquest)**

250.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs.

251.    Ameriquest is a user of consumer reports from consumer reporting agencies, in connection with the extension of credit to consumers, for purposes of 15 U.S.C. § 1681a.

252.    Ameriquest's failure to provide credit on the terms in initially promised to the Bait and Switch Plaintiffs and the Bait and Switch Subclass, and to instead offer credit at less favorable more costly terms, constituted an adverse action, pursuant to 15 U.S.C. § 1681a(k).

253.    The adverse action taken by Ameriquest was based wholly or partly on information contained in a consumer report, or alternatively was based on information obtained from a person other than a consumer reporting agency, bearing upon the credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living of the Bait and Switch Plaintiffs and the Bait and Switch Subclass members.

254.    Ameriquest failed to provide notices of adverse action to each of the Bait and Switch Plaintiffs and the Bait and Switch Subclass members as required by 15 U.S.C. § 1681m(a).

255.    In the alternative, Ameriquest violated the FCRA by failing to provide adverse action notices which provided an accurate or meaningful description of the basis for such adverse taken, or which otherwise fail to comply with FCRA.

256.    Ameriquest's failure to comply with 15 U.S.C. § 1681m(a) was willful or, in the alternative, was negligent.

257.    The Bait and Switch Plaintiffs and the Bait and Switch Subclass members suffered damages as a result of Ameriquest's failure.

**FOURTH CAUSE OF ACTION**
**(Violation of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601)**
**(By the RESPA Plaintiffs on Behalf of themselves and**
**the RESPA Illegal Referral Subclass as Against Ameriquest)**
**(By Barbara Ann Becker as Against Defendant JM Closing Services Inc. and**
**Jonathan Means)**

258.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs.

259.    The RESPA Plaintiffs and the members of the RESPA Illegal Referral Class were subject to one or more of the following practices:  (a) Ameriquest's requirement that a borrower  repay a debt owed to an existing creditor as a condition of receiving a mortgage refinancing loan; (b) Ameriquest's acceptance of fees for providing real estate settlement services when in fact those fees were for charges unrelated to real estate settlement services; and (c) Ameriquest's agreements with other entities (including by way of example JM Closing Services Inc.) that falsely presented themselves as performing bona fide notary or closing services that they did not in fact perform, charged fees for such services, and kicked-back a portion of such fees to Ameriquest.

260.    The referrals from creditors to Ameriquest of the identity of the creditors' debtors in exchange for Ameriquest's requiring such debtors/prospective borrowers to satisfy their debts to creditors is a "thing of value" within the meaning of RESPA.

261.    Kickbacks for notary and closing services are also "things of value" within the meaning of RESPA.

262.    Ameriquest violated RESPA, §2607(a) and related federal regulations and interpretations by giving a fee, kickback, or thing of value in exchange for the referral of real estate services.

263.    The RESPA Plaintiffs and the members of the RESPA Illegal Referral Subclass seek damages in an amount equal to three times the amount of any charge paid for such settlement services, as well as reasonable costs and attorneys' fees.

264.    In addition, Plaintiff Becker seeks damages, as well as reasonable costs and attorneys' fees, from JM Closing Services Inc. and Jonathan Means.

## FIFTH CAUSE OF ACTION
### (Unjust Enrichment)
### (By All Representative Plaintiffs on Behalf of Themselves and
### All Classes as Against Ameriquest)

265.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs.

266.     By its wrongful acts and omissions, including but not limited to making and servicing predatory and unfair mortgage loans described herein, Ameriquest has been unjustly enriched at the expense of Plaintiffs and the Class, and thus Plaintiffs and the Class have been unjustly deprived.

267.     By reason of the foregoing, Plaintiffs and the members of the Class seek restitution from Ameriquest, and an order of this Court disgorging all profits, benefits, and other compensation obtained by Ameriquest from its wrongful conduct.

## SIXTH CAUSE OF ACTION
### (Breach of Contract)
### (By the Discount Points Plaintiffs on Behalf of Themselves and
### the Discount Points Class as Against Ameriquest)

268.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs.

269.     Ameriquest formed contracts with prospective borrowers by charging loan discount fees in exchange for providing a discounted interest rate.

270.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs.

271.     Ameriquest formed contracts with prospective borrowers by charging loan discount fees in exchange for providing a discounted interest rate.  Ameriquest then failed to provide the required discount.

272.     Ameriquest also provided loan documents describing a "par" rate loan as one bearing an initial rate which is equal to an "index" rate, plus a "margin."

273.     These same documents identify the "index," most commonly, as the "average of the London Interbank Offered Rate (LIBOR) for six month dollar denominated deposits in the London market" and the "margin" as a specified number of percentage points.

274.     The Discount Points Plaintiffs and Members of the Discount Points Subclass received loans at interest rates which were at or above Ameriquest's "par rate," even though each loan involved substantial payments for a rate discount.

275.     By failing to provide agreed-upon discounted interest rates, Ameriquest breached the contracts, causing damages.

276.     Ameriquest's breach of contract is in violation of the common law of contract of the State of California, from where the contracts originated, and/or the contract laws in every state in which Ameriquest does business.

277.     As a result of Ameriquest's breach of contract, the Discount Points Plaintiffs and the members of the Discount Point Subclass have suffered and continue to suffer damages in an amount to be determined according to proof at time of trial.

278.     By failing to provide agreed-upon discounted interest rates, Ameriquest breached the contracts, causing damages.

279.     Ameriquest's breach of contract is in violation of the common law of contract of the State of California, from where the contracts originated, and/or the contract laws in every state in which Ameriquest does business.

280.     As a result of Ameriquest's breach of contract, the Discount Points Plaintiffs and the members of the Discount Points Subclass have suffered and continue to suffer damages in an amount to be determined according to proof at time of trial.

### SEVENTH CAUSE OF ACTION
#### (Breach of Contract)
#### (By the Bait and Switch Plaintiffs on Behalf of Themselves and the Bait and Switch Subclass as Against Ameriquest)

281.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs.

282.    Ameriquest formed implied, oral, and/or unilateral contracts with prospective borrowers by common offering terms to prospective borrowers prior to closing.

283.    By delivering different terms at closing than the ones initially promised, Ameriquest breached the contracts, causing damage.

284.    Ameriquest's breach of contract is in violation of the common law of contract of the State of California, from where the contracts originated, and/or the contract laws in every state in which Ameriquest does business.

285.    As a result of Ameriquest's breach of contract, the Bait and Switch Plaintiffs and the members of the Bait and Switch Subclass have suffered and continue to suffer damages in an amount to be determined according to proof at time of trial.

<div align="center">

**EIGHTH CAUSE OF ACTION**
**(Breach of Contract)**
**(By the Servicing Plaintiffs on Behalf of Themselves and**
**the Servicing Class as Against Ameriquest)**

</div>

286.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs.

287.    Ameriquest serviced the Servicing Plaintiffs' loans.

288.    The Servicing Plaintiffs and the Servicing Class had loan agreements that set forth dates by which monthly principal and interest payments were due, dates providing a grace period before the end of which late fees could not be assessed, and other payment and fee terms including, without limitation, provisions regarding hazard insurance and prepayment penalties.

289.    The Servicing Plaintiffs and the Servicing Class satisfied their obligations by making timely payments of principal and interest on their loans and by properly maintaining hazard insurance on their property.

290.    By charging fees that were not authorized by the loan contracts, such as late fees on payments that were not late, insurance premiums on properties that were already

insured, and prepayment penalties that were not due, Ameriquest breached its contracts with the Servicing Plaintiffs and the Servicing Class.

291. Ameriquest's breach of contract is in violation of the common law of contract of the State of California, from where the contracts originated, and/or the contract laws in every state in which Ameriquest does business. All conditions precedent to the filing of this action have been satisfied or waived or would be futile based on Ameriquest's pattern and practice of unlawful conduct in the servicing of mortgage loans.

292. As a result of Ameriquest's breach of contract, the Servicing Plaintiffs and the members of the Servicing Class have suffered and continue to suffer damages in an amount to be determined according to proof at time of trial.

## NINTH CAUSE OF ACTION
### (Breach of the Covenant of Good Faith and Fair Dealing)
### (By the Discount Points, Bait and Switch, and Servicing Plaintiffs and Class and Subclass Members as Against Ameriquest)

293. Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs.

294. All contracts between Plaintiffs and members of the Classes on one hand, and Ameriquest on the other, included a duty of good faith and fair dealing. Pursuant to an implied covenant in the subject contracts, Ameriquest had a duty not to do anything which would deprive the borrowers of the benefits of those contracts, and had a duty to do everything that the contracts presupposed each of the parties would do to accomplish the purpose or purposes of the subject contracts.

295. Ameriquest acted in breach of the implied covenant of good faith and fair dealing, and their duties thereunder.

296. As a result of Ameriquest's wrongful conduct, the Discount Points, Bait and Switch, and Servicing Plaintiffs and members of the Discount Points, Bait and Switch, and Servicing Class and Subclasses have suffered and continue to suffer economic losses and other

damages, all in an amount to be determined according to proof at time of trial, including attorney fees and reasonable costs.

<div align="center">

**TENTH CAUSE OF ACTION**
**(Declaratory and Injunctive Relief)**
**(By All Representative Plaintiffs on Behalf of Themselves and**
**All Class Members as Against the Defendants)**

</div>

297.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs.

298.    On each cause of action stated above, Plaintiffs and the Class will be irreparably injured in the future by the Defendants' misconduct.

299.    Plaintiffs, on behalf of themselves and all Class members, seek a judgment declaring that the Defendants must cease the activities described herein, provide Class Members with the opportunity to rescind their loans, and provide for adequate procedures and policies for the immediate and complete refund of the improper charges and insurance premiums unlawfully assessed, as well as the proper allocation of misapplied payments.

300.    Plaintiffs and the Class members do not have a plain, adequate, speedy, or complete remedy at law to address the wrongs alleged in this Complaint, and will suffer irreparable injury as a result of the Defendants' misconduct unless injunctive and declaratory relief is granted.

301.    By reason of the foregoing, Plaintiffs and the Class members are entitled to declaratory and injunctive relief as set forth herein.

<div align="center">

**ELEVENTH CAUSE OF ACTION**
**(Unfair, Unlawful, and Deceptive Business Acts and/or**
**Practices In Violation of California Business & Professions Code §§ 17200 *et seq*.)**
**(By All Representative Plaintiffs on Behalf of Themselves and**
**all Class Members as Against Ameriquest)**

</div>

302.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs.

303.    This cause of action is brought by all Plaintiffs on behalf of a nationwide Class as against the Ameriquest Defendants, each of which is based in California.

304.    All of the conduct at issue in the Complaint either occurred in California by virtue of the centralized business practices of Ameriquest or was based in policies and procedures that originated from Ameriquest's home offices in California.

305.    California Business & Professions Code §§ 17200 et seq. prohibits acts of unfair competition, including any "unlawful, unfair or fraudulent business act or practice."

306.    The Ameriquest Defendants engaged in unlawful, unfair or fraudulent business acts and practices in violation of California Business & Professions Code §§ 17200, et seq., by engaging in such unlawful conduct as: (a) engaging in aggressive "bait and switch" financing solicitation practices in which they promise certain terms and offer other, less advantageous terms at loan closings; (b) misleading consumers with loans that contain confusing interest variable interest rate structures; (c) providing loans with charges for "discount" fees or points either in exchange for rate discounts that were not provided or for rate discounts that were provided without sufficient information to allow consumers to evaluate the cost of the fees or points; (d) requiring and collecting excessive, improper, or illegal prepayment penalties, and duplicative/excess closing costs; (e) failing to provide statutorily-mandated Notice of Right to Cancel or providing borrowers with a copy of the required disclosures only after the loan documents were signed; (f) falsely promising early refinancing options or providing early refinancing on terms that stripped equity from consumers' property; (g) assessing improper or excessive fees in violation of loan contracts or applicable federal laws; (h) failing to make disclosures required under the Real Estate Settlement Procedures Act; (i) improperly characterizing customers' accounts as being in default or delinquent status to generate unwarranted fees; (j) misapplying or failing to apply customer payments; (k) force placing insurance on properties that already have insurance coverage; (l) violating its contractual obligations; and (m) failing to provide adequate monthly statement information to customers regarding the status of their accounts, payments owed, and/or basis for fees assessed.

307.    The Ameriquest Defendants' conduct is unlawful in that it is in violation of one or more of such statutes and regulations as, for example, (a) California Civil Code

§2954.4 (providing that a late charge may not be imposed on any installment within ten days of its due date); (b) the Truth in Lending Act; (c) the Fair Credit Reporting Act; (d) the Equal Credit Opportunity Act; (e) the Real Estate Settlement Procedures Act; (f) the Fair Housing Act; and (g) the Unruh Act.

308.    The foregoing acts and practices are also unfair and/or fraudulent within the meaning of § 17200 in that they are likely to mislead the public as to the amounts actually owed on their loans, and in that they force customers to pay amounts they do not actually owe under threat of losing their homes.

309.    The foregoing acts and practices have caused substantial harm to the Plaintiffs, the general public, and the members of the Classes.

310.    By reason of the foregoing, the Ameriquest Defendants have been unjustly enriched and should be required to disgorge their illicit profits and/or make restitution to the Plaintiffs, the general public, and the members of the Classes, and/or be enjoined from continuing in such practices pursuant to §§ 17203 and 17204 of the California Business & Professions Code.

<u>**TWELFTH CAUSE OF ACTION**</u>
**(Unfair or Deceptive Acts or Practices in Violation of
California Civil Code §§ 1750 *et seq.*)
(By All Representative Plaintiffs on Behalf of Themselves and
All Class Members as Against Ameriquest)**

311.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs.

312.    This cause of action is brought by all Plaintiffs on behalf of a nationwide Class as against the Ameriquest Defendants, each of which is based in California.

313.    All of the conduct at issue in the Complaint either occurred in California by virtue of the centralized business practices of Ameriquest or was based in policies and procedures that originated from Ameriquest's home offices in California.

314.    By its wrongful conduct as alleged herein, Ameriquest has created, engaged in and/or participated in unfair practices, in violation of the Consumers Legal Remedies Act, California Civil code sections 1750 *et seq.*

315.    Ameriquest has engaged in unfair or deceptive acts or practices intended to result in the sale of their goods and services in violation of California Civil Code §§1750 *et seq.*, including but not limited to:  (a) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, characteristics, status, affiliation, or connection which he or she does not have, in violation of section 1770(a)(5); and (b) that a transaction confers or invokes rights, remedies, or obligations which it does not have or involve, or which are prohibited by law, in violation of section 1770(a)(14); and (c) Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not, in violation of section 1770(a)(16).

316.    Pursuant to § 1780,  Plaintiffs and members of the Classes seek to enjoin the Ameriquest Defendants from engaging in their unfair practices as alleged herein.

317.    Ameriquest has previously been put on notice within the meaning of Cal. Civ. Code § 1782 of its alleged violations of the CLRA through, for example, the CLRA allegations in the *Knox v. American Mortgage Co.* complaint filed on January 14, 2005. Notwithstanding this notice, Ameriquest did not remedy the alleged violations of the CLRA within 30 days after service of the *Knox* complaint, and has not remedied the alleged violation. As such, Plaintiffs and Class members are entitled to seek and recover actual damages, punitive damages and any other relief which this Court deems proper against Ameriquest.

318.    As a proximate result of Ameriquest's violations of the CLRA, Plaintiffs and the Class have suffered damages.

319.    Many Class members, as Ameriquest knows or should know, are seniors and/or persons with disabilities as those terms are defined in Civil Code § 1761(f) and (g).  Said Class members have suffered substantial economic and other damages resulting from

Ameriquest's unlawful conduct, including the loss of assets essential to the health and welfare of the seniors and persons with disabilities. The seniors and persons with disabilities are substantially more vulnerable than other members of the public to Ameriquest's unlawful conduct due to their age, poor health or infirmity, impaired understanding and/or disability. Accordingly, pursuant to Civil Code § 1780, these seniors and persons with disabilities are entitled to up to $5,000 in addition to the other damages otherwise available under California state law, including punitive damages.

320.    The actions described above constitute unlawful, unfair and/or defective acts or practices within the meaning of the Consumer Legal Remedies Act. The Plaintiffs and the Class Members are entitled to actual damages, statutory damages, punitive damages, restitution and disgorgement of any funds received that was a result of the acts and omissions complained of herein and injunctive relief to prevent the use or employment by Ameriquest of the practices alleged herein, along with costs, attorney's fees and any other relief which the Court deems proper.

## THIRTEENTH CAUSE OF ACTION
**(Violation of State Consumer Protection and Unfair and Deceptive Trade Practices Acts)**
**(By Origination and Servicing Representative Plaintiffs on Behalf of Themselves and**
**All Origination and Servicing Subclass Members as Against Ameriquest)**

321.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs.

322.    In the alternative to a nationwide class under the California Consumer Legal Remedies Act and Section 17200 of the California Business and Professions Code, the Representative Plaintiffs assert a claim arising under each state's consumer protection act and/or unfair and deceptive trade practices act.

323.    By its wrongful conduct as alleged herein, Ameriquest has created, engaged in and/or participated in unfair practices, in violation of each state's consumer protection or deceptive trade practices statutes, including but not limited to such statutes in the states where the named plaintiffs in this action reside (such as the Connecticut Unfair Trade

Practices Act, § 42-110a; the Florida Deceptive Trade Practices Act, § 501.201; the Maryland

Consumer Protection Act, § 13-101; the Massachusetts General Law, chap. 93.A; the Minnesota

Deceptive Trade Practices Act, Minn. Stat. §§ 58.13 and 325D, F; the New Jersey Consumer

Fraud Act, N.J.S.A. § 56:8-1; the New York General Business Law, § 349; the Ohio Consumer

Sales Practices Act, § 1345.01; and the Pennsylvania Consumer Protection Law, 73 P.S. § 201-1.

324.    Ameriquest committed the actions described herein knowingly.

325.    Ameriquest's practices caused damage.

326.    The Origination and Servicing Subclass Plaintiffs and Class Members are

entitled to, as applicable, actual damages, statutory damages, punitive damages, rescission,

restitution and disgorgement of any funds received that was a result of the acts and omissions

complained of herein and injunctive relief to prevent the use or employment by Ameriquest of

the practices alleged herein, along with costs, attorney's fees and any other relief which the

Court deems proper.

## FOURTEENTH CAUSE OF ACTION
### (Individual Claims Under TILA)
### (By the Individuals Below as Against Ameriquest)

327.    Plaintiffs hereby incorporate by reference the allegations contained in all

preceding paragraphs.

328.    Plaintiffs Timothy and Francis Adamowicz rescinded their mortgage with

Ameriquest having sent a notice of cancellation dated August 29, 2006.

329.    Plaintiff Christopher Bourassa rescinded his mortgage with Ameriquest

having sent a notice of cancellation dated August 22, 2006.

330.    Plaintiff Venitra Brown rescinded her mortgage with Ameriquest having

sent a notice of cancellation dated October 20, 2006.

331.    Plaintiffs Edrick and Debra Centeno rescinded their mortgage with

Ameriquest having sent a notice of cancellation dated October 10, 2006.

332.    Plaintiff Vaughn DeBold rescinded his mortgage with Ameriquest having

sent a notice of cancellation dated July 18, 2006.

333.   Plaintiffs Gregory and Marcell DeMeo rescinded their mortgage with Ameriquest having sent a notice of cancellation dated November 20, 2006.

334.   Plaintiff James Devlin rescinded his mortgage with Ameriquest having sent a notice of cancellation dated January 13, 2006.

335.   Plaintiffs Timothy and Cynthia Dion rescinded their mortgage with Ameriquest having sent a notice of cancellation dated February 17, 2006.

336.   Plaintiff Karen Dudeck rescinded multiple mortgages with Ameriquest having sent notices of cancellation dated September 19, 2006 and November 12, 2006.

337.   Plaintiff Christopher Gabrielli rescinded multiple mortgages with Ameriquest having sent a notice of cancellation dated January 27, 2006.

338.   Plaintiff Lynn Gay rescinded multiple mortgages with Ameriquest having sent a notice of cancellation dated November 1, 2004.

339.   Plaintiff Harriet Holder rescinded multiple mortgages with Ameriquest having sent a notice of cancellation dated February 11, 2005.

340.   Plaintiff Patricia Masson rescinded her mortgage with Ameriquest having sent a notice of cancellation dated February 9, 2006.

341.   Plaintiff Duval Naughton rescinded his mortgage with Ameriquest having sent a notice of cancellation.

342.   Plaintiffs John and Kathleen O'Callaghan rescinded his mortgage with Ameriquest having sent a notice of cancellation dated March 31, 2006.

343.   Plaintiff Glen Powell rescinded multiple mortgages with Ameriquest having sent a notice of cancellation dated June 21, 2006.

344.   Plaintiff Michele Powell rescinded multiple mortgages with Ameriquest having sent a notice of cancellation dated November 17, 2006.

345.   Plaintiff Michael Russo rescinded his mortgage with Ameriquest having sent a notice of cancellation dated August 31, 2006.

346. Plaintiff Kenneth Sawyer rescinded his mortgage with Ameriquest having sent a notice of cancellation dated April 28, 2006.

347. Plaintiffs Frank and Linda Shea rescinded their mortgage with Ameriquest having sent a notice of cancellation dated March 24, 2006.

348. Plaintiffs Daisybel and William Tolbert rescinded their mortgage with Ameriquest having sent notices of cancellation dated March 30, 2005 and November 30, 2005.

349. Plaintiffs David and Janet Wakefield rescinded multiple mortgages with Ameriquest having sent a notice of cancellation dated October 27, 2004.

350. Plaintiffs Frank and Martha White rescinded their mortgage with Ameriquest having sent a notice of cancellation dated March 3, 2005.

351. Plaintiffs Joshua Wilgoren rescinded his mortgage with Ameriquest having sent a notice of cancellation dated February 28, 2006.

352. Plaintiffs Scott Ventola and Steven Bourassa rescinded their mortgage with Ameriquest having sent a notice of cancellation dated November 30, 2006.

353. Plaintiffs Latonya and Duwayne Williams rescinded their mortgage with Ameriquest having sent a notice of cancellation dated January 15, 2004.

354. Plaintiffs James and Jennifer Jewell rescinded their mortgage with Ameriquest having sent a notice of cancellation on January 26, 2006.

355. This Consolidated Amended Complaint constitutes an additional notice of rescission to Ameriquest by each Plaintiff named above.

356. Each Plaintiff rescinded based on one or more of the statutory violations described in the First Cause of Action *supra*.

357. In each case Ameriquest refused to honor the Plaintiffs' rescission and refused to take the actions required by 15 U.S.C. § 1635(b) and 12 C.F.R. §226.23(d).

358. The Individual Plaintiffs identified above are entitled to a declaratory judgment to enforce their rescissions including, without limitation, that their mortgages are void and that they are not liable for any finance charges in connection with their transactions and to

statutory damages in the amount of $2,000 for Ameriquest's failure to honor their rescissions, together with costs and attorney's fees and other relief as allowed by law.

<div align="center">

**FIFTEENTH CAUSE OF ACTION**
**(Common-Law Fraud)**
**(By Plaintiffs Keri Capasso, Richard A. Madrazo, Yamil Montanez,**
**Pegi Saunders, Matthew and Tracey Lloyd, Dorothy Stevenson, and**
**Aris and Ricardo Gay, Steven H. Ungar as Against Ameriquest)**

</div>

359.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs.

360.    The conduct of Ameriquest constitutes a fraud against the Plaintiffs. Ameriquest made materially false representations, concealments and/or non-disclosures of fact to Plaintiffs in connection with loan discount fees, loan origination fees, and/or loan servicing, knowing the falsity of such representations, concealments and non-disclosures and with the intent to defraud Plaintiffs.

361.    Plaintiffs did not receive a discount and/or avoid paying loan origination fees.

362.    At the time said misrepresentations and omissions of material facts were made, Plaintiffs were ignorant of their falsity and believed them to be true.  Plaintiffs reasonably and/or justifiably relied upon the false representations, concealments and non-disclosures in purchasing goods and services from Ameriquest.

363.    As a result, Plaintiffs sustained damages.

364.    Plaintiffs are entitled to compensatory, punitive and exemplary damages.

<div align="center">

**SIXTEENTH CAUSE OF ACTION**
**(Intentional and/or Negligent Misrepresentation)**
**(By Plaintiffs Keri Capasso, Deborah Juillerat, Richard A. Madrazo,**
**Yamil Montanez, Pegi Saunders, Matthew and Tracey Lloyd, Dorothy Stevenson,**
**and Aris and Ricardo Gay, Steven H. Ungar, Latonya and Dwayne Williams,**
**and Daisybel and William F. Tolbert as Against Ameriquest)**

</div>

365.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs.

366.     Ameriquest made intentional or negligent misrepresentations to Plaintiffs, with the intent of having Plaintiffs finance with Ameriquest or continue to remain with Ameriquest rather than refinancing with another servicer.

367.     These misrepresentations including but not limited making materially false representations, concealments and/or non-disclosures of fact to Plaintiffs in connection with loan discount fees, loan origination fees, assurances of prompt refinancing, and/or loan servicing, knowing the falsity of such representations, concealments and non-disclosures.

368.     Plaintiffs did not receive a discount and/or avoid paying loan origination fees.

369.     At the time said misrepresentations and omissions of material facts were made, Plaintiffs were ignorant of their falsity and believed them to be true.  Plaintiffs reasonably and/or justifiably relied upon the false representations, concealments and non-disclosures in purchasing goods and services from Ameriquest.

370.     As a result, Plaintiffs sustained damages.

371.     Plaintiffs are entitled to compensatory, punitive and exemplary damages as well as equitable remedies.

## SEVENTEENTH CAUSE OF ACTION
**(Violation of the Florida Mortgage Lending Act, § 494.0025, Florida Statute)**
**(By Plaintiffs LaTonya and Dwayne Williams, Daisybel and William F. Tolbert, George and Crisella Barber, Debra Holloway, and Laurence Osten on Behalf of Themselves and a Subclass of Florida Residents as Against Ameriquest)**

372.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs.

373.     This claim is brought by the Florida Plaintiffs and a subclass of other Florida residents who obtained a home loan issued by Ameriquest on or after  April 1, 2001.

374.     Common questions of law and fact exist as to all members of the Florida Subclass and predominate over questions solely affecting individuals, including whether Ameriquest the Florida Mortgage Lending Act, and whether Plaintiffs and the Subclass are entitled to statutory damages, injunctive and declaratory relief, and/or punitive damages.

375.     Through the conduct described herein, Ameriquest has systematically violated the Florida Mortgage Lending Act by:

a.     knowingly and willfully concealing material facts from Plaintiffs and the Subclass;

b.     engaging in a course of business which operates and continues to operate an unfair, unconscionable, and deceptive trade practice upon Plaintiffs and the Subclass through the concealment of material terms in connection with the sale of mortgage loans; and

c.     making or using false writings or documents, knowing them to contain false statements or entries.

376.     Such violations by Ameriquest include the following conduct:

a.     Selling mortgage loans to Plaintiffs and the Subclass in a manner intended to hide the true cost of various loan terms and the true disadvantages of those loan terms to Plaintiffs and the Subclass;

b.     failing to provide customers with good faith estimates of the closing costs prior to closing;

c.     Misrepresenting, concealing, or failing to disclose loan terms including, but not limited to, the disclosure of the risks and ramifications of an ARM, including: (a) possible increase in monthly payments after a certain period of time; (b) no guarantee that the property value of their residence will increase thereby foreclosing an option to refinance at a later date; (c) the recommendation that an ARM should not be chosen by a homeowner who will stay in the mortgage residence for more than 10 years due to the escalation in future payments;

d.     Inflating property appraisal values to qualify borrowers for loans they cannot afford and/or to maximize loan amounts, resulting in excessive loans-to-value ratios;

e.     Fabricating income and employment information related to the cost of loans, particularly in comparison with existing obligations;

    f.  Presenting incomplete or misleading information related to the cost of loans, particularly in comparison with existing obligations;

    g.  Concealing the existence or length of prepayment penalty provisions;

    h.  Utilizing unfair and/or punitive prepayment penalty provisions to discourage and/or prevent Plaintiffs and the Subclass from refinancing their loans at lower rates with Ameriquest's competitors;

    i.  Charging discount points that are not justified by any discount provided to Plaintiffs and the Subclass; and

    j.  Failing to act in good faith and deal fairly in its interactions with the Plaintiffs and the Subclass, including, without limitations, in its form documents.

    377.  As a result of Ameriquest's wrongful conduct, the Florida Plaintiffs and the Florida subclass have suffered and continue to suffer economic losses and other general and specific damages, including but not limited to, the monies paid to Ameriquest, loss of equity, funds spent to mitigate economic losses, and harm to credit, all in an amount to be determined according to proof at time of trial.

**EIGHTEENTH CAUSE OF ACTION**
**(Violation of the Fair Housing Act, 42 U.S.C. § 3601)**
**(By Plaintiffs Nona and Albert Knox, Maria Torres,**
**and Heladio and Maria Arellanes as Against Ameriquest)**

    378.  Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs.

    379.  Plaintiffs are minorities.

    380.  Plaintiffs are informed and believe, and on that basis allege, that Ameriquest discriminated against them on the basis of their race and/or gender, in the terms and conditions of the loan contracts entered into between Plaintiffs, on the one hand, and Ameriquest on the other.

381.    Plaintiffs have been damaged as a result of Ameriquest's discriminatory conduct, and seek damages and equitable and injunctive remedies, including practice changes.

## NINETEENTH CAUSE OF ACTION
### (Violation of the Unruh Act, California Civil Code § 3601)
### (By Plaintiffs Nona and Albert Knox, Maria Torres, and Heladio and Maria Arellanes as Against Ameriquest)

382.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs.

383.    Plaintiffs are informed and believe, and on that basis allege, that Ameriquest discriminated against them on the basis of race, national origin, and/or gender, in the terms and conditions of the loan contracts entered into between Plaintiffs, on the one hand, and Ameriquest, on the other.  Specifically, the terms and conditions offered to Plaintiffs were less favorable than those offered by Ameriquest to borrowers not better qualified than Plaintiffs but at different race, national origin and/or gender.

384.    Plaintiffs have been damaged as a result of Ameriquest's discriminatory conduct.

## TWENTIETH CAUSE OF ACTION
### (Negligent Training and Supervision)
### (By Plaintiffs Nona and Albert Knox, Maria Torres, and Heladio and Maria Arellanes as Against Ameriquest)

385.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs.

386.    Under California law, Ameriquest owed Plaintiffs a duty of reasonable care to train and supervise its employees and agents to comply with all applicable laws, rules and/or regulations and in accordance with professional, industry-wide best practices standards. These laws, rules, regulations and industry-wide best practices standards were enacted to protect individuals such as Plaintiffs.

387.    Ameriquest breached its duty to Plaintiffs by failing to adequately train and supervise its employees and agents to comply with professional, industry-wide best practices

standards and by allowing their employees and agents to operate without such adequate training or supervision.

388.    Moreover, Ameriquest's conduct fell below the standard of care as it trained and/or actively encouraged its employees and agents to act in violation of applicable laws, rules and/or regulations and professional, industry-wide best practices standards.

389.    Ameriquest failed to take reasonable steps to protect Plaintiffs though it knew or had reason to know that its failure to adequately train or supervise its employees and/or agents would result in the detriment of Plaintiffs.

390.    As a proximate cause of Ameriquest's conduct, Plaintiffs suffered damages according to proof.

391.    Ameriquest's negligent training and/or supervision was willful, wanton and in conscious disregard of Plaintiffs' rights.  Accordingly, Plaintiffs are entitled to recover punitive damages in an amount to be established at trial.

### TWENTY-FIRST CAUSE OF ACTION
#### (Violation of the Georgia Fair Lending Act)
#### (By Plaintiffs Johnnie Ross, Charles Meadows, Joseph and Nicole Riggins on Behalf of Themselves and a Subclass of Georgia Residents as Against Ameriquest)

392.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs.

393.    In home loans with Georgia residents, Ameriquest commonly charges and collects points and fees that exceed the statutory threshold to constitute "high-cost" home loans as defined by the Georgia Fair Lending Act ("GAFLA"), Ga. Code Ann. § 7-6A-1 *et seq.* Ameriquest has engaged in a common practice and pattern of issuing high-cost home loans to Georgia residents which violate the limitations, requirements and consumer protections of the GAFLA, § 7-6A-7.

394.    GAFLA authorizes class actions.  GAFLA, § 7-6A-7(d). This claim is brought by the Georgia Plaintiffs and a subclass of Georgia residents who obtained a home loan issued by Ameriquest on or after October 1, 2002.

395.    Ameriquest has issued to Plaintiffs and the Subclass high-cost home loans in violation of GAFLA, §§ 7-6A-5.  Ameriquest has imposed fees and points that exceed 5 percent of the total  loan amount.  These loans are "high cost loans" as defined under Georgia law; however, Ameriquest has failed to comply with GAFLA's requirements and limitations applicable to "high cost home loans."  As a direct and proximate result of Ameriquest's breaches and violations, Plaintiffs and the Georgia Subclass have suffered economic injury and damages.

396.    Common questions of law and fact exist as to all members of the Georgia Subclass and predominate over questions solely affecting individuals, including whether Ameriquest violated GAFLA, and whether Plaintiffs and the Subclass are entitled to statutory damages, injunctive and declaratory relief, and/or punitive damages.

397.    As a result of Ameriquest's violation of GAFLA as relates to high-cost loans, § 7-6A-5, Ameriquest is liable to the Georgia Plaintiffs and the Georgia subclass for actual damages, statutory damages of twice the interest paid, forfeiture of all future interest, punitive damages, costs and attorneys' fees, equitable claims, injunctive relief, class actions, rescission rights of up to 5 years after consummation, and potential criminal prosecution for knowing violations.

### TWENTY-SECOND CAUSE OF ACTION
**(Negligence)**
**(By Pegi Saunders, Matthew and Tracey Lloyd, Dorothy Stevenson, and**
**Aris and Ricardo Gay as Against AMC**
**and Ameriquest Capital Holding Corporation)**

398.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs.

399.    Under Ohio common law, Ameriquest had a duty to represent each Plaintiff and their respective best interests in their individual transactions.  As the representative of each of the Plaintiffs, Ameriquest negligently failed to apply and.  follow customary and usual skills and procedures in regular use by ethical members of its industry occupying its position in the transactions.

400.     The actions of Ameriquest are the proximate cause of the injury to each Plaintiff.

401.     As a result of the negligence of Ameriquest, each Plaintiff has been damaged in an amount that he or she is unable to determine with specificity at this time but is an amount believed to be at least $500,000.00 in each instance by each Plaintiff.

**<u>TWENTY-THIRD CAUSE OF ACTION</u>**
**(Violations of Violation of Ohio's Mortgage Broker's Act)**
**(By Pegi Saunders, Matthew and Tracey Lloyd, Dorothy Stevenson, and**
**Aris and Ricardo Gay as Against AMC**
**and Ameriquest Capital Holding Corporation)**

402.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs.

403.     Ameriquest (in that they acted as its own broker), is a mortgage broker" as defined in Ohio Revised Code §1322.01 (E), and, therefore, ARE subject to the requirements of Ohio Revised Code §1322.01 *et. seq.* Notwithstanding its mortgage broker status, Ameriquest knowingly concealed information, which federal statutes and regulations required it to be disclose to its clients, *i.e.*, the Plaintiffs.

404.     Ameriquest entered into the mortgage transactions with each Plaintiff knowing that he or she would not be able to repay his or her loan obligation in full due to the debt to income ratio and other information shown on their respective loan applications.

405.     Ameriquest fraudulently induced each Plaintiff, into signing a note and mortgage that included an unconscionable loan total with the knowledge that such a requirement is contrary to applicable law and public policy.

406.     Ameriquest concealments and misrepresentations were made maliciously, with knowledge of their falsity.

407.     Each Plaintiff justifiably relied upon Ameriquest's false and fraudulent representations in making their respective mortgage loan agreements.

408.    As a result of the frauds perpetrated by Ameriquest, each Plaintiff is entitled to damages in an amount that she or he is unable to determine at this time but believes to be at least in the amount of $500,000.00.

409.    As a result of Ameriquest violations of Ohio Revised Code §1322.07 (B)(C), Ameriquest is liable to each Plaintiff, pursuant to Ohio Revised Code §1322.11 for damages in an amount to be determined at trial pursuant to O.R.C. §1322.00(A)(1-3) and a statutory injunction prohibiting such violations pursuant to O.R.C. §1322.1 1(B)(A).

### TWENTY-FOURTH CAUSE OF ACTION
**(Breach of Fiduciary Duty)**
**(By Pegi Saunders, Matthew and Tracey Lloyd, Dorothy Stevenson, and Aris and Ricardo Gay as Against AMC and Ameriquest Capital Holding Corporation)**

410.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs.

411.    A fiduciary relationship is one in which special confidence and trust, are placed in the integrity and fidelity of another, and there is a resulting position of superiority or influence.

412.    Ameriquest had a fiduciary relationship with each Plaintiff in that each contracted Ameriquest to provide mortgage loan services, which necessarily involve the duty of representing each Plaintiff best interests throughout the mortgage transaction.

413.    Ameriquest breached its fiduciary duties by arranging a mortgage loan on financing terms that in each instance were in each instance contrary to each Plaintiff's, interest.

414.    As a direct and proximate result of the actions of Ameriquest, each Plaintiff has suffered financial and emotional injury in an amount not yet ascertainable, but which will be proven at trial.

415.    The actions of Ameriquest constitute the tort of breach of fiduciary duty.

416.    These actions were taken with malice, ill will, and/or reckless indifference toward each Plaintiff.  Therefore, each Plaintiff is entitled to receive actual, compensatory and punitive damages.

### TWENTY-FIFTH CAUSE OF ACTION
**(Negligent Misrepresentation and Intentional Infliction of Emotional Distress)**
**(By Pegi Saunders, Matthew and Tracey Lloyd, Dorothy Stevenson, and**
**Aris and Ricardo Gay as Against AMC**
**and Ameriquest Capital Holding Corporation)**

417.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs.

418.    During the course of Ameriquest's dealings with Plaintiffs, Ameriquest negligently and/or intentionally, by its acts and/or omissions, made material misrepresentations of fact, and was negligent in a number of instances, including but not limited to, stating that Plaintiffs were obligated to pay amounts that were improperly or illegally accessed.

### TWENTY-SIXTH CAUSE OF ACTION
**(Accounting)**
**(By Plaintiffs Thomas B. and Elvie Doherty, Raymond and Rebecca Carlson, Patrick**
**Galvan, and Robert and Debra Peabody as Against Ameriquest)**

419.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs.

420.    Ameriquest had a duty and obligation to properly inform and represent to Plaintiffs the correct and accurate interest rates for which they qualify when Plaintiffs applied for loans, or, in the alternative, not to conceal from or mislead them as to the actual interest rates they are being assessed.

421.    Ameriquest failed to satisfy that duty.

422.    As a result, Plaintiffs have paid excessive interest demanded by Ameriquest, and have been injured and suffered financial loss.  Unless corrected, Plaintiffs will continue to suffer.

423.    Ameriquest, by the actions above alleged, has collected money from the Plaintiffs under such circumstances that in equity and good conscience it cannot retain and which in justice and fairness belong to Plaintiffs.

424.    Ameriquest should be ordered to account to Plaintiffs to ensure that only the proper and permitted amount is retained by Ameriquest.  Ameriquest should be ordered to

recalculate each excessive interest charge demanded and collected from Plaintiffs, and to refund all improper and excessive amounts collected.

425.     Plaintiffs pray for an Order appointing a special master or referee to determine the amount by which they have been overcharged, together with such other further or different relief as this Court deems appropriate.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all members of the Classes and the Subclasses, request judgment and relief as follows:

426.     Certification of the case as a class action on behalf of the proposed Classes and Subclasses and designation of Plaintiffs as representatives of the Classes and Subclasses and their counsel of record as Class Counsel;

427.     Restitution, reformation of contract and disgorgement according to proof;

428.     Rescission and/or an opportunity to rescind;

429.     Declaratory and injunctive relief against Ameriquest to prevent future wrongful conduct;

430.     Actual, compensatory, statutory, treble, exemplary and/or punitive damages according to proof;

431.     Prejudgment interest at the maximum legal rate;

432.     Costs of the proceedings herein;

433.     Reasonable attorneys' fees;

434.     An accounting; and

435.     All such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury for all claims so triable.

Respectfully submitted,

Dated:  December 6, 2006

_/s/ Kelly M. Dermody_

Kelly M. Dermody

Kelly M. Dermody (CA Bar No. 171716)
Caryn Becker (CA Bar No. 196947)
LIEFF, CABRASER, HEIMANN &
  BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Rachel Geman (NY Bar No. RG 0998)
LIEFF, CABRASER, HEIMANN &
  BERNSTEIN, LLP
780 Third Avenue, 48th Floor
New York, NY  10017-2024
Telephone:  (212) 355-9500
Facsimile:  (212) 355-9592

_/s/ Gary Klein_

Gary Klein

Gary Klein
Elizabeth Ryan
Shennan Kavanagh
RODDY KLEIN & RYAN
727 Atlantic Avenue
Boston, MA  02111-2810
Telephone:  (617) 357-5500 ext. 15
Facsimile:  (617) 357-5030

_/s/ Jill H. Bowman_

Jill H. Bowman

Jill H. Bowman
Terry Smiljanich
JAMES, HOYER, NEWCOMBER &
  SMILJANICH, P.A.
One Urban Center, Suite 550
4830 West Kennedy Boulevard
Tampa, FL  33609
Telephone: (813) 286-4100
Facsimile:  (813) 286-4174

*Plaintiffs' Co-Lead Counsel*

_/s/ Marvin A. Miller_
_____
Marvin A. Miller

Marvin A. Miller
MILLER FAUCHER AND CAFFERTY LLP
30 N. LaSalle Street, Suite 3200
Chicago, IL  60602
Telephone:  (312) 782-4800
Facsimile:  (312) 782-4485

_Plaintiffs' Liaison Counsel_

Samuel H. Rudman  (SR-7957)
Evan J. Kaufman  (EJK-8042)
LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  (631) 367-7100
Facsimile:  (631) 367-1173

Michael D. Donovan
DONOVAN SEARLES LLC
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103
Telephone:  (215) 732-6067
Facsimile:  (215) 732-8060

William H. Crowder  (20102)
Susan Ford Bedor  (154702)
Gregory L. Paulson  (34517)
CROWDER, BEDOR & PAULSON, LLP
555 West Seventh Street, Suite 201
St. Paul, MN  55201
Telephone:  (651) 225-8330
Facsimile:  (651) 204-2134

Daniel S. Blinn
CONSUMER LAW GROUP, LLC
35 Cold Spring Road, Suite 512
Rocky Hill, CT  06067
Telephone:  (860) 571-0408
Facsimile:  (860) 571-7457

Charles Delbaum
NATIONAL CONSUMER LAW CENTER
77 Summer Street, 10th Floor
Boston, MA  02110
Telephone:  (617) 542-8010
Facsimile:  (617) 542-8028

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
EDELMAN, COMBS, LATTURNER &
GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, IL  60603
Telephone:  (312) 739-4200
Facsimile:  (312) 419-0379

_Executive Committee_

For the Plaintiffs in                    W. Roderick Bowdoin  (FBN 172237)

*Barber v.*
*Ameriquest Capital Corp.*

DARBY PEELE BOWDOIN & PAYNE
P.O. Drawer 1707
Lake City, FL  32056
Telephone:  (386) 752-4120
Facsimile:   (386) 755-4569

Douglas Bowdoin  (FBN 310360)
DOUGLAS BOWDOIN, P.A.
P.O. Box 2254
Orlando, FL  32802-2254
Telephone:  (407) 422-0025
Facsimile:   (407) 843-2448

J. Craig Bourne  (FBN 999466)
1520 East Livingston Street
Orlando, FL  32801
Telephone:  (407) 894-6750
Facsimile:   (407) 894-4735

Elizabeth J. Cabraser
Kelly M. Dermody
Rachel Geman  (RG 0998)
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:   (415) 956-1008

and

780 Third Avenue, 48th Floor
New York, NY  10017
Telephone:  (212) 355-9500
Facsimile:   (212) 355-9592

Laurence Tien
BAILEY, PERRIN & BAILEY
440 Louisiana, Suite 2100
Houston, TX 77002
Telephone:  (713) 425-7240
Facsimile:   (713) 425-7101

For the Plaintiffs in

*Becker v. J.M.*

Richard S. Gordon
Martin E. Wolf
QUINN, GORDON & WOLF, CHTD.

*Closing Services, Inc., et al.*                    102 W. Pennsylvania Avenue, Suite 402
                                                    Towson, MD  21204
                                                    Telephone:  (410) 825-2300

                                                    Nevett Steele, Jr.
                                                    Phillip Robinson
                                                    CIVIL JUSTICE, INC.
                                                    520 West Fayette Street
                                                    Baltimore, MD  21201
                                                    Telephone:  (415) 706-0174

For the Plaintiffs in                               Jonathan A. Boynton
                                                    Sarah Brite Evans
        *Brown v.*                                  KIRBY NOONAN LANCE & HOGE, LLP
*Ameriquest Capital Corp.*                          One America Plaza
                                                    600 W. Broadway, Suite 1100
                                                    San Diego, CA 92101-3387
                                                    Telephone:  (619) 231-8666
                                                    Facsimile: 619/231-9593

                                                    John A. Yanchunis
                                                    Jill H. Bowman
                                                    JAMES, HOYER, NEWCOMER &
                                                    SMILJANICH, P.A.
                                                    4830 W. Kennedy Blvd.
                                                    Urban Center One, Suite 550
                                                    Tampa, FL  33609
                                                    Telephone:  (813) 286-4100
                                                    Facsimile:   (813) 286-4174

For the Plaintiffs in                               Ralph Scoccimaro  (GBN 631525)
                                                    Jimmie H. Brown  (GBN 088134)
        *Campbell v.*                               BROWN & SCOCCIMARO, P.C.
*Ameriquest Mortgage Co.*                           P.O. Box 1646
                                                    Albany, GA  31702
                                                    Telephone:  (229) 432-9310
                                                    Facsimile:   (229) 436-6302

                                                    Bryan A. Vroon  (GBN 729086)
                                                    John W. Crongeyer  (GBN 197267)
                                                    VROON & CRONGEYER, LLP
                                                    1718 Peachtree Street, Suite 1088
                                                    Atlanta, GA  30309
                                                    Telephone:  (404) 607-6710
                                                    Facsimile:   (404) 607-6711

For the Plaintiffs in

*Capasso v.*
*Ameriquest Mortgage Co.*

John T. Whipple
Sean Mack (SM 2016)
PASHMAN STEIN
Court Plaza South
21 Main Street
Hackensack, NY  07601-7054
Telephone:  (201) 488-8200
Facsimile:   (201) 488-5556


Samuel H. Rudman  (SR-7957)
Evan J. Kaufman  (EJK-8042)
LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  (631) 367-7100
Facsimile:   (631) 367-1173


For the Plaintiffs in

*Carlson v.*
*Ameriquest Mortgage Co.*

William H. Crowder  (20102)
Susan Ford Bedor (154702)
Gregory L. Paulson  (34517)
CROWDER, BEDOR & PAULSON, LLP
555 West Seventh Street, Suite 201
St. Paul, MN  55201
Telephone:  (651) 225-8330
Facsimile:   (651) 204-2134


Richard J. Fuller  (32669)
1700 U.S. Bank Plaza South
220 South Sixth Street
Minneapolis, MN 55402-4511
Telephone: (612) 339-4295 /
                (612) 341-1209
Facsimile:   (612) 339-3161


For the Plaintiffs in

*D'Ambrogi v.*
*Ameriquest Mortgage Co.*

Stephen G. Burns
Andrew S. Kasmen
BURNS & KASMEN
The Pavilion, Suite A-51
261 Old York Road
Jenkintown, PA  19046
Telephone:  (215) 517-5800


David S. Markun  (Of Counsel)
MARKUN, ZUSMAN & COMPTON LLP
17383 West Sunset Blvd., Suite A380

Pacific Palisades, CA  90272
Telephone:  (310) 454-5900

Edward S. Zusman
Kevin K. Eng
MARKUN, ZUSMAN & COMPTON LLP
465 California Street, 5th Floor
San Francisco, CA  94104
Telephone:  (415) 438-4515

For the Plaintiffs in

*Doherty v.*
*Town & Country Credit Corp.*

Richard J. Fuller  (32669)
Seymour J. Mansfield  (67271)
MANSFIELD TANICK & COHEN P.A.
1700 U.S. Bank Plaza South
220 South Sixth Street
Minneapolis, MN 55402-4511
Telephone:  (612) 339-4295 /
                        (612) 341-1209
Facsimile:   (612) 339-3161

For the Plaintiffs in

*Harless v.*
*Ameriquest Mortgage Co.*

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
EDELMAN, COMBS, LATTURNER &
GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, IL  60603
Telephone:  (312) 739-4200
Facsimile:   (312) 419-0379

Daniel Harris
Anthony Valach
THE LAW OFFICES OF DANIEL
HARRIS
150 N. Wacker Drive, Suite 3000
Chicago, IL  60606
Telephone:  (312) 960-1802

For the Plaintiffs in

*Jewell v.*
*Ameriquest Mortgage Co.*

Daniel Harris
Anthony Valach
THE LAW OFFICES OF DANIEL HARRIS
150 N. Wacker Drive, Suite 3000
Chicago, IL  60606
Telephone:  (312) 960-1802

Daniel A. Edelman

Cathleen M. Combs
James O. Latturner
EDELMAN, COMBS, LATTURNER &
GOODWIN, LLC.
120 S. La Salle Street, 18th Floor
Chicago, IL  60603
Telephone:  (312) 739-4200
Facsimile:   (312) 419-0379

For the Plaintiffs in

*Juillerat v.*
*Ameriquest Mortgage Co.*

Matthew J. Zevin  (SBN 170736)
STANLEY, MANDEL & IOLA, L.L.P.
550 West "C" Street, Suite 1600
San Diego, CA  92101
Telephone:  (619) 235-5306
Facsimile:   (815) 377-8419

Marc R. Stanley
Roger L. Mandel
Martin Woodward
STANLEY, MANDEL & IOLA, L.L.P.
3100 Monticello Avenue, Suite 750
Dallas, TX  75205
Telephone:  (214) 443-4300
Facsimile:   (214) 443-0358

Andrew S. Kierstead
LAW OFFICE OF ANDREW S.
KIERSTEAD
1001 S.W. Fifth Avenue, Suite 1100
Portland, OR  97204
Telephone:  (508) 224-6246
Facsimile:   (508) 224-4356

Michael D. Donovan
DONOVAN SEARLES LLC
1845 Walnut Street, Suite 1100
Philadelphia, PA 19103
Telephone:  (215) 732-6067
Facsimile:   (215) 732-8060

For the Plaintiffs in

*Kahrer v.*
*Ameriquest Mortgage Co.*

Gary F. Lynch  (PA ID No. 56887)
R. Bruce Carlson  (PA ID No. 56617)
CARLSON LYNCH LTD
36 N. Jefferson Street
P.O. Box 7635
New Castle, PA  16107

Telephone:  (724) 656-1555

A. Hoyt Rowell, III
Daniel O. Myers
RICHARDSON PATRICK WESTBROOK
& BRICKMAN, LLC
1037 Chuck Dawley Blvd., Bldg. A
Mt. Pleasant, SC  29464

For the Plaintiffs in

*Knox v.
Ameriquest Mortgage Co.*

Emmett C. Stanton  (CSB No. 83930)
FENWICK & WEST LLP
801 California Street
Mountain View, CA  94041
Telephone:  (650) 988-8500
Facsimile:   (650) 938-5200

Bryan A. Kohm  (CSB No. 233276)
FENWICK & WEST LLP
275 Battery Street, 16th Floor
San Francisco, CA  94111
Telephone:  (415) 875-2300
Facsimile:   (415) 281-1350

Shirley Hochhausen  (CSB No. 145619)
COMMUNITY LEGAL SERVICES IN
EAST PALO ALTO
2117-B University Avenue
East Palo Alto, CA  94303
Telephone:  (650) 326-6440
Facsimile:   (650) 326-9722

For the Plaintiffs in

*Madrazo v.
Ameriquest Mortgage Co.*

Samuel H. Rudman  (SR-7957)
Evan J. Kaufman  (EJK-8042)
LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  (631) 367-7100
Facsimile:   (631) 367-1173

| | |
|---|---|
| For the Plaintiffs in<br><br>*Montanez v.*<br>*Ameriquest Mortgage Co.* | Thomas G. Shapiro  (BBO #454680)<br>Theodore M. Hess-Mahan  (BBO #557109)<br>SHAPIRO HABER & URMY LLP<br>53 State Street<br>Boston, MA  02109<br>Telephone:  (617) 439-3939<br>Facsimile:  (617) 439-0134<br><br>Samuel H. Rudman  (SR-7957)<br>Evan J. Kaufman  (EJK-8042)<br>LERACH COUGHLIN STOIA GELLER<br>RUDMAN & ROBBINS LLP<br>58 South Service Road, Suite 200<br>Melville, NY  11747<br>Telephone:  (631) 367-7100<br>Facsimile:  (631) 367-1173 |
| For the Plaintiffs in<br><br>*Murphy v.*<br>*Ameriquest Mortgage Co.* | Gary Klein  (BBO #560769)<br>John Roddy  (BBO #424240)<br>Elizabeth Ryan  (BBO #549632)<br>Shennan Kavanagh  (BBO #655174)<br>RODDY KLEIN & RYAN<br>727 Atlantic Avenue, 2nd Floor<br>Boston, MA  02111-2810<br>Telephone:  (617) 357-5500 ext. 15<br>Facsimile:  (617) 357-5030 |
| For the Plaintiffs in<br><br>*Saunders v.*<br>*Ameriquest Mortgage Co.* | George L. Forbes  (0010716)<br>614 W. Superior Avenue, Suite 700<br>Cleveland, OH  44113-1318<br>Telephone:  (216) 696-7170<br>Facsimile:  (216) 696-8076<br><br>Gary Cook  (0021240)<br>A.R. Abdoulkarim  (0022173)<br>27801 Euclid Avenue, Suite 640<br>Euclid, OH  44132<br>Telephone:  (216) 261-8839<br>Facsimile:  (216) 261-8840 |
| For the Plaintiffs in<br><br>*Ungar v.*<br>*Ameriquest Mortgage Co.* | David J. George  (FBN 0898570)<br>Robert J. Robbins  (FBN 0572233)<br>Stuart A. Davidson  (FBN 0084824)<br>LERACH COUGHLIN STOIA GELLER<br>RUDMAN & ROBBINS LLP<br>197 S. Federal Highway, Suite 200 |

Boca Raton, FL  33432
Telephone:  (561) 750-3000
Facsimile:   (561) 750-3364

Samuel H. Rudman  (SR-7957)
Evan J. Kaufman  (EJK-8042)
LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  (631) 367-7100
Facsimile:   (631) 367-1173

For the Plaintiffs in

*Cheryl Williams v.*
*Ameriquest Mortgage Co.*

Elizabeth J. Cabraser
Kelly M. Dermody
Rachel Geman  (RG 0998)
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:   (415) 956-1008

and

780 Third Avenue, 48th Floor
New York, NY  10017
Telephone:  (212) 355-9500
Facsimile:   (212) 355-9592

Gary Klein
Elizabeth Ryan
Shennan Kavanagh
RODDY KLEIN & RYAN
727 Atlantic Avenue
Boston, MA  02111-2810
Telephone:  (617) 357-5500 ext. 15
Facsimile:   (617) 357-5030

Laurence Tien
BAILEY, PERRIN & BAILEY
440 Louisiana, Suite 2100
Houston, TX 77002
Telephone:  (713) 425-7240
Facsimile:   (713) 425-7101

For the Plaintiffs in

*Latonya Williams*
*v. Ameriquest Mortgage Co.*

Theresa I. Wigginton  (FBN 070490)
915 Oakfield Drive, Suite F
Brandon, FL  33511
Telephone:  (813) 653-2992
Facsimile:   (813) 655-7082

Gary Klein  (BBO #560769)
RODDY KLEIN & RYAN
727 Atlantic Avenue, 2nd Floor
Boston, MA  02111-2810
Telephone:  (617) 357-5500 ext. 15
Facsimile:   (617) 357-5030

-86-

1  BILL LOCKYER, Attorney General
     of the State of California
2  ALBERT NORMAN SHELDEN
     Senior Assistant Attorney General
3  BENJAMIN G. DIEHL (Ca. Bar No. 192984)
     Deputy Attorney General
4  300 S. Spring Street, Suite 1702
   Los Angeles, CA  90013
5  Telephone: (213) 897-5548
   Facsimile: (213) 897-4951
6
   WAYNE STRUMPFER
7  Acting California Corporations Commissioner
   ALAN S. WEINGER
8  Acting Deputy Commissioner
   JUDY L. HARTLEY (Ca. Bar No. 110628)
9  Senior Corporations Counsel
   320 W. 4th Street, Ste. 750
10 Los Angeles, California 90013-2344
   Telephone: (213) 576-7604
11
   THOMAS J. ORLOFF, District Attorney
12   County of Alameda
   CHRISTOPHER G. CARPENTER, Assistant District Attorney
13 LAWRENCE C. BLAZER (Ca. Bar No. 95598)
     Senior Deputy District Attorney
14 7677 Oakport Street, Suite 650
   Oakland, CA  94621
15 Telephone: (510) 569-9281

16 [Additional Attorneys For Plaintiff Listed on Following Page]
   Attorneys for Plaintiff

17

18           SUPERIOR COURT OF THE STATE OF CALIFORNIA
                    FOR THE COUNTY OF ALAMEDA
19

20 THE PEOPLE OF THE STATE OF           Case No.: RG06260804
   CALIFORNIA, by the Attorney General, the
21 California Corporations Commissioner, and the    PERMANENT INJUNCTION AND
   District Attorneys of Alameda, Los Angeles,      FINAL JUDGMENT
22 Merced, Monterey, San Francisco, and San
   Mateo Counties,
23                      Plaintiff,
                  v.
24
   AMERIQUEST MORTGAGE COMPANY, a
25 Delaware corporation; ACC CAPITAL
   HOLDINGS CORPORATION, a Delaware
26 corporation; TOWN AND COUNTRY
   CREDIT CORPORATION, a Delaware
27 corporation; and AMC MORTGAGE
   SERVICES, INC., formerly known as Bedford
28 Home Loans, a Delaware corporation,

                  Defendants.

1  ADDITIONAL COUNSEL FOR PLAINTIFF:

2  STEVE COOLEY, District Attorney
   County of Los Angeles
3  THOMAS A. PAPAGEORGE (Ca. Bar No. 77690)
   Head Deputy District Attorney
4  STUART C. LYTTON (Ca. Bar No. 114241)
   Deputy District Attorney
5  Consumer Protection Division
   201 N. Figueroa Street, Room 1200
6  Los Angeles, CA 90012
   Telephone: (213) 580-3319
7  Facsimile: (213) 480-9420

8
   GORDON SPENCER, District Attorney
9  County of Merced
   RICHARD S. MICHAELS (Ca. Bar No. 51940)
10 Special Prosecutor
   2222 "M" Street
11 Merced, CA 95340
   Telephone: (209) 725-3600
12 Facsimile: (209) 725-3669

13
   DEAN D. FLIPPO, District Attorney
14 County of Monterey
   DENINE GUY (Ca. Bar No. 145360)
15 Deputy District Attorney
   1200 Aguajito Road, Room 301
16 Monterey, CA 93940
   Telephone: (831) 647-7770
17 Facsimile: (831) 647-7762

18
   KAMALA D. HARRIS
19 District Attorney of the City and County of San Francisco
   JUNE D. CRAVETT (Ca. Bar No. 105094)
20 Assistant District Attorney
   732 Brannan Street
21 San Francisco, California 94103
   Telephone: (415) 551-9537
22 Facsimile: (415) 551-9504

23
   JAMES P. FOX, District Attorney
24 County of San Mateo
   JOHN E. WILSON (Ca. Bar No. 95602)
25 Deputy District Attorney In Charge
   Consumer & Environmental Protection Unit
26 400 County Center, 3rd Floor
   Redwood City, CA 94063
27 Telephone: (650) 363-4098

28

1    It appearing to this Court that Plaintiff the People of the State of California, by and

2  through the Attorney General, the California Corporations Commissioner, and the District

3  Attorneys of Alameda, Los Angeles, Merced, Monterey, San Francisco, and San Mateo Counties

4  ("Plaintiff," "the State" or "the State of California") and Defendants ACC Capital Holdings

5  Corporation ("ACCCH"), and its subsidiaries Ameriquest Mortgage Company ("AMQ"), Town

6  & Country Credit Corporation ("TCCC"), and AMC Mortgage Services, Inc., formerly known as

7  Bedford Home Loans (hereafter "AMC"), on behalf of themselves and their successors, assigns,

8  predecessors, and any future acquired or created corporations or other business entities of

9  ACCCH, AMQ, TCCC or AMC, engaged in the Retail Based origination and funding of real

10  estate secured, owner-occupied, residential mortgage loans, have resolved the matters in

11  controversy between them and have consented to the terms of this judgment, and good cause

12  having been shown, the Court hereby enters this Stipulated Permanent Injunction and Final

13  Judgment.

14  **I. DEFINITIONS**

15    For purposes of this Permanent Injunction and Final Judgment, the following Definitions

16  apply (capitalized terms used in a definition are themselves defined below):

17    **A.    "Adjustable Rate Mortgage"** means a Loan that has "a variable rate feature" as

18  used in 12 C.F.R. § 226.18(f).

19    **B.    "Ameriquest Party(ies)"** means, as the context requires, any ACCCH subsidiary,

20  including those acquired or formed in the future, involved in the Retail Based origination and

21  funding of real estate secured, owner-occupied, residential mortgage loans, and also including its

22  current Retail Based real estate lending subsidiaries AMQ, AMC and TCCC, and the respective

23  successors and assigns and all the respective employees, officers and directors (solely in their

24  respective official capacities during the term of their employment or directorship and not in their

25  individual capacities) of these subsidiaries.  This term does not include ACCCH or any

26  subsidiaries that are not involved in the Retail Based origination and funding of real estate

27  secured, owner-occupied, residential mortgage loans.

28

C.    **"Annual Percentage Rate" and "APR"** mean the measure of the cost of credit expressed as a yearly rate, calculated according to the provisions of TILA.

D.    **"Appraisal"** means a written or electronic analysis by an appraiser licensed or certified under the laws California or any other political subdivision of California to conduct Appraisals of the value or worth of a single-family or 1-4 unit residential property proposed to serve as collateral for a Loan.  The term does not include reports that estimate the value of residential property by means of an Automated Valuation Model or AVM.

E.    **"Appraisal Department"** means that department of an Ameriquest Party housing employees with responsibility for ordering and reviewing appraisals, which is located at the regional or headquarters office of the Ameriquest Party.  It includes members of the Appraisal and Business Control Groups but does not include any employees who are Sales Personnel.

F.    **"Borrower"** means an individual who has consummated a Loan with an Ameriquest Party.

G.    **"Closing"** means the process during which a Borrower executes a note and security instrument regarding a lien on real property in connection with a Loan.  In some Settling States a Closing is referred to as a "settlement" and in others as an "escrow."

H.    **"Covered Transactions"** means any Loans originated by any Ameriquest Party during the period January 1, 1999 through and including December 31, 2005.

I.    **"Debt Collector"** means a person or entity who is a debt collector as that term is defined at 15 U.S.C. § 1692a (6), and [insert applicable state law provision, if any].

J.    **"Discount Points"** means fees or charges paid by the Borrower to an Ameriquest Party at the time of origination of a Loan for the purpose of reducing the interest rate applicable to the Loan.

K.    **"District Attorneys"** means the District Attorneys of Alameda, Los Angeles, Merced, Monterey, San Francisco and San Mateo Counties, California.

L.    **"Effective Date"** means March 21, 2006.

M.    **"Financial Regulator"** means the administrative agency or agencies within any Settling State, which at any time between January 1, 1999 through and including December 31,

1    2005, exercised regulatory, licensing, examination, supervisory or other administrative

2    enforcement authority over the Ameriquest Parties with respect to any of the Covered

3    Transactions.

4        **N.**     **"Fixed Rate Mortgage"** means a Loan that is not an Adjustable Rate Mortgage.

5        **O.**     **"Good Faith Estimate"** and **"GFE"** mean an estimate of charges, prepared in

6    accordance with section 5 of RESPA, which a Borrower is likely to incur in connection with the

7    Closing of a proposed Loan.

8        **P.**     **"Independent Loan Closer"** means any person who is not an employee of the

9    branch office where the Loan is originated, a spouse, parent, sibling, or child of a branch office

10   employee, or a spouse of any such person, who has no financial interest in the Loan being closed

11   other than payment of standard settlement fees and charges, and who is present at the time of

12   Closing for the purpose of procuring the Borrower's execution of documents related to the

13   Closing process.

14       **Q.**     **"Lending Practices"** means any representations, misrepresentations, omissions,

15   disclosures or any other acts, events, facts, transactions, occurrences, or conduct, whether oral,

16   written or otherwise, by an Ameriquest Party, including its employees or agents, arising out of, in

17   connection with, or relating to any of the following:

18          **1.**      Loan types and terms, including Discount Points, interest rates,

19          origination-related fees, monthly payment amounts, terms of Adjustable Rate and

20          Fixed Rate Mortgages and Prepayment Penalties;

21          **2.**      Written disclosures, including the GFE and other documents

22          required to be provided to a Potential Borrower by any law or otherwise, provided

23          by an Ameriquest Party;

24          **3.**      The Borrower benefits of obtaining a Loan from an Ameriquest

25          Party or from a repeat Refinancing with an Ameriquest Party;

26          **4.**      Coordination with Debt Collectors;

27          **5.**      The timely completion of the Underwriting functions and funding

28          of a Loan;

6.      Closing of a Loan;

7.      Appraisals;

8.      Stated Income Loans; and

9.      Disclosures to non-English speaking Borrowers and Potential Borrowers, including but not limited to the claims set forth in the Complaint filed in this matter, as well as the matters referred to in Paragraph S of Section IV, below.

R.      **"Loan"** means a Retail Based, real estate secured, owner-occupied, residential mortgage loan originated and funded by an Ameriquest Party.

S.      **"Material Change in Terms"** means:

1.      An increase in the interest rate of the Loan of thirty (30) basis points or more or any increase in Discount Points, other than as the result of trading Discount Points for interest rate at the affirmative request of the Borrower;

2.      Any increase in the repayment term of the Loan;

3.      A decrease in the Loan amount greater than one percent (1%);

4.      The addition of a Prepayment Penalty; or

5.      The change from a Fixed Rate Mortgage to an Adjustable Rate Mortgage.

T.      **"Non-Prime Loan"** means a Loan for which the APR is equal to or greater than two and one-half percentage points (2.5%) for first-lien loans or five percentage points (5%) for subordinate-lien loans above the Treasury yield for securities of a comparable period of maturity as of the fifteenth day of the month in which the interest rate on the Loan is set. Following receipt of the first Monitor's Report, due on March 31, 2007, and again upon receipt of the second Monitor's Report, due on March 31, 2008, the Compliance Committee shall renegotiate this provision in good faith with ACCCH and the Ameriquest Parties, taking into account the Ameriquest Parties' record of compliance reflected in the Monitor's Reports and any other relevant information.

U.      **"Potential Borrower"** means an individual who is seeking or receiving information about a Loan from an Ameriquest Party Sales Person; provided, however, that

1  Potential Borrower does not include an individual who receives, but does not respond to,

2  marketing materials or information, including advertisements.

3       **V.**    **"Prepayment Penalty"** means a fee assessed, pursuant to the terms of the Loan

4  documents, when a Borrower pays off a Loan within a designated period of time after Closing,

5  but excluding any fee or charge that may be assessed to facilitate Loan pay-off, such as a pay-off

6  fee, fax fee, reconveyance fee or other fee that is not prohibited under applicable law and would

7  be payable for the pay-off of any Loan without regard to whether the Loan documents impose

8  what generally is understood to be a Prepayment Penalty.

9       **W.**    **"Refinance"** means to satisfy one Loan with the proceeds from a new Loan

10  obtained by the same Borrower(s), using the same property as security.  A Refinance does not

11  include the matters identified in 12 C.F.R. § 226.20(a)(1)-(5).

12       **X.**    **"RESPA"** means the federal Real Estate Settlement Procedures Act of 1974, 12

13  U.S.C. § 2601 et seq., and Regulation X, promulgated pursuant thereto, 24 C.F.R. Part 3500,

14  including subsequent amendments.

15       **Y.**    **"Retail Based"** means originated and funded by loans by employees or

16  independent contractors acting in the name and on behalf of the lender directly to consumers.  It

17  does not include other methods of originating loans using third parties, such as mortgage brokers

18  or loan correspondents.

19       **Z.**    **"Sales Person" or "Sales Personnel"** means any employee or employees who

20  work in the AMC Portfolio Retention Department, at a branch office of any Ameriquest Party or

21  who otherwise may reasonably be foreseen to have direct communications (whether in person,

22  telephonically, or by electronic means) with Potential Borrowers for the purpose of originating a

23  Loan and those who supervise those employees, including regional and area managers.

24       **AA.**    **"Settlement Fund"** means the amounts required to be paid under this Judgment

25  for consumer restitution and administration.

26       **BB.**    **"Settling States"** means the States or Commonwealths, including the District of

27  Columbia, that file fully executed Consent Judgments or Stipulated Judgments, or comparable

28  documents, resolving with ACCCH and the Ameriquest Parties the matters set forth herein.

1      **CC.** **"State Attorneys General"** means the chief legal officer of each state,

2 commonwealth and the District of Columbia, except for the states of Hawaii and Georgia. For

3 Hawaii, it means the Executive Director of the Hawaii Office of Consumer Protection, an agency

4 with statutory authority to represent the State of Hawaii in Consumer Protection Actions. For

5 Georgia, it means the Administrator of the Fair Business Practices Act, who is authorized by

6 statute to enter into Settlement Agreements on behalf of the State of Georgia.

7      **DD.** **"Stated Income Loan"** means a Loan where a Borrower is not required to

8 provide verification or documentation to support all income listed on the Borrower's application.

9      **EE.** **"TILA"** means the federal Truth-in-Lending Act, 15 U.S.C. §1601 et seq., and

10 Regulation Z, promulgated pursuant thereto, 12 C.F.R. Part 226, including subsequent

11 amendments.

12      **FF.** **"Underwriting"** means the process of approving or denying a Loan based on an

13 evaluation of the applicant's creditworthiness and ability to repay the Loan and an Appraisal of

14 the market value of the residential property proposed to secure the Loan.

15 **II. STIPULATED RECITALS**

16      **A.** Plaintiff, as well as state attorneys general and state financial regulators in other

17 states, has received and investigated consumer complaints, and conducted examinations with

18 respect to the Lending Practices of the Ameriquest Parties and acknowledges that ACCCH and

19 the Ameriquest Parties cooperated with Plaintiff and the other Settling States' investigations and

20 examinations of the Lending Practices.

21      **B.** ACCCH and the Ameriquest Parties deny each of Plaintiff's allegations. This

22 Permanent Injunction and Final Judgment shall not be interpreted as an admission of wrongdoing

23 by ACCCH or the Ameriquest Parties or as an admission, concession, or evidence of any alleged

24 fault, misrepresentation, act or omission or any other alleged violation of law, and it does not

25 represent a formal finding of wrongdoing by any court or administrative agency.

26      **C.** Plaintiff and Defendants waive their right to move for a new trial or otherwise

27 seek to set aside the Judgment through any collateral attack, and further waive their right to

28

1   appeal from the Judgment, except that Plaintiff and Defendants, and each of them, agree that this

2   Court shall retain jurisdiction for the purposes specified in paragraph VIII(H) of this Judgment.

3

4   **III.  PAYMENT OF RESTITUTION, ATTORNEYS' FEES, INVESTIGATION COSTS
    AND OTHER EXPENSES.**

5

6       **A.      Payment Obligation of ACCCH.**  ACCCH is a party to this Permanent

7   Injunction and Final Judgment for the sole purpose of paying restitution and other amounts as set

8   forth below in this Section III and in Sections V.C.3 and VI.E.

9       **B.      Payment of Restitution.**  ACCCH or AMQ shall pay the sum of Two Hundred

10  Ninety-Five Million Dollars ($295,000,000) for the payment of restitution to Borrowers in the

11  Settling States nationally.  The restitution awarded under the terms of this Judgment is not and

12  shall not be considered as forgiven debt.  The Settlement Fund shall be divided into two

13  sub-funds:

14      **1.**     The sum of One Hundred Seventy-Five Million Dollars ($175,000,000) shall be

15              used to provide restitution to Borrowers who obtained Loans from an Ameriquest

16              Party during the period of January 1, 1999 to April 1, 2003 ("Sub-Fund A").

17              Sub-Fund A, together with accrued net after-tax income, if any, shall be

18              distributed on a nationwide basis by the Settlement Administrator to certain

19              Borrowers, including certain Borrowers in California, who received a Loan from

20              any of the Ameriquest Parties from January 1, 1999, through and including April

21              1, 2003, according to a formula to be established by the Settling States.

22      **2.**     The sum of One Hundred Twenty Million Dollars ($120,000,000) shall be used to

23              provide restitution to Borrowers who obtained Loans from an Ameriquest Party

24              between January 1, 1999 and December 31, 2005 ("Sub-Fund B").  The State of

25              California's share of  Sub-Fund B shall be Twenty-Six Million, Six Hundred

26              Thirty-Six Thousand and Four Hundred Dollars ($26,636,400.00), plus any net,

27              post-tax interest earned on that sum. The Settlement Administrator shall, at the

28              joint instruction of the California Attorney General and the Alameda County

1    District Attorney, transfer a portion, not to exceed Four Million Dollars

2    ($4,000,000) of the State of California's share of Sub-Fund B designated by the

3    Attorney General and the Alameda County District Attorney to the California

4    Attorney General's Office for later distribution as directed by the Attorney General

5    and the Alameda County District Attorney.   This designated share shall be in

6    addition to any amounts paid to the State under subparagraph (C), below.  The

7    State shall have sole discretion to determine the manner in which it will distribute

8    its remaining share of Sub-Fund B to California consumers, including criteria for

9    choosing which Borrowers shall receive any restitution and the amount to

10    distribute to each.

11    **C.**    **Payment to the Settling States.** Within three (3) business days after the Effective

12    Date, ACCCH or AMQ shall pay, by wire transfer or as otherwise directed by the Settling States,

13    the sum of Thirty Million Dollars ($30,000,000) to the Settling States for their attorneys' fees,

14    investigation costs, and other expenses related to the investigation and resolution of this matter.

15    The State of California's share of these settlement costs is Four Million Dollars ($4,000,000).

16    One Million Dollars ($1,000,000) of California's share of the settlement costs is to be paid by

17    ACCCH and the Ameriquest Parties in settlement of Plaintiff's claims related to California

18    Business and Professions Code section 17206 concerning Covered Transactions prior to

19    December 31, 2002, which shall be divided evenly among the Office of the Attorney General, the

20    Department of Corporations, and the District Attorney's Offices of Alameda, Los Angeles,

21    Merced, Monterey, San Francisco and San Mateo Counties.  ACCCH or AMQ shall distribute

22    the entire Four Million Dollars ($4,000,000) being paid to the State of California pursuant to this

23    subparagraph as follows:  One Million, Four Hundred Seventy-Five Thousand Dollars

24    ($1,475,000) to the Office of the California Attorney General, of which the Attorney General

25    shall transfer $425,000 to the District Attorney's Office of Monterey County and $425,000 to the

26    District Attorney's Office of San Mateo County; Six Hundred and Twenty-Five Thousand

27    Dollars ($625,000) each to the Department of Corporations and the District Attorney's Office of

28

1 Alameda County; and Four Hundred Twenty-Five Thousand Dollars ($425,000) each to the

2 District Attorney's Offices of Los Angeles, Merced, and San Francisco Counties.

3     **D.**    **Payment Schedule.**  All payments to the Settlement Fund shall be by wire

4 transfer to the Settlement Administrator and deposited by the Administrator into an interest

5 bearing account.  In the event the Settlement Administrator is not in place at the time any

6 payment is due, ACCCH or AMQ shall make the payment into an escrow account established for

7 that purpose by the Compliance Committee with a trustee to be named by the Settling States,

8 who shall deposit the payment with the Settlement Administrator as soon as one is in place.

9 ACCCH or AMQ shall make the required payments according to the following schedule:

10     **1.**    The sum of Forty-five Million Dollars ($45,000,000) shall be paid no later than

11         three (3) business days after the Effective Date.

12     **2.**    The sum of Sixty Million Dollars ($60,000,000) shall be paid not later than ninety

13         (90) days after the date the first payment is due.

14     **3.**    The sum of Sixty Million Dollars ($60,000,000) shall be paid not later than one

15         hundred eighty (180) days after the date the first payment is due.

16     **4.**    The sum of Sixty Million Dollars ($60,000,000) shall be paid not later than two

17         hundred seventy (270) days after the date the first payment is due.

18     **5.**    The sum of Seventy Million Dollars ($70,000,000) shall be paid not later than

19         three hundred sixty five (365) days after the date the first payment is due.

20     **E.**    **Funds to Be Held in Trust.**  All monies in the Settlement Fund, including

21 interest income, shall be held in trust for the purposes stated in this Judgment.  Neither ACCCH

22 nor the Ameriquest Parties shall have any property right, interest, claim or title to the Settlement

23 Fund or any interest earned thereon once a deposit is made into the Settlement Fund.

24     **F.**    **Qualified Settlement Fund.**  The fund established by this Judgment for the

25 payment of restitution is intended to be a Qualified Settlement Fund within the meaning of

26 Treasury Regulation Section 1.468B-1 of the U.S. Internal Revenue Code of 1986, as amended.

27

28

## IV. INJUNCTIVE RELIEF

The Ameriquest Parties are enjoined with respect to their origination and funding of Loans from engaging in unfair or deceptive acts or practices and are further enjoined as follows:

**A.    Scope.**  The injunctive requirements set forth below are intended as a floor or minimum requirements governing the conduct of the Ameriquest Parties.  Nothing set forth herein alters the requirements of state or federal law to the extent those laws offer greater protection to consumers.

**B.    Disclosure of Loan Terms.**   The Ameriquest Parties shall not make false, misleading or deceptive representations regarding Loan terms and shall make the following disclosures to Potential Borrowers in a clear manner:

1.    **Oral Disclosures.**  Ameriquest Parties' Sales Personnel, whenever they have obtained Non-Prime Loan pricing information from their respective pricing model based on credit information provided by a Potential Borrower and that Potential Borrower has in a conversation with an Ameriquest Party Sales Person agreed to the submission of a specific Non-Prime Loan proposal for processing (but in no event later than when an appraisal or loan documents have been ordered, whichever occurs first), shall provide oral disclosures as follows:

   a.    **Fixed Rate Mortgage - Specific Loan Terms.**  If the proposed Non-Prime Loan is a Fixed Rate Mortgage, the Ameriquest Parties' Sales Personnel shall provide an oral disclosure in substantially the following form:

   "The loan we have been discussing is a [insert term of the loan] year fixed rate loan for $ [insert loan amount].  The interest rate is [insert interest rate]%.  The monthly payment is $[insert monthly payment], which does [or does not] include escrows for property taxes or insurance.  Your loan does [or does not] include a prepayment penalty."

   b.    **Fixed Rate Mortgage - With Discount Points.**  If the proposed Non-Prime Loan includes a fixed rate mortgage and provides for the

1    payment of Discount Points, Ameriquest Parties' Sales Personnel shall

2    provide an oral disclosure in substantially the following form:

3        "This loan includes payment of [insert number] discount points, a

4    fee you pay at closing that reduces the interest rate on your loan and also

5    the amount of your monthly payment but increases the total amount of

6    your loan.  You may be eligible for a loan with fewer discount points."

7    c.    **Adjustable Rate Mortgage - Specific Loan Terms.**  If the proposed

8    Non-Prime Loan includes an Adjustable Rate Mortgage, Ameriquest

9    Parties' Sales Personnel shall provide an oral disclosure in substantially the

10    following form:

11        "The loan we have been discussing is an adjustable rate loan for

12    $[insert loan amount], with an initial interest rate of [insert initial interest

13    rate]%.  Your initial monthly payment would be $[insert initial monthly

14    payment], which does [or does not] include escrows for property taxes or

15    insurance.  Your loan does [or does not] include a prepayment penalty.

16        "Because this is an adjustable rate loan, the initial interest rate and

17    monthly payment I quoted you are only guaranteed for the first [insert

18    length of initial fixed rate period] of the loan.  After that, your interest rate

19    can increase by up to [insert rate adjustment cap] percent each year.  But,

20    your interest rate can never be higher than [insert lifetime cap] percentage

21    points over your initial interest rate."

22    If the Sales Person has not previously discussed a specific Fixed Rate

23    Mortgage proposal with the Potential Borrower, the Sales Person shall also

24    provide an additional oral statement in substantially the following form:

25        "You may be eligible for a loan with an interest rate that does not

26    change."

27    d.    **Adjustable Rate Mortgage - With Discount Points.**  If the proposed

28    Non-Prime Loan includes an Adjustable Rate Mortgage and the payment

of Discount Points, Ameriquest Sales Personnel shall provide an oral

disclosure in substantially the following form:

"This loan includes a payment of [insert the number] discount

points, a $[insert the amount of the discount points in dollars] fee you will

pay at closing to lower your initial interest rate and monthly payment.

You may be eligible to pay fewer discount points, but if you do that your

initial interest rate and monthly payment will be higher."

e.    **Prepayment Penalty.**  If the proposed Non-Prime Loan includes a

Prepayment Penalty, Ameriquest Sales Personnel shall make an oral

disclosure in substantially the following form:

"This loan contains a prepayment penalty.  That means if you pay

off or refinance your loan within [insert the length of the period] you will

pay a fee of as much as $[insert the amount of the fee in dollars].  You

may be eligible for a loan without a prepayment penalty, but you would

then pay a higher interest rate and a higher monthly payment."

f.    **Concluding Statement.**  The Ameriquest Parties' Sales Personnel shall

conclude the conversation with the Potential Borrower by making a

statement in substantially the following form:

"We will be sending you some written disclosures that explain

your options regarding a fixed versus adjustable rate loan, paying more or

less discount points and a loan with or without a prepayment penalty.  If,

after reading the information we send you, you wish to make any changes

to this loan proposal, please give me a call."

g.    **Interest Rate Disclosure.**  The Ameriquest Parties shall disclose the

interest rate being offered, if known, whenever asked by a Potential

Borrower.

h.    **Written or Electronic Disclosures.**  The Ameriquest Parties' Sales

Personnel shall be instructed that in the event a Potential Borrower's

14

PERMANENT INJUNCTION AND FINAL JUDGMENT

1    application is not submitted orally but in a written or electronic document

2    (or submitted through a website or other electronic format), the foregoing

3    oral disclosures, as and if applicable, shall be provided within three (3)

4    days of receipt of the application, in writing by mail or by transmission by

5    the same means used in submitting the application.

6        i.    **Failure to Make Oral Disclosures.** If an Ameriquest Party discovers that

7    a Sales Person has failed to make required oral disclosures to the Potential

8    Borrower, that Ameriquest Party shall take prompt and appropriate

9    disciplinary action, up to and including dismissal of the responsible

10   personnel.

11       2.    **Written Disclosures.** Within three (3) days after obtaining Loan pricing

12   information from their respective pricing model based on credit information

13   provided by a Potential Borrower and the Potential Borrower agreeing to the

14   submission of a specific Loan proposal for processing (but in no event later than

15   three (3) days after when an appraisal or loan documents have been ordered,

16   whichever occurs first) and without regard to any other disclosure requirements,

17   the Ameriquest Parties shall provide the Potential Borrower a single page

18   disclosure, in writing or electronically, which discloses the terms of the specific

19   Loan proposal being offered to the Potential Borrower, in substantially the form as

20   attached hereto as Exhibit A (hereafter "Disclosure Form"). The initial Disclosure

21   Form may be included with other required disclosures being sent to Potential

22   Borrowers at the same time.

23       a.    If any one or more Material Changes in Terms occurs, subsequently

24   making the initial Disclosure Form inaccurate, the Ameriquest Parties

25   shall mail, not less than six (6) days before Closing, or deliver or cause to

26   be delivered by courier, facsimile transmission, e-mail or website access

27   so as to be received or accessed by the Potential Borrower at least three (3)

28   days prior to Closing for a Non-Prime Refinance Loan and as soon as

1    reasonably possible but in no event less than one (1) day prior to Closing

2    for any other Loan, a revised Disclosure Form that reflects the Loan terms

3    that will be presented to the Potential Borrower at Closing, including all

4    Material Changes in Terms.

5    b.    Notwithstanding the provisions of Section IV.B.2.a. above, an Ameriquest

6    Party need not provide the Potential Borrower a revised Disclosure Form

7    when the only Material Change in Terms is an increase in Discount Points

8    of no more than forty-seven (47) basis points and that increase has been

9    requested by the Potential Borrower to buy down an increase in the interest

10    rate that would not by itself represent a Material Change in Terms.

11    c.    If the revised Disclosure Form is mailed or delivered by courier or

12    facsimile transmission, it must be accompanied by a cover letter advising

13    the Potential Borrower that changes have been made to the terms of the

14    proposed Loan.  If the revised Disclosure Form is delivered by e-mail

15    message, the subject line must contain the following: "IMPORTANT

16    CHANGES to your [THE APPLICABLE AMERIQUEST PARTY] loan

17    proposal."  If the revised Disclosure Form is delivered by website access,

18    access to the website must be password protected.

19    d.    Compliance with the time provisions of this subparagraph may be proven

20    by satisfactory proof of one of the following:

21        (1)    Timely mailing;

22        (2)    Timely dispatch by courier or facsimile transmission;

23        (3)    Confirmation of timely receipt of the e-mail by the Potential

24            Borrower; or

25        (4)    Confirmation of timely access to the web site by the Potential

26            Borrower.

27    e.    The Ameriquest Parties shall instruct the Independent Loan Closer that the

28    final Disclosure Form must be the first document presented to the

PERMANENT INJUNCTION AND FINAL JUDGMENT

1                 Potential Borrower at Closing by the Independent Loan Closer, who shall

2                 review it with, and have it signed by, the Borrower.  In the event an

3                 Ameriquest Party employee is conducting the Closing, when permitted

4                 under this Judgment, the final Disclosure Form shall be the first document

5                 presented to the Potential Borrower at Closing, who shall review it with,

6                 and have it signed by, the Borrower.

7   **3.**    In communicating with Potential Borrowers, the Ameriquest Parties shall not

8      represent that their respective interest rate or terms are "better," "lower" than, or

9      "competitive" with those of other mortgage lenders, or use words of similar

10      import, unless such representations are in fact true.

11   **4.**    The Ameriquest Parties shall not misrepresent the adjustable rate feature of any

12      Adjustable Rate Mortgage.  For example, the Ameriquest Parties may not:

13     **a.**    State or imply that the interest rate on the Loan will not, or is unlikely to,

14        adjust in the future;

15     **b.**    State or imply that the interest rate on the Loan can go down (from its

16        initial rate) as well as up, unless that is in fact true;

17     **c.**    State or imply that the initial "fixed" interest rate in an Adjustable Rate

18        Mortgage is the interest rate for the entire term of the Loan;

19     **d.**    State or imply that the interest rate will go up only if the market rates

20        increase, unless that is, in fact, true.

21   **5.**    When comparing different Loans, the Ameriquest Parties shall not state or imply

22      that monthly Loan payments, which include amounts escrowed for payment of

23      property taxes and homeowner's insurance, are comparable with monthly Loan

24      payments that do not include these amounts.  The Ameriquest Parties shall inform

25      a Potential Borrower whether the monthly payment discussed with or proposed to

26      the Potential Borrower does or does not include any amount escrowed for taxes or

27      insurance, as the case may be.

28

PERMANENT INJUNCTION AND FINAL JUDGMENT

6.  No Ameriquest Party shall represent to a Potential Borrower that it will be able to Refinance the Potential Borrower's proposed Loan at a later date on more favorable terms unless the Loan proposal being made to the Potential Borrower provides that the Ameriquest Party is contractually bound to Refinance the Potential Borrower's proposed Loan at the later date on more favorable terms.

7.  The Ameriquest Parties shall not misrepresent to any Borrower or Potential Borrower the credit rating or credit status of that Borrower or Potential Borrower.

**C.**  **Same Rate Available.** The Ameriquest Parties shall make Loans in accordance with a pricing model that is designed to produce (before the use of any price exception) the same interest rate and number of Discount Points for all Potential Borrowers with the same credit risk characteristics, who are applying for the same Loan, and who are the same with respect to any other characteristic(s) or fact(s) that affect the pricing information generated by the pricing model. Nothing herein shall prohibit an Ameriquest Party from making individual "price exceptions" wherein the Ameriquest Party offers a Potential Borrower a rate that is lower than the rate for which the Potential Borrower otherwise qualifies ("Price Exception"). Provided, however, if in any ninety (90) day period the number of Borrowers receiving a Price Exception from an Ameriquest Party exceeds thirty percent (30%) of the Loans originated within the period, there shall be a rebuttable presumption that the Ameriquest Party has violated the provisions of this Section IV.C.

Price Exception does not include the following: (1) a price reduction given to prevent the Loan from becoming a high-cost or covered loan under the Home Ownership and Equity Protection Act (HOEPA), or any similar state law, or from violating any state law limitation on fees, rates, or other costs; (2) a price override given at or near the time of funding to honor a previous price commitment; or (3) a firm offer of credit to a pre-screened Potential Borrower that is required by the Fair Credit Reporting Act and based upon the pricing model price at the time of the offer but that is not accepted by the Potential Borrower until after the pricing model price has increased.

1   **D.    Good Faith Estimates (GFE).**  The Ameriquest Parties shall provide each Loan

2   applicant with a GFE, as required by RESPA.  The Ameriquest Parties shall not disparage,

3   discredit, or otherwise encourage Potential Borrowers to disregard the GFE.  For example, the

4   Ameriquest Parties shall not represent to a Potential Borrower that the GFE is incorrect, reflects

5   the worst case scenario, is not the true Loan proposal, or reflects terms that are higher or lower

6   than the actual terms the Potential Borrower will receive.

7   **E.    Borrower Benefit Assessment.**  The Ameriquest Parties shall not enter into any

8   Non-Prime Refinance Loan that does not provide a benefit to the Borrower.  The Ameriquest

9   Parties must document that each Non-Prime Refinance Loan provides a benefit and maintain

10  such documentation in a readily retrievable format.

11  **F.    Foreign Language Provisions.**  The Ameriquest Parties shall continue their

12  current policy of: (a) maintaining a program of testing and certifying appropriate Sales Personnel

13  for fluency in the Spanish language, and (b) translating into Spanish (i) all documents legally

14  required to be translated, (ii) the Disclosure Form and (iii) any other disclosure documents

15  voluntarily provided to Potential Borrowers under an Ameriquest Party's Best Practices.  If an

16  Ameriquest Party advertises in any language other than English or Spanish, it must adopt and

17  implement a similar policy with respect to consumers who speak the other language.

18  **G.    Prepayment Penalties.**

19  **1.**      The Ameriquest Parties shall reimburse a consumer for any Prepayment Penalty

20          paid by that consumer if the existence of the penalty was not timely and fully

21          disclosed.  The Ameriquest Parties shall be deemed to have complied with this

22          requirement of full and timely disclosure by the mailing or delivery of the

23          Disclosure Form as provided in Paragraph IV.B.2 above.

24  **2.**      For any Non-Prime Adjustable Rate Mortgage Loan originated one (1) year or

25          later after the Effective Date that has a Prepayment Penalty, the term of the

26          Prepayment Penalty may not exceed six months beyond the fixed rate term of the

27          Loan.  For a period of five (5) years after the Effective Date, the Ameriquest

28

Parties shall, with respect to such Loans, limit the interest rate adjustment during the Prepayment Penalty term to not more than two (2) percentage points.

3. The Ameriquest Parties shall not make false, misleading or deceptive representations regarding a Prepayment Penalty provision. For example:

   a. Whenever an Ameriquest Party orally represents that a Potential Borrower can Refinance at a later date, that Ameriquest Party must also simultaneously advise the Potential Borrower of any obligation to pay a Prepayment Penalty.

   b. The Ameriquest Parties shall not promise or represent to a Potential Borrower that the Ameriquest Parties will waive a Prepayment Penalty at some future date, unless that promise is contemporaneously communicated in writing and is included as a term in the Loan made to the Potential Borrower.

   c. The Ameriquest Parties shall not refer to a Prepayment Penalty as a "Prepayment Privilege," a "Prepayment Benefit," a "Prepayment Opportunity," or use any similar term that tends to mislead a Potential Borrower regarding the obligation to pay a penalty.

   d. The Ameriquest Parties shall not state, infer or imply that the circumstances that would trigger a Prepayment Penalty may not or will not occur; provided, however, that the Ameriquest Parties may inform a Potential Borrower of the facts regarding when a Prepayment Penalty included in a Loan proposal does and does not have to be paid according to its terms.

4. The Ameriquest Parties shall continue their current practice of not providing their employees with any monetary incentive or other compensation for including a Prepayment Penalty provision in a Loan.

1    **H.**    **Repeat Refinancings.**

2    **1.**    No Ameriquest Party may solicit Borrowers with existing Non-Prime Loans for

3    Refinancing within twenty-four (24) months of the Loan Closing date unless it:

4        **a.**    Receives a request for a pay-off statement from the Borrower or by

5        someone authorized by the Borrower;

6        **b.**    Is contacted by a Borrower who expressly inquires about Refinancing; or

7        **c.**    Otherwise has a good faith belief, supported by objective evidence, that

8        the Borrower is considering Refinancing.

9    **2.**    Any proposed Refinancing of a Borrower's Non-Prime Refinance Loan must

10    provide a benefit pursuant to Section IV.E above.

11    **3.**    No Ameriquest Party employee may offer, give or receive compensation to or

12    from a fellow employee, including employees of the Portfolio Retention Centers,

13    in connection with Refinancing a Borrower within twenty-four (24) months of the

14    Closing date of an existing Loan; provided, however, this restriction shall not

15    apply to payments made under an Ameriquest Party's then existing compensation

16    policy.

17    **I.**    **Independent Loan Closers.**

18    **1.**    The Ameriquest Parties shall use an Independent Loan Closer for all of their

19    Non-Prime Loan Closings.

20    **2.**    Written Instructions and Whistleblower Agreement.  The Ameriquest Parties shall

21    provide each Independent Loan Closer with written instructions and procedures,

22    which the Independent Loan Closer shall be required to follow at Closings.  The

23    Ameriquest Parties shall require the Independent Loan Closer to provide a written

24    report both to designated Ameriquest Party senior management, and to the

25    Monitor during the compliance monitoring period, if the Independent Loan Closer

26    discovers unfair, deceptive, misleading or unlawful behavior by any Ameriquest

27    Party employee in connection with any Loan.  If an Ameriquest Party learns that

28    an Independent Loan Closer failed to report such misconduct, the Ameriquest

1   Party shall take disciplinary action against the Independent Loan Closer, including

2   temporary or permanent removal from the list of approved Independent Loan

3   Closers.  The Ameriquest Parties may not retaliate against an Independent Loan

4   Closer for reporting misconduct.

5      **3.**   Independent Loan Closers shall be instructed by the Ameriquest Parties to explain

6   fully the Closing process and Loan documents to Potential Borrowers and to

7   answer all questions from Potential Borrowers to the best of the Independent Loan

8   Closer's ability, unless the Independent Loan Closer is prohibited by law or

9   professional standards from doing so.  Further, Independent Loan Closers shall be

10  instructed not to pressure or rush Potential Borrowers at Closing or encourage

11  them to close by suggesting Potential Borrowers may use the rescission period

12  either to read Loan documents or to address questions or objections raised at

13  Closing.

14     **4.**   Employees of Ameriquest Parties may attend Non-Prime Loan Closings only if

15  requested by a Potential Borrower.  Ameriquest Party employees attending a

16  Closing may not pressure or rush Potential Borrowers, encourage them to close by

17  suggesting they may use the rescission period either to read Loan documents or to

18  address questions or objections raised at Closing, or in any way obstruct the

19  ability of the Independent Loan Closer to perform his or her duties.  The

20  Independent Loan Closer shall be required to report any violation of this

21  Paragraph IV.I.4 by any Sales Personnel to designated persons in the appropriate

22  regional or headquarters office of the applicable Ameriquest Party.  Persons

23  designated may not be Sales Personnel.

24     **5.**   Notwithstanding the foregoing, Ameriquest employees may conduct and attend

25  Closings of Loans that are not Non-Prime Loans.

26  **J.**   **Closings.**

27     **1.**   Before Closing a Loan, the Ameriquest Parties shall ensure that (a) the Potential

28  Borrower has satisfied all credit Underwriting requirements; (b) an Appraisal or

1    AVM has been submitted and evaluated (if required); and, (c) standard

2    title-related information has been received and reviewed.

3    **2.**    The Ameriquest Parties may Close a Loan subject to satisfaction of standard

4    industry contingencies such as execution and receipt of state-specific documents

5    (e.g., New York and New Jersey same-name affidavits, Texas election not to

6    rescind forms, receipt of pay stubs for proof of employment, credit report

7    explanation letters, use of proceeds letters and hazard insurance loss payee

8    endorsements).

9    **3.**    If an Ameriquest Party schedules a Closing before satisfying the requirements set

10    forth above in Paragraph IV.J.1, it may not represent, suggest or imply to a

11    Potential Borrower that a Loan has been or will be approved, unless and until

12    these Closing requirements are met.  If an Ameriquest Party communicates with a

13    Potential Borrower to schedule a Closing before the Closing requirements have

14    been met, it must clearly inform the Potential Borrower that the Loan has not yet

15    been approved, and that Closing is contingent upon resolution of all outstanding

16    issues.

17    **K.**    **Loan Funding.**  The Ameriquest Parties must fully and unconditionally disburse

18    the proceeds of all Refinance Loans to the Borrower, settlement agent, or other creditors as

19    reflected in the settlement statement on the first business day after the expiration of any

20    rescission period provided for by law or internal Best Practices; provided, however, that the

21    Ameriquest Parties will not be deemed to have violated this requirement where: (1) Closing

22    contingencies as set forth in Paragraph IV.J.2 have not been satisfied; (2) an Ameriquest Party is

23    prevented from fully disbursing the proceeds because the wire transfer is delayed (by no more

24    than one (1) day) due to the volume of other scheduled Closings; or (3) by other causes beyond

25    an Ameriquest Party's reasonable control and occurring without its fault or negligence, including,

26    Acts of God, floods, fires, government restrictions, wars, strikes and insurrections.

27    If an Ameriquest Party fails, for reasons other than those described above, to timely

28    disburse the Refinance Loan proceeds, it shall reimburse any resulting interest, late fees, or other

23

PERMANENT INJUNCTION AND FINAL JUDGMENT

1    charges incurred by the Borrower, and fully cooperate in assisting the Borrower in removing any

2    adverse credit report information arising from the non-timely payment. Notwithstanding the

3    foregoing, no Ameriquest Party shall be required to disburse the proceeds of any Loan until it is

4    reasonably satisfied the Borrower has not rescinded the Loan transaction.

5        **L.**    **Appraisals.**

6        **1.**    **Conducting Appraisals.** The Ameriquest Parties shall take reasonable steps to

7        ensure all Appraisals are accurate, that appraisers do not inflate property values

8        and that no employee of an Ameriquest Party attempts to influence the

9        development, reporting, result or review of any Appraisal or otherwise interferes

10       with an appraiser's professional duty to perform the Appraisal impartially,

11       objectively and independently.

12       **2.**    **Removal of Branch from Appraiser Selection.** The Ameriquest Parties shall

13       implement a system to ensure that Appraisals are ordered as part of an automated,

14       centralized process apart from the branch sales offices. Sales Personnel may not

15       select appraisers.

16       The Ameriquest Parties shall inform all appraisers currently on their

17       approved or accepted lists that they are no longer dependent upon the branch

18       offices for Appraisal assignments, that only the Appraisal Department can remove

19       them from a panel, and that they are to ignore, and report immediately to the

20       Appraisal Department, any effort by any Sales Person, including any Mortgage

21       Specialist, Branch Manager, Area Sales Manager, or Regional Sales Manager to

22       influence appraised value in any way.

23       Similarly, the Ameriquest Parties shall instruct Sales Personnel they are

24       not to engage in any communications with any appraiser regarding the substantive

25       content of the Appraisal report or the final appraised value, or to attempt to

26       influence the results of the Appraisal in any way and, if they are found to have

27       done so, they will be subject to immediate disciplinary action, up to and including

28       dismissal.

3.    **Automated Selection of Ranked Appraisers Required.** A panel of qualified, approved appraisers shall be created for each State. When a new Loan file is opened, the automated system will assign the Appraisal to an appraiser on the appropriate panel using an algorithmic system designed to limit choice or selection from the discretion of Ameriquest Party employees. This algorithmic system shall be created and maintained by the Appraisal Department and may involve ranking appraisers on the basis of legitimate and relevant factors, including:

a.    The appraiser's familiarity with the geographic locale of the subject property and the type of property to be appraised;

b.    The number of Appraisals the appraiser is capable of performing within a given time period;

c.    The appraiser's record with respect to responsiveness and timeliness;

d.    The status of the appraiser's license; and

e.    Whether, at the time of the Appraisal request, the appraiser has prior Appraisals undergoing pre- or post-funding review or investor due diligence review.

In limited cases (but in no event for purposes of a second or subsequent Appraisal), the Appraisal Department may assign Appraisals to appraisers not selected using the algorithmic system, if the consideration of previously unconsidered legitimate and relevant factors dictates. In that event, the Appraisal Department shall document the reasons for its departure from the normal selection process and maintain the documentation in a readily retrievable format. In no event, however, shall the willingness or unwillingness of an appraiser to produce a desired value become a factor in the selection of an appraiser.

4.    **Appraiser Panels.**

a.    **Service Areas.** If an appraiser declines an assignment because the appraiser, in his or her professional judgment, believes the property is

1  outside of the appraiser's professional service area, the Appraisal

2  Department shall assign the Appraisal to another appraiser and may not

3  pressure the declining appraiser to accept the assignment.  The Ameriquest

4  Parties shall not punish appraisers, including by reducing future

5  assignments, for declining assignments the appraiser believes are outside

6  the appraiser's professional service area.

7  **b.**  **Inclusion on a Panel.**  As a prerequisite to inclusion on a panel, an

8  appraiser must be in good standing with his or her licensing authority.

9  Only persons who are not Sales Personnel may oversee the selection of

10  appraisers on the panel.

11  **(1)**  Before being assigned to a panel, all appraisers who currently or in

12  the past have performed Appraisals on behalf of an Ameriquest

13  Party, including staff appraisers, must have their work product

14  audited for quality and compliance by the Appraisal Department or

15  by a licensed third party appraiser retained for auditing purposes.

16  The Ameriquest Parties agree to review or have reviewed, for each

17  of these appraisers, the greater of ten (10) Appraisals or fifteen

18  percent (15%) of the total number of Appraisals performed by the

19  appraiser for Refinance Loans submitted for approval during the

20  six months prior to the review.  If the total number of Appraisals

21  performed by an appraiser during that period is less than ten (10),

22  then all Appraisals performed by that appraiser during that period

23  shall be reviewed.  Whenever possible, Appraisals shall be selected

24  for review from the pool of Appraisals performed by the appraiser

25  on Refinance Loans submitted for approval and previously subject

26  to investor due diligence or pre- or post-funding reviews during the

27  period.  To the extent the number of previously reviewed

28  Appraisals is insufficient for this purpose, additional Appraisals

PERMANENT INJUNCTION AND FINAL JUDGMENT

1                shall be selected at random from the remaining previously

2                unreviewed Appraisals in the pool.  If the result of this review

3                indicates further evaluation is necessary, the Appraisal Department

4                (or Third Party Reviewer) shall conduct an additional audit of a

5                random sample of fifteen percent (15%) of Appraisals drawn from

6                those performed by the appraiser for Refinance Loans submitted

7                for approval during the year prior to this review.  Any Ameriquest

8                Party may use an appraiser who has been placed on a panel by

9                another Ameriquest Party.  No Ameriquest Party may use an

10             appraiser who fails an audit review by any Ameriquest Party.

11      **(2)**    Appraisers who have been previously disciplined by their licensing

12             authority are not eligible for inclusion on a panel.  The foregoing

13             provision shall not apply where the discipline is for reasons not

14             involving dishonesty or appraisal quality.  In the unlikely event that

15             a sufficient number of non-disciplined appraisers are not available

16             to serve a particular defined service area, an Ameriquest Party may

17             use an appraiser who has been disciplined previously by his or her

18             licensing authority but only if the discipline did not involve

19             allegations of fraud or misrepresentation, the license was not

20             suspended and the last disciplinary action was at least one year

21             prior to the proposed retention date.

22  **5.**    **Appraiser Independence.**  The Ameriquest Parties shall comply with the

23      independence standards set forth in the October 28, 2003, Independent Appraisal

24      and Evaluation Functions statement by the Office of the Comptroller of the

25      Currency, Federal Reserve Board of Governors, Federal Deposit Insurance

26      Corporation, Office of Thrift Supervision and National Credit Union Association,

27      as amended from time to time.

28

6.   **Communication of Expected Value to Appraiser Prohibited.**

   a.   There shall be no direct communication between Branch Managers or Mortgage Specialists and appraisers except for communications initiated by the appraiser in response to which the Manager or Specialist shall immediately refer the appraiser to the appropriate persons in the Appraisal Department.

   b.   In the case of Refinance Loans, no Ameriquest Party employee may identify on the Appraisal order form or communicate by any other means to any individual appraiser or firm either the Loan amount or any other express or implied statement of the anticipated or desired Appraisal value. However, the Borrower's estimated value of the property may be identified on the Appraisal order form but only if accompanied by a statement it is being provided solely to assist the appraiser in determining the relative complexity of the Appraisal and that it is not a target or expected value.

7.   **Appraisal Review.**  At the same time the completed Appraisal report is delivered (by whatever means) to the Appraisal Department, the report may be forwarded or otherwise made available to the applicable Branch Manager.

   a.   If, for the initial Appraisal only, the Branch Manager has a good faith belief that the Appraisal contains an error or is otherwise professionally deficient, the Branch Manager may submit a written or electronically transmitted request to the Appraisal Department explaining the objection and requesting the appraiser address the specific issue raised.  If the Appraisal Department agrees that a good faith basis for the review exists, either on the basis of a request from the Branch Manager or on the basis of a pre-funding review, the Appraisal Department may request in writing or by electronic transmittal the appraiser do one or more of the following:

      (1)   Consider additional appropriate information about the property, including additional comparables;

(2) Provide further detail, substantiation, or explanation for the appraiser's valuation; or

(3) Correct errors in the Appraisal. The Appraisal Department may not request that an appraiser review an Appraisal solely on the grounds that the valuation is not high enough to qualify the Potential Borrower for the proposed Loan and shall not suggest a specific value.

b. The Ameriquest Parties shall document and retain in a readily retrievable format any change in the Appraisal and the reason for the change.

8. **Second Appraisals.** If, after the review process set forth in Paragraph IV.L.7 above has been completed, the Ameriquest Party continues to believe the Appraisal is professionally deficient, that Ameriquest Party may order a second Appraisal from the next appraiser on the panel. The Ameriquest Parties may not order a second Appraisal prior to the completion of this review process; provided, however, that nothing contained herein shall prevent an Ameriquest Party from ordering two simultaneous Appraisals where a particular Loan program requires two different Appraisals. The Ameriquest Parties may also order a second Appraisal in the following cases: (a) where the appraised value of the property is within ten percent (10%) of the value necessary to make the proposed Loan, (b) where the Ameriquest Party reasonably believes the property has been damaged or has otherwise declined in value since the first Appraisal, or (c) where the Appraisal has expired before the Loan has been closed. The Ameriquest Parties shall pay the cost of any second Appraisal ordered because the appraised value was within ten percent (10%) of the value necessary to make the proposed Loan. In no event shall the Ameriquest Parties order more than two Appraisals.

9. **Appraisal Audits.** Each Ameriquest Party shall maintain a record of its Appraisal review and second Appraisal requests, retrievable by branch office, mortgage specialist and by appraiser. This record shall contain the value

1  determined by each Appraisal and the amount of any change in value resulting

2  from the review or second Appraisal.  The Ameriquest Parties shall audit an

3  appraiser's work whenever the Appraisal Department requests review of more

4  than a certain percentage of Appraisals performed by the appraiser for Refinance

5  Loans submitted for approval during a twelve (12) month period.  For those

6  appraisers with less than ten (10) Appraisals performed during a twelve (12)

7  month period, the Ameriquest Parties shall review the appraiser's work only if the

8  Appraisal Department made two or more review requests during the period.

9  An Ameriquest Party shall conduct a comprehensive review of its

10  Appraisal review process whenever the number of review requests or the number

11  of second Appraisals by the Ameriquest Party submitted during a twelve (12)

12  month period exceeds a certain percentage of the total of all first Appraisals

13  during the same period.  The exact percentages to be used to determine whether an

14  Appraisal audit is required will be established by agreement between the

15  Ameriquest Parties and the Compliance Committee no later than twelve (12)

16  months after the Effective Date.

17  **10.  Discipline/Mandatory Reporting.**  If an Ameriquest Party has a reasonable basis

18  to believe an appraiser is violating applicable laws, or is otherwise engaging in

19  unethical or unprofessional conduct, that Ameriquest Party shall refer the matter

20  to the applicable state appraiser regulatory agency, if any.  Similarly, if an

21  Ameriquest Party learns that one of its employees or agents involved in the Loan

22  production process has attempted to influence the Appraisal valuation process in

23  any manner, it shall immediately discipline the offending person, up to and

24  including dismissal.

25  **11.  Appraisal Monitoring.**  The Appraisal Department shall review twenty percent

26  (20%) of all Appraisals for Refinance Loans submitted for approval (which

27  review may be pre- or post-funding) as part of its existing internal quality control

28  procedures.  Review appraisers must be independent of Loan sales and shall be

1     assigned to review Appraisals from no more than ten (10) specific states within

2     the same geographic region.

3     **12.**    **Copies of Appraisals to Borrowers.**  A complete copy of the Appraisal (or the

4     AVM report if that was used for determining the value of the property) must be

5     provided to the Borrower.  If more than one Appraisal (or AVM report) is

6     completed, copies of all Appraisals (or AVM reports) must be provided to the

7     Borrower.

8     **13.**    **Appraiser Compensation.**  Appraisers must be timely paid for every completed

9     Appraisal regardless of whether the Loan actually closes.  The Ameriquest Parties

10     shall not pay additional or bonus compensation to an appraiser for meeting the

11     desired Appraisal value and no Ameriquest Party employee may accept

12     compensation of any kind from an appraiser or Appraisal firm for an Appraisal

13     assignment.

14     **M.**    **Stated Income Loans.**

15     **1.**    The Ameriquest Parties shall not:

16     **a.**    Inflate or fabricate, or encourage a Potential Borrower to inflate or

17     fabricate the source or amount of a Potential Borrower's actual income or

18     assets; or

19     **b.**    Sign any document on behalf of a Borrower.

20     **2.**    The Ameriquest Parties shall instruct the Independent Loan Closer to review with

21     the Potential Borrower, and require the Potential Borrower to sign, at and as a

22     condition of Closing, a statement certifying the Potential Borrower understands

23     that:

24     **a.**    The Loan has been approved based on the amount of income reported by

25     the Potential Borrower;

26     **b.**    The amount of income reported by the Potential Borrower is accurate;

27     **c.**    If the Potential Borrower's income is in fact less than the amount set forth

28     in the Loan application, the Potential Borrower understands there is a

1  significant risk that the Potential Borrower will not be able to afford the
2  Loan and may lose their home through foreclosure or be forced into
3  bankruptcy; and
4      **d.**    Any false statements may subject the Potential Borrower to criminal
5          penalties.
6  **3.**  The Ameriquest Parties shall maintain a record of those applications that are
7      originally submitted as full document or limited document (also called Fast Trac)
8      Loans that are subsequently approved as Stated Income Loans.
9  **4.**  The Underwriting guidelines employed by the Ameriquest Parties shall require the
10     amount of stated income be reasonable for the occupation and experience claimed.
11 **5.**  If a Stated Income Loan is based upon self-employment or a home-based business,
12     the Ameriquest Parties shall request evidence of the existence of the business.
13 **N.**  **Employee Compensation Programs.**  The compensation system employed by an
14 Ameriquest Party may not provide incentives that encourage its employees: (1) to include a
15 Prepayment Penalty provision in a Loan, (2) to quote a Potential Borrower an interest rate
16 inconsistent with the Same Rate Available provision of this Judgment, or (3) to otherwise
17 increase compensation based on Loan fees or Closing costs.
18 **O.**  **Quotas.**  The Ameriquest Parties may not require its employees to complete an
19 unreasonable minimum number of Loan applications or Loan Closings per month or other time
20 period where the result is that employees violate any provision of this Judgment or the law.  No
21 branch, regional or area sales manager may establish a quota system separate from that
22 established by an Ameriquest Party; provided, however, nothing in this Judgment shall prohibit
23 regional, area or branch managers from conducting reasonable sales or incentive contests.
24 **P.**  **Whistleblower Policies and Procedures.**  The Ameriquest Parties shall adopt
25 written policies and procedures to facilitate reporting of suspected improper conduct by
26 Ameriquest Party employees.  Each Ameriquest Party shall provide a copy of these policies and
27 procedures, including the name, address and telephone number of a manager designated by that
28 Ameriquest Party to receive reports of suspected improper conduct, to all current employees and

1   all newly hired employees at the time of their employment.  These policies and procedures shall

2   include provisions to:

3          **1.**    Encourage the reporting of suspected improper conduct;

4          **2.**    Take reasonable steps to preserve the anonymity of the whistleblower to

5                 the maximum extent practical;

6          **3.**    Investigate the allegations of suspected improper conduct and report the

7                 results of that investigation to senior management; and

8          **4.**    Protect the whistleblower from retaliation.

9   **Q.**    **Employee Training.**

10   **1.**    Ameriquest Party branch employees shall complete a training course appropriate

11        to the duties and responsibilities of each employee, which shall include:

12        **a.**    A discussion of the Ameriquest Party's obligations under this Judgment

13              and a written summary of the Judgment provided to each trainee;

14        **b.**    A discussion of the purpose and general prohibitions of state unfair or

15              deceptive acts or practices statutes as they relate to secured real estate

16              mortgage lending.

17   **2.**    Newly hired Sales Personnel shall complete a training course which shall include,

18        in addition to the elements described above, basic training in mortgage lending

19        and in ethical sales practices.

20   **3.**    The General Counsel of ACCCH shall discuss with each of ACCCH's and the

21        Ameriquest Parties' officers and directors their respective general duties and

22        responsibilities as they relate to the real estate secured mortgage lending activities

23        of ACCCH or the Ameriquest Party with which they are associated and provide

24        each of them with a written summary of this Judgment.

25   **4.**    Each employee required to complete the training courses referred to in Paragraphs

26        IV.Q.1-2 above, and each officer and director of ACCCH and each Ameriquest

27        Party shall execute a form, which shall be maintained in a readily retrievable

28        format by ACCCH or the applicable Ameriquest Party, acknowledging:

1         **a.**    Completion of the training or discussion with the ACCCH Counsel, as the

2                 case may be;

3         **b.**    They have received, read and understand the Ameriquest Party's

4                 obligations under this Judgment as set forth in the above-referenced

5                 written summary;

6         **c.**    They understand that violations of applicable state and federal laws may

7                 subject them to individual liability and judicial or administrative sanction;

8                 and

9         **d.**    They understand that violations of applicable state and federal laws may

10                subject the Ameriquest Party to liability and judicial or administrative

11                sanction.

12   **R.**    **No Coordination with Debt Collectors.**  Neither the Ameriquest Parties nor its

13   employees may compensate Debt Collectors for providing referrals nor may the Ameriquest

14   Parties or its employees work in concert with Debt Collectors to pressure a Potential Borrower to

15   obtain a Loan from an Ameriquest Party.  Nothing in this Section IV.R shall prohibit the

16   Ameriquest Parties from purchasing bulk mailing lists from Debt Collectors or receiving

17   uncompensated referrals from Debt Collectors, whether or not solicited.

18   **S.  Other Provisions.**

19       **1.**    The Ameriquest Parties shall, for loans being made under the license issued to any

20             of them pursuant to the California Finance Lenders Law ("CFLL," as codified at

21             sections 22100 et seq. of the California Financial Code), refund appraisal fees to

22             Potential Borrowers in instances where (i) the loan was denied and there was no

23             failure on the part of the Potential Borrower to disclose outstanding liens and/or to

24             provide other essential information, and/or (ii) Potential Borrowers canceled their

25             loan during the cancellation period provided for under TILA.

26       **2.**    The Ameriquest Parties shall not, for loans being made pursuant to licenses issued

27             under the CFLL, charge Borrowers fees for returned and/or dishonored checks,

28

1    negotiable orders of withdrawal and/or share drafts in excess of the amount

2    provided for in section 22320 of the California Financial Code.

3    **3.**    The Ameriquest Parties shall maintain records as required by section 22156 of the

4    California Financial Code and the California Code of Regulations, title 10,

5    sections 1425 and 1435.

6    **V. ADMINISTRATION**

7    **A.**    **State Settlement Administration and Compliance Committee.**  Within fifteen

8    (15) days of the Effective Date, the Settling States shall designate a State Administration and

9    Compliance Committee (the "Compliance Committee").  The Compliance Committee shall serve

10    as the Settling States' representative in the administration of this Judgment and the monitoring of

11    compliance with it by ACCCH and the Ameriquest Parties.

12    **B.**    **Claims Process.**  Subject to the provisions of this Judgment pertaining to

13    Sub-Fund A, each Settling State shall determine the procedures to provide notice and distribute

14    restitution to its eligible Borrowers.

15    **C.**    **Procedures for Administration.**

16    **1.**    Within ninety (90) days of the Effective Date, the Ameriquest Parties, in

17    consultation with the Compliance Committee, shall choose and retain an

18    Administrator ("the Administrator") to administer the distribution of restitution

19    payments under this Judgment.  The Administrator shall be deemed appointed and

20    the contract approved unless within fifteen (15) days of receipt of the proposed

21    contract identifying the proposed Administrator, more than one-third (1/3) of the

22    number of the Settling States object to the appointment.

23    **2.**    Subject to the limitations of Section IV above, each Settling State shall determine

24    the criteria, procedures and manner of allocation and distribution of restitution to

25    the eligible Borrowers in that State and may direct the Administrator with respect

26    to these matters.

27    **3.**    ACCCH or the Ameriquest Parties shall pay to the Settlement Fund an amount

28    sufficient to pay the Administrator's reasonable fees and expenses, including

1    attorneys' fees and costs of litigation, if any, related to maintaining the

2    confidentiality of customer and proprietary information; provided, however, that

3    in no event shall the total of fees, expenses and costs of administration exceed

4    Seven Million Five Hundred Thousand Dollars ($7,500,000). From time to time,

5    as the Settlement Fund incurs administrative costs, it shall render an invoice of the

6    reasonable costs incurred to ACCCH or the Ameriquest Parties and ACCCH or

7    the Ameriquest Parties shall, within thirty (30) days of receipt, transfer that

8    amount to the Settlement Fund for payment to the Administrator. Any

9    unexpended portion of this amount at the termination of the administration of this

10   Judgment shall revert to ACCCH or the Ameriquest Parties.

11   **4.**    The Ameriquest Parties shall provide to the Administrator all information

12   reasonably necessary for the administration of this Judgment within a reasonable

13   time not to exceed thirty (30) days after receipt of the request for information.

14   The Ameriquest Parties shall be ordered to provide this information under 15

15   U.S.C. § 6802(e) (1)(A), (5) and (8) of the Gramm-Leach-Bliley Act. Information

16   pertaining to individual eligible Borrowers, including names and other identifying

17   information may be provided to the State but only if:

18   **a.**    The information is used solely for the purpose of contacting eligible

19   Borrowers concerning the award of restitution under this Judgment;

20   **b.**    The information consists solely of identifying information about eligible

21   Borrowers who have failed to respond to two or more written notices

22   about the restitution offer; and

23   **c.**    Any personal identifying information related to a Borrower provided to the

24   State shall be considered non-public, confidential data not subject to

25   disclosure under  California Public Records Act, Cal. Gov. Code §§ 6250

26   *et seq.*

27   **D.**    **Warranties.** The Ameriquest Parties shall warrant to the State at the time of

28   supplying information to the Administrator that the information is complete and accurate. If the

36

PERMANENT INJUNCTION AND FINAL JUDGMENT

1  Ameriquest Parties supply information that is incomplete or inaccurate and that results in an

2  eligible Borrower receiving no restitution or less restitution than that Borrower otherwise would

3  have been entitled to receive under California's restitution plan if complete and accurate

4  information had been provided, the Ameriquest Parties shall pay the difference between the

5  restitution received by the Borrower, if any, and the amount that should have been paid had

6  complete and accurate information been provided.  The Ameriquest Parties and Plaintiff mutually

7  warrant to the other that the individuals executing the Stipulation for entry of this Judgment are

8  duly authorized to do so and that, as a result of their execution, this Judgment shall be

9  enforceable against any party.

10      **E.**      **Onsite Inspections.**  The Administrator shall permit reasonable onsite inspection

11  by the Settling States on the premises of the Administrator to monitor administration of this

12  Judgment.

13      **F.**      **Taxes.**  Income taxes, if any, on income earned by the Administrator on funds

14  held temporarily by the Administrator pending distribution as restitution shall be paid out of the

15  income earned by those funds.

16      **VI.  COMPLIANCE MONITORING**

17      **A.**      **Implementation Timeline.**  The Ameriquest Parties shall implement the changes

18  required by this Judgment as soon as reasonably feasible but not later than March 15, 2007.

19      **B.**      **Ameriquest Parties' Internal Monitoring.**  No later than ninety (90) days after

20  the Effective Date, the Ameriquest Parties shall implement a program of internal monitoring to

21  insure its compliance with this Judgment.  This program shall include, at a minimum, periodic

22  on-site visitation of branch offices, and a Mystery Shopping program (except for AMC), all

23  designed to test the Ameriquest Parties' employees' compliance with this Judgment and the

24  Ameriquest Parties' policies and procedures regarding the Loan origination and funding  process.

25      **C.**      **Customer Satisfaction Monitoring in Welcome Calls.**  The Ameriquest Parties

26  will attempt to contact, by telephone, each Borrower as his or her Loan is transferred to Loan

27  servicing.  During such calls, Loan servicing personnel will review the Borrower's Loan terms

28  with Borrowers and assess their overall satisfaction with the Loan origination and funding

1  process. When material deficiencies or problems with the Loan origination or funding process

2  are identified, the matter will be promptly referred to a complaint resolution unit.

3      **D.    Appointment of an Independent Monitor.**  The Compliance Committee and the

4  Ameriquest Parties shall agree on the appointment of an independent Monitor (hereafter the

5  "Monitor") to oversee compliance with the provisions of this Judgment by the Ameriquest

6  Parties. In the event the parties fail to reach agreement on a Monitor within ninety (90) days after

7  the Effective Date, the Compliance Committee shall appoint a Monitor.

8      Within thirty (30) days after the appointment of the Monitor, the Compliance Committee

9  and the Ameriquest Parties shall agree with the Monitor on a proposed work plan and contract,

10  which shall include all reasonable and necessary costs of the Monitor. If the Monitor, the

11  Compliance Committee and the Ameriquest Parties fail to reach agreement within that time, the

12  Compliance Committee shall determine a fair and reasonable work plan and contract in

13  consultation with the Ameriquest Parties and the Monitor.

14      In the event of any dispute arising over the Monitor's performance or the reasonableness

15  of the Monitor's costs and fees, either an Ameriquest Party or the Monitor may request the

16  Compliance Committee arbitrate the dispute. In such event, the determination of the Compliance

17  Committee shall be final.

18      **E.    Costs of the Monitor.**  ACCCH or AMQ shall pay all reasonable and necessary

19  costs of the Monitor. Reasonable and necessary costs shall be limited to those set out in the

20  Monitor Contract, but in no event shall they exceed Two Million Dollars ($2,000,000) per

21  calendar year. The Ameriquest Parties and the Compliance Committee may agree to the

22  performance of additional necessary work by the Monitor in an amount not to exceed One

23  Million Five Hundred Thousand Dollars ($1,500,000) for the entire Monitoring period.

24  Agreement for any additional work shall not be unreasonably withheld.

25      **F.    Powers of the Monitor.**

26      **1.**    The Monitor shall have broad discretion to review the Ameriquest Parties'

27          operations to ensure that each of them complies with the terms of this Judgment.

28

1        The Monitor shall have all powers reasonable and necessary to efficiently and

2        effectively discharge its responsibilities under this Judgment.

3    **2.**    The Ameriquest Parties shall provide the Monitor access to all documents

4        necessary to permit the Monitor to fulfill its duties in a manner, format and time

5        frame convenient to the Monitor. Similarly, the Ameriquest Parties shall provide

6        the Monitor with reasonable access to their employees as the Monitor reasonably

7        determines necessary to fulfill its duties under this Judgment. The Ameriquest

8        Parties shall make its employees available for interview, either telephonic or

9        in-person, within seven (7) business days of the Monitor's request. Any customer

10       or proprietary information provided to the Monitor shall remain the sole property

11       of the Ameriquest Parties and shall be treated as confidential information, subject

12       to the provisions of Section VI.H and Section VIII.F.

13   **3.**    For Loan sampling purposes, the Monitor shall request the number of Loans

14       needed for a ninety-five percent (95%) confidence level, with an error tolerance of

15       plus or minus five percent (5%).

16   **4.**    The Ameriquest Parties shall provide the Monitor with private workspace and

17       access to a photocopier whenever the Monitor makes inspections of the

18       Ameriquest Parties' documents, files and other materials.

19   **G.**    **Oversight and Compliance.** The Monitor shall issue a report (hereafter

20  "Report") to the Compliance Committee for the periods ending December 31, 2006; June 30,

21  2007; December 31, 2007; December 31, 2008; December 31, 2009; and December 31, 2010.

22  Each report is due three (3) months after the close of the period covered by the Report. A copy

23  of the Report shall be submitted simultaneously to undersigned counsel for the Ameriquest

24  Parties. The Report shall include:

25   **1.**    The Monitor's evaluation of the Ameriquest Parties' compliance with this

26       Judgment; and

27   **2.**    The factual basis for the Monitor's conclusions.

28

PERMANENT INJUNCTION AND FINAL JUDGMENT

1    The Monitor shall confer with the Ameriquest Parties and the Compliance Committee

2  prior to issuing each Report.

3    **H.    Use of the Monitor's Reports.**  The Monitor's Reports and testimony may be

4  used by Plaintiff, ACCCH or the Ameriquest Parties in any court hearing, trial or other

5  proceeding relating to this action, and the Reports shall be admissible into evidence if there is an

6  alleged violation of this Judgment.  The Monitor's Report and testimony with respect to any

7  particular alleged violation shall not be admissible or used in any such proceeding by the State if

8  the Ameriquest Parties have cured to the reasonable satisfaction of the State the alleged violation

9  within a reasonable time, which shall be no fewer than thirty (30) days and no more than ninety

10  (90) days after receipt of the report.  Provided, however, that the Ameriquest Parties shall not be

11  afforded an opportunity to cure for the purpose of preventing the State from using the Monitor's

12  Report and testimony when the violation of the same injunctive provision is found to have

13  occurred in over ten percent (10%) of the Loan transactions reviewed by the Monitor in any one

14  state in more than one Report.  Subject to the California Public Records Act, Cal. Gov. Code §§

15  6250 *et seq.*, the Monitor's Reports shall not be disclosed to any private party without fifteen (15)

16  days prior notice to the Ameriquest Parties, to permit the Ameriquest Parties adequate

17  opportunity to object to their disclosure.  The Ameriquest Parties' remedy against the State for

18  any violation of this fifteen (15) day prior notice requirement is limited to seeking return of the

19  documents from the private party.

20    Nothing in this Judgment limits the right of the State to conduct investigations or

21  examinations independent of the work of the Monitor.

22    **I.    Retention of Documents.**  The Ameriquest Parties shall generate, retain and

23  make readily available to the State for inspection, upon reasonable notice and without the

24  necessity of a subpoena or other legal process, all material records and documents reasonably

25  necessary to document compliance with this Judgment.  The Ameriquest Parties shall maintain

26  these records and documents for a minimum of five (5) years after the Monitor's final Report.

27  ///

28  ///

## VII. RELEASES

**A.    Release from Borrowers.** Each Borrower who receives a payment from the Settlement Fund shall first execute the following release (which shall be provided to Borrowers in both English and Spanish):

"'We' and 'our' mean the Borrowers under the Loan account number(s) listed above. If there is only one Borrower, these terms refer to that single Borrower. The 'Ameriquest Parties' are Ameriquest Mortgage Company, Town and Country Credit Corporation, Ameriquest Mortgage Services, Inc., formerly known as Bedford Home Loans, ACC Capital Holdings Corporation and their respective (i) predecessors, past, present and future direct and indirect parents, owners, subsidiaries, affiliated and other related persons or entities of any kind (be they corporations, partnerships, trusts, individuals), including the successors and assigns of any of the foregoing, and (ii) all past, present and future owners, employees, officers, agents, directors, insurers, and any other representatives of all the foregoing, including, for natural persons, both in their official and individual capacities.

By our signatures(s) below we acknowledge that we have read the following release and are bound by its terms. In consideration for the restitution payment we are to receive, we release the Ameriquest Parties from all civil claims, causes of action, any other right to obtain any type of monetary damages (including punitive damages), expenses, attorneys' and other fees, rescission, restitution or any other remedies of whatever kind at law or in equity, in contract, in tort (including, but not limited to, personal injury and emotional distress), arising under any source whatsoever, including any statute, regulation, rule, or common law, whether in a civil, administrative, arbitral or other judicial or non-judicial proceeding, whether known or unknown, and whether or not alleged, threatened or asserted by us or by any other person or entity on my/our behalf, including any currently pending or future purported or certified class action in which I/we am/are now or may hereafter become a class member, that arise from or are related to the following lending practices engaged in by the Ameriquest Parties, during the period from January 1, 1999 through December 31, 2005, in connection with the Loan account numbers listed above:

1    All representations, misrepresentations, disclosures or any other acts, events, facts,

2    transactions, occurrences, omissions or conduct, whether oral, written or otherwise, by the

3    Ameriquest Parties, arising out of, in connection with or relating to any of the following:

4    1.    Loan types and terms, including discount points, interest rates, origination-related

5        fees, monthly payment amounts, terms of adjustable rate and fixed rate mortgages

6        and prepayment penalties.

7    2.    Written disclosures, including the Good Faith Estimate, other documents required

8        to be provided to a Potential Borrower by any law or otherwise provided by an

9        Ameriquest Party.

10    3.    The Borrower benefits of obtaining a loan from an Ameriquest Party or from a

11        repeat refinancing with an Ameriquest Party.

12    4.    Coordination with debt collectors.

13    5.    The timely completion of the underwriting functions and funding of a loan.

14    6.    Closing of a loan.

15    7.    Appraisals.

16    8.    Stated income loans.

17    9.    Disclosures to non-English speaking Borrowers and Potential Borrowers.

18    **Additionally,** we have read and understand Section 1542 of the California Civil Code

19    ("Section 1542"), which provides:

20    "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE

21    CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER

22    FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF

23    KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS

24    OR HER SETTLEMENT WITH THE DEBTOR."

25    **Notwithstanding** the above-stated provisions of Section 1542, in order to give a full and

26    complete release and discharge to the Ameriquest Parties, we, knowingly and voluntarily,

27    expressly waive all rights afforded to us under the provisions of Section 1542. We expressly and

28    specifically intend for this Release to include in its effect all the claims described above that we

1   had or might have had against any of the Ameriquest Parties at any time on or prior to the date of

2   our signing this Release, even if we neither knew nor suspected the existence of those claims at

3   that time. This is our intent even if, had we known or suspected the existence of any claims at

4   that time, any such knowledge or suspicion would or might have materially affected our decision

5   to grant this release to the Ameriquest Parties.

6       **Also notwithstanding** this release, we may affirmatively or defensively assert any claim

7   or defense that we have with respect to my loan with an Ameriquest Party in response to a

8   judicial or threatened non-judicial foreclosure, including those related to the lending practices

9   listed in this release."

10      **B.    Release from the State.** The relief to be provided by ACCCH and the

11  Ameriquest Parties resolves all civil and administrative investigations and proceedings, if any,

12  including those that are pending or closed, that have been or could have been brought by the

13  State against the Ameriquest Parties, as defined in the "Release from Borrowers" set forth above,

14  based upon the Lending Practices with respect to the Covered Transactions. This release is

15  effective so long as restitution and other payments required under the terms of this Judgment are

16  timely made. However, this release does not include a waiver or release of any civil or

17  administrative claims, regulatory matters, or causes of action relating to any practices, acts or

18  omissions by any Ameriquest Party that are not based upon the Lending Practices with respect to

19  the Covered Transactions.

20  **VIII.  MISCELLANEOUS**

21      **A.    State Authority.** The relief provided in this Judgment, including all payments by

22  ACCCH or by the Ameriquest Parties, to the Settlement Fund or any accounts established by this

23  Judgment, is in response to and in compliance with the State of California's authority to regulate

24  ACCCH and the Ameriquest Parties and the State of California's police powers.

25      **B.    Removal of the Administrator or the Monitor.** The Settling States reserve the

26  right to remove and replace the Monitor or Administrator upon approval of two-thirds (2/3) of

27  the number of the Settling States.

28

1       **C.     Compliance with State and Federal Law and Prior Agreements.**  Nothing in

2   this Judgment shall relieve the Ameriquest Parties of their obligation to comply with applicable

3   California and federal law.  Where California statutes or regulations, letters of understanding or

4   agreements with the Ameriquest Parties, entered into and in force with the Department of

5   Corporations, Office of the Attorney General, or any of the District Attorneys provide greater

6   consumer protections than the terms or provisions included in this Judgment, then those statutes,

7   regulations, letters of understanding or agreements with the Ameriquest Parties shall govern.

8       **D.     Modification of Judgment.**  This Judgment may be modified only by order of

9   this Court.  After making a good faith effort to obtain the concurrence of the other party for the

10  requested relief, which concurrence shall not be unreasonably withheld, the party seeking

11  modification may petition the Court for modification of the terms and conditions of this

12  Judgment.

13      **E.     Limitation on Use of Information from the Ameriquest Parties.**  This

14  Judgment and any information provided by the Ameriquest Parties in the course of negotiating

15  the Judgment shall not be used by the State as the basis for the denial, revocation, suspension or

16  non-renewal of, or imposition of any condition on, any license, authorization, approval or

17  consent that ACCCH or an Ameriquest Party may now have, or may hereafter seek to obtain

18  under the State of California's lending, banking, insurance or similar financial laws or

19  regulations, except as expressly provided in this Judgment.

20      **F.     Disclosure of Information.**  If the Office of the California Attorney General,

21  Department of Corporations, or any of the District Attorneys, receives a request for documents

22  provided by an Ameriquest Party relating to the subject matter of this Judgment, the Monitor's

23  Reports, or information obtained by the Administrator or Monitor in connection with this

24  Judgment, the office receiving the request for documents shall comply with applicable public

25  disclosure laws and promptly provide notice to the Ameriquest Parties of the request that will

26  afford the Ameriquest Parties the reasonable opportunity to assert that the documents subject to

27  the request are exempt from disclosure.

28

1    **G.    No Disqualification to Do Business.**  This Judgment is not intended to disqualify

2    ACCCH or the Ameriquest Parties from engaging in any business in California.  Further, this

3    Judgment is not intended to have any effect upon the existing ACCCH or Ameriquest Party

4    licenses in California.  This Judgment may not be used as any basis for the denial, revocation,

5    suspension or non-renewal of, or imposition of any condition on, any license, authorization,

6    approval or consent that ACCCH or an Ameriquest Party may now have or hereafter may seek

7    under California law.

8    **H.    Judgment Enforceable Only By the Parties.**  This Judgment may only be

9    enforced by the Parties.  This Judgment shall not be interpreted to alter the contractual terms of

10   any Loan agreement that any Borrower has with any of the Ameriquest Parties, or constitute a

11   novation of any Loan agreement, except as expressly provided in this Judgment.  This Court shall

12   retain jurisdiction to enforce the terms and conditions of this Judgment.

13   California may not bring an action to enforce this Judgment without first notifying

14   ACCCH and the Ameriquest Parties in writing of Plaintiff's intent to file and of the alleged

15   violations, specifically citing the applicable provisions of the Judgment on which the proposed

16   action is to be based.  This notice shall be no less than fifteen (15) days prior to filing the action.

17   **I.    Submission to Jurisdiction for Limited Purpose.**  ACCCH and the Ameriquest

18   Parties submit to the jurisdiction of this Court for the limited purpose of entering into and

19   enforcing this Judgment only.  Any acts, conduct or appearance by ACCCH or the Ameriquest

20   Parties shall not constitute or be construed as a submission to the general jurisdiction of any court

21   or non-judicial forum in California for any purpose whatsoever.

22   **J.    Conflict with Subsequent Law.**  In the event that any law conflicts with any

23   provision of this Judgment, making it impossible for ACCCH or the Ameriquest Parties to

24   comply both with the law and with the provisions of this Judgment, the provisions of the law

25   shall govern.

26   **K.    No Third Party Beneficiaries Intended.**  This Judgment is not intended to

27   confer upon any person any rights or remedies, including rights as a third party beneficiary.

28   **L.    Service of Notices and Process.**  Service of notices and process required by this

PERMANENT INJUNCTION AND FINAL JUDGMENT

1  Judgment, or its enforcement shall be served on the following persons, or any person

2  subsequently designated by the parties:

3        For ACCCH and the Ameriquest Parties:   ACC Capital Holdings Company
                                          1100 Town & Country Road

4                                            Orange, California 92868
                                          Attn: Thomas J. Noto, Esquire

5                                            Executive Vice President and
                                          General Counsel

6                                            Fax: (714) 479-0406

7

8        For the Settling States:                   Iowa Office of the Attorney General
                                            Consumer Protection Division

9                                            Hoover State Office Building
                                          Des Moines, Iowa 50319

10                                           Attn: Patrick Madigan, Esquire
                                          Assistant Attorney General

11                                           Fax: (515) 281-6771

12       For California:                          Benjamin G. Diehl, Esq.
                                            Deputy Attorney General

13                                           Office of the Attorney General
                                          300 S. Spring St.

14                                           Los Angeles, CA 90013
                                          Fax: (213) 897-5548

15

16                                           Judy L. Hartley, Esq.
                                          Senior Corporations Counsel

17                                           California Department of Corporations
                                          320 W. 4th Street, Ste. 750

18                                           Los Angeles, California 90013-2344
                                          Fax: (213) 576-7181

19

20       **M.**      **Waiver/Construction.** The failure of any party to exercise any rights under this

21 Judgment shall not be deemed a waiver of any right or any future rights. If any part of this

22 Judgment shall for any reason be found or held invalid or unenforceable by any court of

23 competent jurisdiction, such invalidity or unenforceability shall not affect the remainder of this

24 Judgment, which shall survive and be construed as if such invalid or unenforceable part had not

25 been contained herein.

26 ///

27 ///

28

## **ORDER AND JUDGMENT**

NOW, THEREFORE, based upon the advice and stipulation of the parties, and good cause appearing,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED, AS FOLLOWS:

A.    Upon agreement of the parties, this Court hereby enters this Permanent Injunction and Final Judgment.

B.    This Court shall retain jurisdiction to enforce the terms and conditions of this Judgment.

Date:  3/21/06

Judge, California Superior Court

PERMANENT INJUNCTION AND FINAL JUDGMENT

# IMPORTANT NOTICE OF LOAN TERMS OFFERED
## BY [COMPANY]
### Date of this Notice: _____

The **TOTAL AMOUNT** of your proposed mortgage loan is $_____.

Your loan amount includes **TOTAL LENDER FEES of (BOLD/UNDERLINED) $**

[For fixed-rate loans]  Your **MONTHLY PAYMENTS** of principal and interest will be $ _____ for the life of your loan.

[For ARM loans]  Your **MONTHLY PAYMENTS** of principal and interest will be $ ___ for the first ___ [initial adjustment term], after which they may increase as your loan interest rate adjusts.

[As applicable: This amount does **NOT** include the cost of your property taxes and homeowner's insurance]

**[For fixed rate loans]**

Ameriquest is offering you a loan at _____**% INTEREST**.

**[For ARM loans]**

[Company] is offering you a loan starting at _____**% INTEREST**.

This loan is a fixed rate loan for [initial adjustment term].  After that the rate may adjust.  This means that after the initial period, your interest rate and loan payments can go up every [subsequent adjustment period], depending on market rates.  [As applicable: The rate will not ever go lower than _____%.]

This loan has a **PREPAYMENT PENALTY**.  This means that if you were to prepay your loan in full within [term], you could pay a charge as high as $_____.

Ameriquest is charging you $_____ **(BOLD/UNDERLINED)** in loan **DISCOUNT POINTS**, which lowers the interest rate on your loan.  You may choose a loan with fewer discount points and a higher interest rate.  Below is a comparison:

| <u>**Loan as Presented**</u> | | <u>**WITH FEWEST DISCOUNT POINTS**</u> | |
|---|---|---|---|
| Loan Amount | _____ | Loan Amount | _____ |
| Current Interest Rate | _____ | New Interest Rate | _____ |
| Discount Points ____% $ | _____ | Discount Points ____% $ | _____ |
| Monthly Payment | _____ | Monthly Payment | _____ |

**Please contact your Ameriquest mortgage specialist if you have questions about this loan proposal.**

EX A